# Exhibit <u>1</u>

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-----------------------------------------------------------------------------x

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH
LLC, SECOND SOURCE FUNDING LLC, DALMAO, INC. and
SHMUEL CHANIN,

                                                Plaintiffs,

        - against -

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC,
COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, LLC, CYNERGY
EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE
CYNERGY, INC., PIPELINE DATA, INC., RANDY McCOY,  KIM
FITZSIMMONS, SHEILA CORVINO,  MARCELO PALADINI,GUSTAVO
CEBALLOS, ANDRES ORDONEZ, STEPHEN ASCHETTINO, DEAN M.
LEAVITT, JAFFE RAITT HEUR & WEISS P.C, HOLLI HART TARGAN,
NIXON PEABODY LLP., FRANK PENSKI, MARK N. BERMAN,
UNICORN PARTNERS LLC, JOHN MARTILLO, 6M INVESTMENT, LP,
MERCHANT PROCESSING SYSTEMS CORP., OLEG FIRER, LEON
GOLDSTEIN, VLADIMIR SADOVSKY, MERCHANT CAPITAL
PORTFOLIO LLC, NEW EDGE PAYMENTS, LLC, PROCESS PINK
PAYMENTS LLC, and UNIFIED PAYMENTS, LLC,

                                                Defendants.

-----------------------------------------------------------------------------x

**Index No: 502672/2012**

**Summons with Verified Complaint**

*Plaintiffs designate Kings County as the place of trial. The basis of venue is that Plaintiffs and Defendants transact significant business in this County.*

TO:     TO EACH DEFENDANT
        ON ATTACHED LIST AS MARKED

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: August 25, 2012

                                        By: Mitchell C. Shapiro, Esq.

Notice: The object of this action is to
        recover for breach of contract and
        tortious interference with contract and
        business relationships.
The relief sought is Monetary Damages
and Equitable Relief.

SHAPIRO TAMIR LAW GROUP PLLC
Attorneys for Plaintiffs
245 West 17th Street, 5th Floor
New York, NY 10011
(T)  212.444.9970
(F)  212.444.9971
(E)  comvestcase@shapirotamirlaw.com
(W)  www.shapirotamirlaw.com

*Upon your failure to appear, judgment will be taken against you by default, with interest and the costs of this action.*

*This SUMMONS AND COMPLAINT and the papers on which it is based, are certified pursuant to Section 130-1.1-a of the rules of the Chief Administrator (22 NYCRR §130-1.1-a)*

1.  THE COMVEST GROUP
    aka COMVEST GROUP HOLDINGS, LLC
    CORPORATION SERVICE COMPANY
    80 STATE STREET
    ALBANY, NEW YORK, 12207-2543

2.  COMVEST CYNERGY HOLDINGS, INC.
    NATIONAL REGISTERED AGENTS, INC.
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

3.  PIPELINE CYNERGY HOLDINGS, LLC,
    NATIONAL REGISTERED AGENTS, INC.
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

4.  CYNERGY EQUITY HOLDINGS, LLC,
    NATIONAL REGISTERED AGENTS, INC.
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

5.  CYNERGY EQUITY HOLDINGS, INC.,
    NATIONAL REGISTERED AGENTS, INC.
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

6.  CYNERGY DATA, INC.
    NATIONAL REGISTERED AGENTS, INC.
    SUITE 501
    875 AVENUE OF THE AMERICAS
    NEW YORK, NEW YORK, 10001

7.  PIPELINE CYNERGY, INC.,
    NATIONAL REGISTERED AGENTS, INC.
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

8.  PIPELINE DATA, INC.
    3 W MAIN ST
    PO BOX 300
    BRASNER FALLS, NEW YORK, 13613-0300

    PIPELINE DATA INC.
    4400 NORTH POINT PARKWAY
    STE 295
    ALPHARETTA, GEORGIA, 30022

9.  RANDY McCOY,
    c/o Pipeline Data Inc.
    4400 NORTH POINT PARKWAY
    STE 295
    ALPHARETTA, GEORGIA, 30022

10. KIM FITZSIMMONS
    c/o Pipeline Cynergy Holdings, LLC
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

11. SHEILA CORVINO
    c/o Pipeline Cynergy Holdings, LLC
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

12. MARCELO PALADINI
    1100 BISCAYNE BLVD UNIT 3905
    MIAMI, FL 33132-1749
    MIAMI-DADE COUNTY

13. GUSTAVO CEBALLOS
    531 N MONROE ST UNIT N
    RIDGEWOOD, NJ 07450-1410
    BERGEN COUNTY

14. ANDRES ORDONEZ
    2132 PLANTATION CT
    LAWRENCEVILLE, GA 30044-3743
    GWINNETT COUNTY

15. STEPHEN ASCHETTINO
    c/o ASCHETTINO STRUHS L.L.P.
    1120 AVENUE OF THE AMERICAS
    FOURTH FLOOR
    NEW YORK, NEW YORK, 10036

16. DEAN M. LEAVITT
    c/o MANDELL MANDELL OKIN &
    EDLEMAN LLP
    ATTN: GLEN S EDELMAN ESQ
    3000 MARCUS AVE
    LAKE SUCCESS, NEW YORK,
    11042

18.  HOLLI HART TARGAN
     c/o JAFFE RAIT HEUR & WEISS P.C
     27777 FRANKLIN ROAD SUITE 2500
     SOUTHFIELD   MI 48034-8214

19.  NIXON PEABODY LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

20.  FRANK PENSKI
     c/o NIXON PEABODY LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

21.  MARK N. BERMAN
     c/o Nixon Peabody LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

22.  UNICORN PARTNERS LLC
     c/o MANDELL MANDELL OKIN & EDLEMAN LLP
     ATTN: GLEN S EDELMAN ESQ
     3000 MARCUS AVE
     LAKE SUCCESS, NEW YORK, 11042

23   JOHN MARTILLO
     c/o 6M INVESTMENT, LP
     5500 Preston Rd. Ste 250
     Dallas, TX 75205-2699

24.  6M INVESTMENT, LP
     5500 Preston Rd. Ste 250
     Dallas, TX 75205-2699

25.  MERCHANT PROCESSING SYSTEMS CORP.
     d/b/a MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

26.  OLEG FIRER
     c/o Unified Payment, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

27.  LEON GOLDSTEIN
     c/o MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

28.  VLADIMIR SADOVSKY
     c/o MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

29.  MERCHANT CAPITAL
     PORTFOLIO LLC,
     Att: Star Capital Management LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

30.  NEW EDGE PAYMENTS, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

31.  PROCESS PINK PAYMENTS LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

32.  UNIFIED PAYMENTS, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

33.  JAFFE RAIT HEUR &
     WEISS P.C
     27777 FRANKLIN ROAD
     SUITE 2500
     SOUTHFIELD   MI 48034-
     8214

To: MARK N. BERMAN

The enclosed summons and complaint, or summons and notice, or notice of petition and petition are served pursuant to section 312-a of the Civil Practice Law and Rules.

To avoid being charged with the expense of service upon you, you must sign, date and complete the acknowledgement part of this form and mail or deliver one copy of the completed form to the sender within thirty (30) days from the date you receive it. You should keep a copy for your records or your attorney. If you wish to consult an attorney, you should do so as soon as possible before the thirty (30) days expire.

If you do not complete and return the form to the sender within thirty (30) days, you (or the party on whose behalf you are being served) will be required to pay expenses incurred in serving the summons and complaint, or summons and notice, or notice of petition and petition in any other manner permitted by law, and the cost of such service as permitted by law will be entered as a judgment against you.

If you have received a complaint or petition with this statement, the return of this statement and acknowledgement does not relieve you of the necessity to answer the complaint or petition. The time to answer expires twenty (20) days after the day you mail or deliver this form to the sender. If you wish to consult with an attorney, you should do so as soon as possible before the twenty (20) days expire.

If you are served on behalf of a corporation, unincorporated association, partnership or other entity, you must indicate under your signature your relationship to the entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

It is a crime to forge a signature or to make a false entry on this statement or on the acknowledgement

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X
TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC,
TRIBUL CASH LLC, SECOND SOURCE FUNDING
LLC, DALMAO, INC. and SHMUEL CHANIN,

                        Plaintiffs,

             -against-                     Index No.     2-ᶜaˉ¹/-

THE COMVEST GROUP aka COMVEST GROUP
HOLDINGS, LLC, COMVEST CYNERGY HOLDINGS,
INC., PIPELINE CYNERGY HOLDINGS, LLC, CYNERGY             VERIFIED
EQUITY HOLDINGS, LLC, CYNERGY EQUITY                  COMPLAINT
HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE
CYNERGY, INC., PIPELINE DATA, INC., RANDY
McCOY, KIM FITZSIMMONS, SHEILA CORVINO,
MARCELO PALADINI,GUSTAVO CEBALLOS, ANDRES
ORDONEZ, STEPHEN ASCHETTINO, DEAN M.
LEAVITT, JAFFE RAIT HEUR & WEISS P.C, HOLLI
HART TARGAN, NIXON PEABODY LLP., FRANK
PENSKI, MARK N. BERMAN, UNICORN PARTNERS
LLC, JOHN MARTILLO, 6M INVESTMENT, LP,
MERCHANT PROCESSING SYSTEMS CORP., OLEG
FIRER, LEON GOLDSTEIN, VLADIMIR SADOVSKY,
MERCHANT CAPITAL PORTFOLIO LLC, NEW EDGE
PAYMENTS, LLC, PROCESS PINK PAYMENTS LLC, and
UNIFIED PAYMENTS, LLC,
                        Defendants.
-------------------------------- -------------------------X

       Plaintiffs TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH,

LLC, SECOND SOURCE FUNDING LLC, DALMAO, INC. and SHMUEL CHANIN, by their

attorneys herein, SHAPIRO TAMIR LAW GROUP, PLLC, as and for their Verified Complaint

against THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC, PIPELINE

CYNERGY HOLDINGS, LLC, PIPELINE DATA, INC., CYNERGY DATA, INC., and the

other defendants listed in the caption above, hereby depose and say:

## NATURE OF THE CASE

This is an action seeking more than $50 million in damages from a group of interrelated individuals and entities that have acted in concert to cripple Plaintiffs, a once-valuable and growing group of companies, through a continuing campaign of fraudulent and illegal acts. Many of the named Defendants were the owners, investors and advisors of a company called Cynergy Data, LLC ("CynergyPreB"). CynergyPreB's operations were taken over by its secured lenders after the disclosure of financial irregularities in the Spring of 2009 and it filed for bankruptcy in September 2009. After the bankruptcy filing, Defendants Cynergy Equity Holdings, LLC (a/k/a "Cynergy Data, Inc.") -- a successor institution run by the same core team of executives, investors and advisors that had run CynergyPreB into the ground and had defrauded and injured Plaintiffs Tribul LLC ("Tribul"), Tribul Cash LLC ("Tribul Cash") and Second Source Funding, LLC ("SSF") (collectively, the "Tribul Plaintiffs") and primarily owned and managed by Defendant The Comvest Group -- bought substantially all of the assets of CynergyPreB and continued to operate the same business.

Plaintiffs have claims against three different groups of Defendants that have acted in concert with one another at various points in time dating back to 2009, in order to withhold moneys due and owing to Plaintiffs, divert moneys due and owing to Plaintiffs, steal Plaintiffs' revenue-generating clients, interfere with Plaintiffs' relationships with their sales agents, interfere with Plaintiffs' ability to sell Plaintiffs' valuable merchant portfolio for a fair-market price and otherwise cripple Plaintiffs' competing business operations.

The Tribul Plaintiffs were independent sales organizations ("ISOs") under ISO Conduit Processing Agreements (the "CynergyPreB ISO Agreement") with CynergyPreB dated October 11, 2006, until CynergyPreB filed for bankruptcy in September, 2009 and Defendant Cynergy assumed the CynergyPreB ISO Agreement. In those three years alone, the Tribul Plaintiffs signed, boarded and provided customer support to more than seven thousand merchants to the CynergyPreB processing platform, and these merchants processed more than $1.5 billion worth of credit and debit card transactions (including cash advance transactions).

Prior to the CynergyPreB bankruptcy filing, more than $7 million in commission payments (known as Residuals) that were otherwise due and owing from CynergyPreB to the Tribul Plaintiffs were baselessly and improperly withheld by CynergyPreB. The Tribul Plaintiffs now believe that money was diverted to the accounts of certain of the named Defendants, who as owners and affiliates of CynergyPreB, stood to gain handsomely if CynergyPreB could be restructured and sold based upon a manipulated, higher Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA). The Tribul Plaintiffs seek damages for that fraudulent conduct and other bad acts.

When the original withholding of residuals began, the Tribul Plaintiffs commenced a lawsuit against a few of the named Defendants and CynergyPreB in June 2009 and procured a Temporary Restraining Order that required CynergyPreB to pay that month's residuals (the "2009 TRO"). Instead of complying with the 2009 TRO, many of the named Defendants engaged in a conspiracy to frustrate the Tribul Plaintiffs' ability to prosecute the case or procure prospective injunctive relief, continued interfering with the Tribul Plaintiffs' relationships with their agents and merchants, and then filed for bankruptcy protection. At the request of certain

3

Defendants, the entire lawsuit against CynergyPreB and certain named Defendants (Paladini, Leavitt and Aschettino) was dismissed due to the filing of the bankruptcy petition. The Tribul Plaintiffs seek to reinstate those claims against many of the Defendants for this fraudulent, deceitful conduct.

At the time that the CynergyPreB bankruptcy petition was filed in September 2009, the Tribul Plaintiffs believed that the amount of residuals improperly withheld was only approximately $4 million and accordingly agreed to cap their bankruptcy cure claims. The fact that the improper withholds and fees actually exceeded $7 million was concealed by many of the named Defendants from the Tribul Plaintiffs as part of an ongoing conspiracy of fraud and deceit. As part of their fraudulent scheme, Defendants Cynergy, Corvino and others cooperated freely with the debtors' liquidation trustee to defend against the Tribul Plaintiffs' claim against the CynergyPreB estate, while continuing to deceive and mislead the Tribul Plaintiffs until just before the bankruptcy proceeding settled on the eve of trial on February 1, 2012. The Tribul Plaintiffs seek damages against many of the Defendants for this fraudulent, deceitful conduct.

Tribul Plaintiffs have recently discovered the reason for Defendants' deception of Tribul Plaintiffs. Apparently, approximately 1,000 of Tribul Plaintiffs' merchants that were improperly transferred from Tribul Plaintiffs' portfolio account back in 2009 are still missing, as are the more than $5 million in residuals and fees due to Tribul Plaintiffs from those accounts. Additionally, almost $1 million in reserves that were supposed to be held on reserve for Tribul Plaintiffs and their merchants by Harris Bank, the financial sponsor of CynergyPreB and Defendant Cynergy, are missing. According to the individual who served as the restructuring agent for CynergyPreB, the Trustee for the CynergyPreB and Cynergy Prosperity Plus, LLC

4

estates, and the Liquidation Trustee, those reserves and all the merchant accounts were transferred to Defendant Cynergy as part of the bankruptcy proceeding.

After the CynergyPreB bankruptcy filing, the Tribul Plaintiffs and Plaintiff Chanin believed that the new chief executive in charge of Defendant Cynergy -- Defendant Randy McCoy -- who was put into place by Defendant Comvest and Defendant Pipeline Cynergy Holdings, LLC, was operating in good faith and planning to clean house. Accordingly, Plaintiffs continued to do business with Defendant Cynergy and spent a tremendous amount of time and effort negotiating various deals with Defendant Cynergy and other entities affiliated with Defendant Cynergy. Unbeknownst to Plaintiff Chanin and the others running Plaintiff Dalmao (and Business Payment System and Outside Ventures), some of the executives of Defendant Cynergy who placed enormous pressure and duress upon those three Tribul Plaintiffs to sign a deal settling a dispute with certain of these affiliated entities, were also working directly for these allegedly independent companies. One of those deals was the settling of a lawsuit between Plaintiff Dalmao and Defendants Merchant Capital Portfolio, LLC, Oleg Firer, Leon Goldstein and Vladimir Sadovsky (and others) (hereinafter the "Unified Defendants") in which Plaintiff Dalmao agreed to release financial obligations owed by the Unified Defendants to Plaintiff Dalmao of approximately $6 million, without any consideration and under duress from Defendants Cynergy, Corvino and others. Plaintiffs believe that Defendant Comvest participated in this fraudulent scheme since, unbeknownst to the Tribul Plaintiffs at the time, the Unified Defendants had taken significant loans from Defendant Comvest which were secured by the assets in dispute between Plaintiff Dalmao and the Unified Defendants, the merchant portfolio that had previously been solely owned by Plaintiff Business Payment Systems. As part of this

action, Plaintiff Dalmao seeks to nullify the settlement agreement with the Unified Defendants,
to resurrect its claims against the Unified Defendants (and against Defendants Corvino and
McCoy as co-conspirators) and recover more than $6 million in compensation rightfully due to
Plaintiff Dalmao from the Unified Defendants under the parties' agreements and 50% of the
residuals ever paid or to be paid in the future to the Unified Defendants (or to anyone on the
merchant account that were the property of Business Payment Systems or MCP, or alternatively,
to unwind the parties' transactions and receive at least 50% of the combined merchant portfolio
(plus 50% of all past residuals received on that combined merchant portfolio).

     The Tribul Plaintiffs negotiated and signed under duress a new ISO Agreement with
Defendant Cynergy in late 2010/early 2011 (the "Cynergy EP Agreement"). The duress was
caused in part by the Defendants' fraudulent misrepresentations that Defendant Cynergy had the
right to enforce all of the terms of the original CynergyPreB ISO Agreement (and a loan made
by Cynergy Prosperity Plus in the amount of $8 million, personally guaranteed by Plaintiff
Chanin that Defendant Cynergy had purportedly assumed from CynergyPreB (the "CPP Loan")).
The Tribul Plaintiffs now believe that Defendant Cynergy did not pay any consideration for, or
properly assume, the CPP Loan.

     Unfortunately, the Tribul Plaintiffs have only recently learned that Defendant McCoy
never cleaned house and Cynergy never turned over the new leaf, and its officers and lawyers
actively deceived the Tribul Plaintiffs and Plaintiff Chanin into signing the new agreement in
October 2009 based on false pretenses and under duress, and have continued to severely damage
the Tribul Plaintiffs using many of the same tactics as when they operated as CynergyPreB. The
Tribul Plaintiffs seek to nullify the January 2011 Cynergy EP Partner Agreement (and ancillary

documents, including the replacement loan documents) and seek damages for the improper enforcement of the onerous and unconscionable terms of those agreements by Defendants.

Defendant Cynergy's improper enforcement of the onerous, unconscionable terms of the Cynergy EP Agreement — including UCC filings against the Tribul Merchant Portfolio and steep penalties for unreachable minimum performance requirements -- has caused additional damages to the Tribul Plaintiffs. During 2011, Defendant Cynergy improperly exercised its "right of first refusal" to scuttle a deal in which the Tribul Plaintiffs were to receive more than $40 million of consideration to a prospective buyer of the Tribul Merchant Portfolio. Neither that prospective purchaser nor any ISO in the industry could profitably operate a merchant portfolio under the restraints found in the current ISO Agreement. The Tribul Plaintiffs seek damages for Defendants' interference with the sale of the Tribul Merchant Portfolio in an amount equivalent to the $40 million benefit of the bargain that the Tribul Plaintiffs would have received.

Right before the Tribul Plaintiffs settled their bankruptcy claims against the CynergyPreB estate on the eve of trial on February 1, 2012, Defendant Cynergy replaced interim CEO Randy McCoy with another Chief Executive Officer (Defendant Kim Fitzsimmons), and Defendant Fitzsimmons promptly visited with the Tribul Plaintiffs' executives and advisors and promised to clean house and see that past wrongs were righted. Over the ensuing six months, the Tribul Plaintiffs have persistently attempted to engage Defendants Fitzsimmons and Corvino in order to renegotiate the unconscionable and onerous terms of the Cynergy EP Agreement. The Tribul Plaintiffs have now learned that Defendants Cynergy, Fitzsimmons, Corvino and others have been stalling these long-promised negotiations, and have instead been tortiously interfering

7

I

with the Tribul Plaintiffs' relationships with the Tribul Plaintiffs' merchants and sales agents, in direct violation of the few terms of the Cynergy EP Agreement that can be read in the Tribul Plaintiffs' favor, and in direct, knowing violations of a TRO against such conduct (the "2012 TRO"). This case is directly related to the active litigation in which the 2012 TRO was issued to prevent an agent from violating its agreement with the Tribul Plaintiffs and moving their largest merchants to another ISO (or directly to Defendant Cynergy, cutting out the Tribul Plaintiffs from their share of more than $2 million in annual residuals). The Tribul Plaintiffs will be seeking damages against Defendants Cynergy, Fitzsimmons, Corvino and others for their improper and illegal interference with the Tribul Plaintiffs' contracts and business relations, and will be seeking to have them held in contempt of court and appropriately sanctioned.

Plaintiffs seek to hold Defendant Comvest and its other subsidiaries and affiliates, including Pipeline Cynergy Holdings, LLC, Comvest Cynergy Holdings, Inc., and Pipeline Data, Inc. responsible for all of the post-bankruptcy activities by Defendant Cynergy since it appears that Defendants McCoy, Corvino and Fitzimmons have operated Defendant Cynergy at the direction of and for the direct benefit of the other Comvest/Pipeline entities, which Plaintiffs believe are mere alter egos of one another.

## PARTIES AND JURISDICTION

PLAINTIFFS

1.       At all times hereinafter mentioned, Plaintiff TRIBUL MERCHANT SERVICES, LLC (hereinafter "Tribul") was and is a limited liability company duly formed and existing under the laws of the State of New York, with scores of employees, agents, and independent contractors living and working throughout Kings County, New York.

8

2.     At all times hereinafter mentioned, Plaintiff TRIBUL, LLC (hereinafter "Tribul

LLC") was and is a limited liability company duly formed and existing under the laws of the State

of New York, with scores of employees, agents, and independent contractors living and working

throughout Kings County, New York.

3.     At all times hereinafter mentioned, Plaintiff SECOND SOURCE FUNDING LLC ("S

SF") was and is a limited liability company duly formed and existing under the laws of the State of

Delaware, authorized to do business in New York and conducting business in the State of New York

and throughout Kings County, New York.

4.     At all times hereinafter mentioned, BUSINESS PAYMENT SYSTEMS, INC.

("BPS") was and is a corporation duly formed and existing under the laws of the State of

Delaware and is authorized to do business in New York. At certain relevant times in the past,

BPS conducted business in the State of New York with scores of employees, agents, and

independent contractors living and working throughout Kings County, New York.

5.     At all times hereinafter mentioned, OUTSIDE VENTURES LLC ("OV") was and is a

limited liability company duly formed and existing under the laws of the State of Delaware and is

authorized to do business in New York. Upon information and belief, at certain relevant times in the

past, OV conducted business in the State of New York with scores of employees, agents, and

independent contractors living and working throughout Kings County, New York, and was the sole

owner of BPS.

6.     At all times hereinafter mentioned, Plaintiff DALMAO LLC ("DALMAO") was

and is a limited liability company duly formed and existing under the laws of the State of

Delaware and is authorized to do business in New York. At certain relevant times in the past,

9

DALMAO conducted business in the State of New York with scores of employees, agents, and

independent contractors living and working throughout Kings County, New York.

      7.    At all times hereinafter mentioned, Plaintiff SHMUEL CHANIN, commonly

known as Sam Chanin (hereinafter "Chanin"), was and is an individual residing in the State of

New York. At certain relevant times in the past, Chanin served as Chief Executive Officer and

managed the business of Plaintiff Dalmao and the Tribul Plaintiffs, and signed personal

guarantees in connection with particular transactions that Plaintiffs seek to declare null and

void herein, as more fully described below.

### COMVEST/PIPELINE/CYNERGY DEFENDANTS

      8.    Upon information and belief, CYNERGY DATA, LLC (hereinafter

"CynergyPreB") was, at all relevant times prior to its selling substantially all of its assets in

bankruptcy proceedings on or about October 26, 2009, (a) a Delaware corporation authorized to

do business in New York with its principal place of business in Long Island City, New York, and

(b) in the business of providing credit card processing and other merchant services to merchants

who accepted credit cards and debit cards for payments of their goods and services through

independent sales organizations including the Tribul Plaintiffs.

      9.    Upon information and belief, CYNERGY PROSPERITY PLUS, LLC (hereinafter

"CPP") was, at all relevant times prior to the sale of substantially all of its assets in bankruptcy

proceedings on or about October 26, 2009, (a) a limited liability company duly formed and existing

under the laws of the State of Delaware, and authorized to do business in New York, and (b) a holding

company through which loans were made to Independent Sales Organizations working with

CynergyPreB, including without limitation Plaintiff SSF.

10.      Upon information and belief, on or about September 1, 2009 (hereinafter "Petition Date"), CynergyPreB and CPP filed for Chapter 11 Bankruptcy.

11.      Upon information and belief, on or about August 26, 2009, CynergyPreB and CPP entered into an Asset Purchase Agreement ("APA") with Defendant Cynergy Holdings LLC in which Defendant Cynergy Holdings LLC acted as the purchaser of substantially all of CynergyPreB and CPP assets, and assumed certain unexpired leases and executory contracts, including contracts with certain of the Tribul Plaintiffs, for $81 million.

12.      Upon information and belief, at all relevant times since 2009, Defendant CYNERGY EQUITY HOLDINGS, LLC ("CynergyLLC") was and is a Delaware limited liability company, with its principal place of business at 4400 Northpoint Parkway, Alpharetta, Georgia 30022.

13.      Upon information and belief, Defendant CYNERGY DATA, INC. is and was at all relevant times a corporation formed and existing under the laws of the State of Delaware in or about October 2009, with its corporate headquarters at 4400 Northpoint Parkway, Alpharetta, Georgia 30022, is authorized to do business in New York, maintains its principal place of business in Long Island City, Queens and transacts a significant amount of business in the State of New York, and in the County of Kings.

14.      Upon information and belief, Defendants CynergyLLC and Cynergy Data, Inc. were founded, formed and/or incorporated by Defendants THE COMVEST GROUP, RANDY MCCOY, SHEILA CORVINO and others for the purpose of acquiring substantially all of the assets held by the bankruptcy estates of Cynergy Data, LLC and Cynergy Data Holdings, Inc. (a/k/a CD Liquidation Co., LLC) and Cynergy Prosperity Plus, LLC (a/k/a CD Liquidation Co.,

11

LLC) ("CPP"), and to operate a similar business, using the same "Cynergy Data" name and trademark.

15.     Upon information and belief, Defendants CynergyLLC and Cynergy Data, Inc. share common ownership, management, operation, and control, or one is the successor of the other, and are alter 'egos of one another. Accordingly, Defendants CynergyLLC and Cynergy Data, Inc. are hereinafter collectively and individually referred to as "Defendant Cynergy".

16.     Upon information and belief, Defendant Cynergy in fact acquired substantially all of the assets and assumed most of the contractual rights and obligations previously owned and held by CynergyPreB and CPP and held by the bankruptcy estates.

17.     Upon information and belief, at all times subsequent to purchasing substantially all of the assets of CynergyPreB and CPP on or about October 26, 2009, Defendant Cynergy is and was at all relevant times, in the business of providing credit card processing and other merchant services to merchants who accepted credit cards and debit cards for payments of their goods and services, and contracting with independent sales organizations including the Tribul Plaintiffs, and maintained the same principal place of business in Long Island City, Queens as CynergyPreB.

18.     Upon information and belief, at all relevant times, Defendant PIPELINE CYNERGY HOLDINGS, LLC ("PipelineCH") was and is a Delaware corporation, with its principal place of liusiness at 4400 Northpoint Parkway, Alpharetta, Georgia 30022.

19.     Upon information and belief, Defendant PipelineCH was formed in or about 2009 by Defendants THE COMVEST GROUP, RANDY MCCOY, SHEILA CORVINO and others for the purpose of acquiring complete ownership of and operational control over Defendant

Cynergy and Defendant Pipeline Data, Inc., including substantially all of the assets previously owned by CynergyPreB and CPP and held by the bankruptcy estates and all of the contractual rights and obligations assumed under the APA.

20.     Upon information and belief, at all relevant times after October 2009, Defendant PipelineCH had and has maintained ownership and management of Defendant Cynergy, which has been operated for the benefit of Defendants PipelineCH and Comvest.

21.     Upon information and belief, Defendant PIPELINE DATA, INC.("PipelineData") was and is, at all relevant times, a Delaware corporation with its principal place of business at 4400 North Point Pkwy, Suite 260, Alpharetta, GA 30022, and has transacted a significant amount of business in the State of New York, and in Kings County, New York, and continues to do so through the present.

22.     Upon information and belief, Defendant PipelineData markets and sells its products and services through three lines of distribution: banks, Independent Sales Organizations and the Internet. Pipeline Data has contractual relationships with scores of commercial banks and financial institutions, and provides the general merchant community an integrated suite of merchant payment processing services and related software enabling products in order to deliver credit and debit card-based payments processing solutions to small and mid-sized merchants that operate in physical brick and mortar business environments or over the internet, and in settings that require wired as well as wireless mobile payment solutions.

23.     Upon information and belief, substantially all of the members of Defendant Cynergy's Board of Directors concurrently serve on Defendant PipelineCH's Board of Directors. As of August 22, 2012, the "merchant services" subpage of Pipeline Data's website

13

(www.pipelinedata.com), is redirected to a landing page --

https://mybackofficetools.com/corporatesite/login.asp -- that provides any ISO agent of

Defendant Pipeline Data with instructions on logging into the Residual accounting system,

VIMAS, which is operated by and for Defendant Cynergy (with the Cynergy logo).

      24.     Upon information and belief, Defendants Cynergy, Pipeline Data, and PipelineCH are

alter egos of one another.

      25.     Upon information and belief, Defendant THE COMVEST GROUP aka

COMVEST GROUP HOLDINGS, LLC (hereinafter "ComvesC), was and is at all relevant times

since 1988, a Delaware limited liability company, with its principal place of business in West

Palm Beach, Florida.

      26.     Upon information and belief, Defendant Comvest is a private investment firm

that specializes in financing, advising and investing in distressed, underperforming, and growth-

oriented lower middle-market businesses and have financed, restructured, owned and operated

numerous lower middle market businesses, many of which have returned significant multiples of

invested capital to Comvest and its partners.

      27.     Upon information and belief in or about October, 2009, all assets of the CD

Liquidation Co., LLC were purchased by Cynergy Equity Holdings, LLC, an investment affiliate of the

Comvest Group, for $81 million in consideration. Upon information and belief, Defendant Comvest

was and is an alter ego of Cynergy Equity Holdings, LLC.

      28.     Upon information and belief, Defendant Comvest and its partners financed,

advised and managed the operations of CynergyPreB, Defendant Cynergy, Defendant Pipeline

and Defendant PipelinCH, and did so for the benefit of themselves. As an example of that, as of

14

August 22, 2012, Defendant Randy McCoy, who served as the Chief Executive Officer of

both Defendant Cynergy and Defendant Pipeline Data from February 2009 to January 2009,

was listed on the Comvest website (www.comvest.com/team.asp) as currently serving as one

of the Comvest Investment Professionals, an Operating Partner of Comvest and Chief

Executive Officer of Pipeline Data, Inc.

       29.       Upon information and belief, Defendants COMVEST CYNERGY

HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC, and PIPELINE CYNERGY, INC.

are Delaware limited liability companies or corporations that were formed, founded and

incorporated by Defendants Comvest, McCoy and Corvino and are under common ownership,

management and control as Comvest and Defendants CynergyLLC, Cynergy, Pipeline, PipelineCH,

and transact a significant amount of business in the State of New York.

       30.       Upon information and belief, the following Defendant entities (collectively

referred to hereinafter as the "Comvest/Cynergy/Pipeline Entities") are each alter egos of one

another: Comvest, CynergyLLC, Cynergy, Pipeline, PipelineCH, Comvest Cynergy Holdings, Inc.,

Pipeline Cynergy Holdings, LLC and Pipeline Cynergy, Inc.

       31.       Upon information and belief, Defendant Comvest and each of the

Defendant Comvest/Cynergy/Pipeline Entities transacted a significant amount of business

throughout the State of New York, including some of the acts described herein, and continue to

transact business in New York.

       32.       Upon information and belief, Defendant Comvest and each of the Defendant

Comvest/Cynergy/Pipeline Entities personally participated in and benefited from the fraudulent acts

described herein.

CO-CONSPIRATORS AND AFFILIATED/INDIVIDUAL DEFENDANTS

33.     Upon information and belief, Defendant MARCELO PALADIN' (hereinafter "Paladini") is a natural person residing in the State of Florida.

34.     At all times relevant, Defendant Paladini was the Chief Executive Officer of CynergyPreB and CPP.

35.     Upon information and belief, at all times relevant between October 26, 2009 and February 2012, Defendant Paladini was an officer and board member of Defendant Cynergy and Defendant PipelineCH and still serves as the Executive Vice President of Development for those two Defendants.

36.     Upon information and belief, Defendant Paladini transacted a significant amount of business in New York, including many of the acts described herein.

37.     Upon information and belief, Defendant Paladini personally participated in and benefited from the fraudulent acts described herein.

38.     Upon information and belief, at all times relevant, Defendant Paladini was an officer and membei/owner of Defendant Unified.

39.     Upon information and belief, STEPHEN ASCHETTINO (hereinafter "Aschettino") is a natural person residing in the State of New York.

40.     At all times relevant, Defendant Aschettino was the Chief Legal Officer of CynergyPreB and CPP and subsequently served as an outside counsel for Defendant Cynergy.

41.     Upon information and belief, Defendant Aschettino personally participated in and benefited from the fraudulent acts described herein.

16

42.     Upon information and belief, Defendant DEAN M. LEAVITT (hereinafter "Leavitt") is a natural person residing in the State of New York.

43.     Upon information and belief, at certain times relevant, Defendant Leavitt was the President of CynergyPreB.

44.     Upon information and belief, Defendant Leavitt was and currently is the Chairman and Chief Executive Officer of Defendant UNICORN PARTNERS LLC (hereinafter "Unicorn").

45.     Upon information and belief, at all times relevant, Defendant Unicorn was and is a limited liability company incorporated in the State of Delaware, authorized to do business in the State of New York

46.     Upon information and belief, Defendant Unicorn was and is in the business of advising corporations in business development.

47.     Upon information and belief, Defendants Leavitt and Unicorn represented CynergyPreB and CPP on many matters and advised CynergyPreB and CPP (along with certain of the named Defendants who were affiliated with or officers of CynergyPreB and CPP) on business operations and strategy both prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

48.     Upon information and belief, Defendants Leavitt and Unicorn transacted a significant amount of business in New York, including many of the acts described herein, and continue to transact a significant amount of business in New York.

49.     Upon information and belief, Defendants Leavitt and Unicorn personally participated in and benefited from the fraudulent acts described herein.

17

50.     At all times hereinafter mentioned, Defendant ANDRES ORDONEZ (hereinafter "Ordonez") was and currently is the Chief Information Officer of CynergyPreB since 1998, Defendant Cynergy since October 26, 2009 and, Defendant Pipeline since December 2009. Upon information and belief, at certain relevant times, Defendant Ordonez transacted a significant amount of business throughout the State of New York, including some of the acts described herein and still continues to transact business in New York.

51.     Upon information and belief, Defendant Ordonez personally participated in and benefited from the fraudulent acts described herein.

52.     Upon information and belief, at all relevant times mentioned, Defendant GUSTAVO CEBALLOS (hereinafter "Ceballos") was the Chief Financial Officer of CynergyPreB and CPP. Upon information and belief, at certain relevant times, Defendant Ordonez transacted a significant amount of business throughout the State of New York including some of the acts described herein,

53.     Upon information and belief, Defendant Ordonez personally participated in and benefited from the fraudulent acts described herein.

54.     Upon information and belief, at certain relevant times, Classic Closeouts transacted a significant amount of business throughout the State of New York and in Kings County.

55.     Upon information and belief, Defendant JOHN MARTILLO is a former executive of CynergyPreB and the president of Defendant 6M LOAN INVESTMENTS LP ("6M"), a Delaware limited partnership, with its principal place of business in Irving, Texas. Upon information and belief, at certain relevant times, Defendants Martino and 6M transacted a

18

significant amount of business throughout the State of New York, including some of the acts described herein, and still continue to transact business in New York.

56.   Upon information and belief, Defendants Martillo and 6M personally participated in and benefited from the fraudulent acts described herein.

57.   At all times hereinafter mentioned, Defendant NIXON PEABODY LLP (hereinafter "Nixon Peabody") was and is a limited liability partnership law firm duly formed and existing under the laws of the State of New York and is authorized to do business in New York.

58.   Upon information and belief, Defendant Nixon Peabody represented Defendants CynergyPreB, CPP and Cynergy on many matters prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

59.   Upon information and belief, Defendant FRANK PENSKI, a partner at Defendant Nixon Peabody, represented and advised Defendants Cynergy prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

60.   Upon information and belief, Defendant MARK N. BERMAN (hereinafter "Berman"), a partner at Nixon Peabody, represented and advised Defendants CynergyPreB, CPP and Cynergy on many matters prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

61.   Upon information and belief, Defendants Nixon Peabody, Penski and Berman represented CynergyPreB and CPP and advised them with respect to hiring Charles Moore of Conway Mackenzie as the Restructuring Agent for CynergyPreB.

62.     Upon information and belief, Defendants Nixon Peabody, Penski and Berman transacted a significant amount of business throughout the State of New York including some of the acts described herein, and continue to transact business in New York.

63.     Upon information and belief, Defendants Nixon Peabody, Penski and Berman personally participated in and benefited from the fraudulent acts described herein.

64.     Upon information and belief, Defendant JAFFE RAITT HEUER & WEISS, P.C. (hereinafter "Jaffe Raitt") is a professional corporation duly formed and incorporated in the State of Michigan.

65.     Upon information and belief, Defendant HOLLI HART TARGAN (hereinafter "Targan"), is a partner at Defendant Jaffe Raitt and personally represented and advised Defendants CynergyPreB, CPP, Cynergy, Paladini and others on many matters prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

66.     Upon information and belief, Defendant Jaffe Raitt represented Defendants CynergyPreB, CPP, and Cynergy on many matters prior to and after the filing of the bankruptcy petitions on behalf of CynergyPreB and CPP.

67.     Upon information and belief, Defendants Jaffe Raitt and Targan transacted a significant amount of business throughout the State of New York including some of the acts described herein, and continue to transact business in New York.

68.     Upon information and belief, Defendants Jaffe Raitt and Targan personally participated in and benefited from the fraudulent acts described herein.

69.     Upon information and belief, Defendant OLEG FIRER (hereinafter "Firer") is a natural person residing in the State of Florida.

20

70.     Upon information and belief, Defendant LEON GOLDSTEIN (hereinafter "Goldstein") is a natural person residing in the State of Florida.

71.     Upon information and belief, Defendant VLADIMIR SADOVSKY (hereinafter "Sadovsky") is a natural person who at all times relevant hereto resided in Brooklyn, New York and maintained his principal place of business in New York, New York.

72.     Upon information and belief, Defendant Sadovsky is an individual who at all times relevant hereto was and is a principal/member/partner/owner/officer of co-Defendant MPS. And was and is the Chief Executive Officer of Defendant New Edge.

73.     Upon information and belief, at all times hereinafter, Defendants Firer, Goldstein, and Sadovsky were and are the principals, members, shareholders, board members, officers and/or directors of Defendants UNIFIED PAYMENTS LLC (hereinafter "Unified"), PROCESS PINK LLC (hereinafter "Pink"), MERCHANT CAPITAL PORTFOLIOS, LLC (hereinafter "MCP"), MERCHANT PROCESS SERVICES (hereinafter "MPS"), and NEW EDGE PAYMENTS LLC (hereinafter "New Edge").

74.     Upon information and belief, Defendants Firer, Goldstein, Sadovsky, Unified, Pink, MCP, MPS and New Edge (hereinafter, the "Unified Defendants") own significant assets and conduct a significant amount of business in the State of New York.

75.     Upon information and belief, Defendants Firer, Goldstein, Sadovsky, Unified, Pink, MCP, MPS and New Edge transacted a significant amount of business throughout the State of New York, including some of the acts described herein, and continue to transact business in New York.

76.     Upon information and belief, Defendants Firer, Goldstein, Sadovsky, Unified, Pink, MCP, MPS and New Edge personally participated in and benefited from the fraudulent acts described herein.

77.     Upon information and belief, Defendant SHEILA CORVINO ("Corvino") is an individual, who at all relevant times herein has resided in New Hampshire but has conducted a significant amount of business and meetings in the State of New York.

78.     Upon information and belief, Defendant Corvino was and is (a) at all relevant times since June 2007, General Counsel of Defendant Pipeline Data, (b) at all relevant times since February 2009, the Corporate Secretary of Defendant Pipeline Data, (c) at all relevant times since October 2009, the Chief Legal Officer and Corporate Secretary of Defendant Cynergy.

79.     Upon information and belief, at all relevant times, Defendant Corvino was and is an officer, director and/or owner of Defendants MCP, Pink, MPS and Unified.

80.     Upon information and belief, Defendant Corvino transacted a significant amount of business throughout the State of New York, including some of the acts described herein, and continues to transact business in New York.

81.     Upon information and belief, Defendant Corvino personally participated in and benefited from the fraudulent acts described herein.

82.     Upon information and belief, Defendant RANDY McCOY (hereinafter "McCoy") was the Chief Executive Officer, President and Director of Defendant Pipeline Data from February 2009 until the present and was the Chief Executive Officer of Defendant Cynergy and a member of Defendant Cynergy's Board of Directors from October 2009 until January 2012.

Upon information and belief, Defendant McCoy also provides management services for Defendant Unified and also serves as an Operating Partner of Defendant Comvest.

83.    Upon information and belief, Defendant McCoy transacted a significant amount of business throughout the State of New York, including some of the acts described herein, and continues to transact business in New York.

84.    Upon information and belief, Defendants McCoy personally participated in and benefited from the fraudulent acts described herein.

85.    Upon infolination and belief Defendant KIM FITZSIMMONS ("Fitzsimmons") is an individual, who at all relevant times herein has resided in Memphis, Tennessee and has conducted a significant amount of business in the State of New York.

86.    Upon information and belief, Defendant Fitzsimmons was and is at all relevant times since January 2012, an officer of Defendant PipelineCH and the Chief Executive Officer of Defendant Cynergy. Upon information and belief, Defendant Fitzsimmons transacted a significant amount of business throughout the State of New York, including some of the acts described herein, and continues to transact business in New York.

87.    Upon information and belief, Defendant Fitzsimmons personally participated in and benefited from the fraudulent acts described herein. FACTUAL

BACKGROUND

A.    Tribul Plaintiffs' Processing Business with CynergyPreB and Defendant Cynergy

88.    At all relevant times, continuing through the present, the Tribul Plaintiffs were and are independent sales organizations (hereinafter "ISO"), in the business of providing merchants with services, including bank card and credit card processing services and factoring of 23

future accounts receivables. The Tribul Plaintiffs do not provide these processing services themselves. Rather, like CynergyPreB before it, Defendant Cynergy is a credit card processor (technically a "SuperISO") that provides the actual credit card transaction processing services through a contract with another entity. Both Defendants CynergyPreB and Cynergy are referred to individually as a "SuperISO" or collectively as the "the SuperISOs."

89.     In or about October 2006, the Tribul Plaintiffs entered into two virtually identical ISO Conduit Processing Agreements with CynergyPreB (hereinafter the "CynergyPreB ISO Agreement"). In or about January 2011, the Tribul Plaintiffs entered into a new ISO Agreement (titled "Executive Partner Card Processing Agreement") with Defendant Cynergy (the "Cynergy EP Agreement"; collectively, with the CynergyPreB ISO Agreement referred to as the ISO Agreements. The Tribul Plaintiffs continue to perform under the Cynergy EP Agreement through the present.

90.     Pursuant to the ISO Agreements, the Tribul Plaintiffs recruited, provided many functions for merchants, and held liability for the risk that certain merchants may incur charge-backs and reversal that result in losses that are passed along to the Tribul Plaintiffs.

91.     In order to do so, Plaintiffs engaged the services of various agents and other ISOs who act as subcontractors for Tribul Plaintiffs and who canvas the marketplace in order to recruit merchants (hereinafter "Agents" or "Downlines"). The merchants then contract directly with the SuperISO and Harris Bank (the financial institution that sponsored the merchants into the Visa Inc. and MasterCard Inc. card organization for the SuperISOs and their ISOs) for the credit card transaction processing services.

24

92.    The Tribul Plaintiffs then collect commissions, known in the industry as "residuals" (hereinafter "Residuals") generated from each credit and debit transaction processed by the SuperISOs on behalf of merchants procured by Tribul Plaintiffs. Residuals include other fees that are charged to merchants on an annual, periodic or occasional basis by the SuperISOs.

93.    The Agents and Down Lines are paid a percentage of the Residuals collected by Tribul Plaintiffs for processing generated by the specific merchants recruited by the Agents and the Down Lines pursuant to marketing agreements, between Tribul Plaintiffs and Sub-ISO's.

94.    Beginning in or about October 2006 and continuing through the present, aided by their Agents and Down Lines, Tribul Plaintiffs performed under their respective ISO agreements with the SuperISOs in good faith and collectively procured well over 7,000 new merchant accounts which, as of the present date generates over 7 million dollars a year in Residuals due and owing to Tribul Plaintiffs. Ironically, immediately before the initial dispute arose with CynergyPreB in the Spring of 2009, the Tribul Plaintiffs' Residual was also over 7 million dollars a year. After the disruption to the Tribul Plaintiffs' business caused by the actions of Defendants in 2009, the Tribul Plaintiffs' Residuals were down to approximately 1 million dollars at the end of 2009, and have since built back up to 7 million dollars.

95.    Upon information and belief, at one point in 2008, the Tribul Plaintiffs were CynergyPreB's largest ISO, and through a management agreement with another company, MPS, managed the second largest ISO portfolio at Cynergy.

96.    At all relevant times through the present, CynergyPreB and Defendant Cynergy — as the entity that authorizes the credit and debit card transactions for the merchant and collects the fees from the cardholders' depository account electronically through the credit card systems

(e.g., Visa and MasterCard) — have been in exclusive and complete control of the money flowing from the credit and debit card transactions processed for the Tribul Plaintiffs' merchants, including the Residuals.

97.     At all relevant times, the Tribul Plaintiffs have been and are wholly and completely reliant upon Defendant Cynergy to make proper payment of the Residuals due and owing to them.

98.     At all relevant times, the Tribul Plaintiffs have been and are required to pay a portion of these Residuals to their Down Lines. Payment to the Down Lines is crucial to the existence, survival and continuity of the Merchant accounts (and to the Tribul Plaintiffs' solvency) because the Down Lines maintain the personal relationships with the merchants, rely on receipt of their portion of the Residuals as their income stream and can and will move merchant accounts to competing ISOs and credit card processors if they are not paid (despite the fact that doing so would be in violation of the agreements between the Down Lines and the Tribul Plaintiffs).

99.     At all relevant times, Plaintiff Sam Chanin was and currently is the Chief Executive Officer of the company Plaintiffs (and of BPS and OV).

100.     Upon information and belief in or about February 2008, Plaintiff SSF borrowed money from CPP under the terms of a Revolving Line of Credit Loan Agreement ("CPP Loan").

101.     Upon information and belief, the CPP Loan Agreement was and is collateralized by a Security Agreement (listing the merchant accounts as collateral) and a Note, as well as a Personal Guaranty executed by Chanin.

26

102.   The CPP Loan Agreement sets forth the terms between the parties and governs their rights concerning Residual setoffs for losses sustained and the permissible remedies of the parties in the event of a default, including the possible acceleration of the debt and loan assumption rights. From the inception of the CPP Loan Agreement and continuing to the present, the outstanding principal under the CPP Loan Agreement was approximately $8,000,000.00. Under the terms of the CPP Loan Agreement, CynergyPreB was responsible in withholding that portion of Residuals from SSF as required and in paying such sums to CPP on SSF's behalf up to a total of twenty (20%) percent of the monthly residuals earned by SSF.

103.   Beginning in or about September 2008, the global economy experienced a severe credit crisis and deterioration in capital markets. The global crisis resulted in greater attrition of merchant accounts due to failing businesses and also resulted in fewer credit card processing overall due to a significant reduction in consumer purchases.

104.   Upon information and belief, Plaintiff SSF experienced financial difficulties together with the global economy, but at all times continued to perform under their CynergyPreB ISO Agreement and the CPP Loan Agreement in good faith. Upon information and belief, at all relevant times from the inception of the Loan Agreement to the present, SSF remained current on all payments due and has never defaulted on its loan obligations under the CPP Loan Agreement. Under the terms of the relevant agreements between the parties, CynergyPreB retained exclusive control of the Residual stream. In the event that Plaintiff SSF had ever defaulted on its loan obligations to CPP under the CPP Loan Agreement, such default could only have been occasioned by CynergyPreB's failure to retain Residuals to pay CPP as CynergyPreB was required to do under the CPP Loan Agreement.

27

105.    Upon information and belief, CynergyPreB also experienced financial difficulties arising from the global economic crisis beginning in or about September 2008. Upon information and belief, CynergyPreB and certain of the named Defendants (including without limitation, Paladini, Ceballos, Ordonez, Leavitt and Aschettino) also engaged in improper and imprudent financial transactions on behalf of CynergyPreB that led to significant cash flow difficulties for CynergyPreB.

106.    Upon information and belief, those improper and imprudent financial transactions included the financing of large distributions and loans to Defendants Paladini, Martillo, Ceballos and Ordonez from secured lenders, the largest of which was Comerica Bank. Upon information and belief, the Trustee for the Cynergy bankruptcy subsequently (in or about 2011) commenced adversary proceedings detailing some of those transactions and seeking to recover tens of millions of dollars from Defendants Paladini and Martillo.

107.    Upon information and belief, beginning at the end of 2008, CynergyPreB was no longer able to service its debt to Comerica Bank and the other secured lenders and certain of the named Defendants (including Paladini, Ceballos, Ordonez, Aschettino, Leavitt, Jaffe Rait, Targan, Unicorn and Leavitt) approved the charging of unjustified fees and penalties to the Tribul Parties in order to withhold millions of dollars in residuals in order to attempt to balance CynergyPreB's cash flow and service its debt to the secured lenders.

108.    Upon information and belief, an audit of the CynergyPreB financials performed at the request of its secured lenders in 2009 revealed that CynergyPreB was technically insolvent. Upon information and belief, that audit also revealed that CynergyPreB's merchant and EP/ISO reserve accounts that were supposed to be kept segregated at Harris Bank, had in fact been

28

commingled with CynergyPreB's operating accounts, and the reserves for merchants and ISOs had a deficiency of more than $30 million.

109.    CynergyPreB's insolvency would have triggered the Tribul Plaintiffs' right to terminate the ISO Agreement and move the Tribul Merchants to another SuperISO/Processor.

110.    Upon information and belief, beginning in or about April 2009, Defendants Paladini, Ceballos, Ordonez, Aschettino, Leavitt, Unicorn, Targan, Jaffe Rait, Penski, Mark Berman and Nixon Peabody were aware that CynergyPreB was legally insolvent, were aware that such insolvency was a material breach of the Tribul Plaintiffs' ISO Agreement and held meetings in New York to intentionally deceive and defraud the Tribul Plaintiffs regarding the Tribul Plaintiffs' right to terminate the ISO Agreement.

111.    In fact, in or about May 2009, the Tribul Plaintiffs sought written confirmation that CynergyPreB was insolvent and had hired a restructuring agent to serve as a receiver on behalf of the secured lenders. CynergyPreB and certain individual defendants — upon information and belief including Defendants Paladini, Ceballos, Ordonez, Aschettino, Leavitt, Unicorn, Targan, Jaffe Rait, Penski, Mark Berman and Nixon Peabody — participated in the decision to defraud the Tribul Parties by withholding that information and instead concocting a scheme to accelerate the CPP Loan and try to collect the 8 million dollars or seize the Tribul Merchant Portfolio and the 7 million dollars plus in annual Residuals that they were then-generating.

112.    Upon information and belief, merchant portfolios like the Tribul Merchant Portfolio were selling at the time at the rate of 2 to 4 times annual earnings, thus the Tribul Merchants Portfolio were worth up to $30 million. Pursuant to the terms of the ISO Agreements,

all merchant accounts solicited, signed, procured or boarded by the Tribul Plaintiffs were the

rightful property of Tribul or SSF, respectively.

**B.    Defendants' Slander, Violation of the ISO Agreement and Interference
with the Tribul Plaintiffs' Prospective Purchasers of the Merchant Portfolio**

113. Upon information and belief, Defendants Paladini and others verbally confirmed to

several third parties in that indeed, it was Defendants' intent to put Tribul Plaintiffs out of business

and to have Defendant Mike Berman, then an executive working for Plaintiffs, take over the

management of the Tribul Plaintiffs' accounts for CynergyPreB and Defendants.

114. Upon information and belief, Defendants contacted and/or communicated with

Tribul Plaintiffs' Down Lines and merchants and further defamed Tribul Plaintiffs, falsely

alleging among other things that Tribul Plaintiffs and Chanin individually have:

    a)     "failed to pay large sums of money due to [Defendants] that have gone unpaid for

some time";

    b)     subjected Defendants to "attacks of baseless slander";

    c)     incorrectly alleged that "Cynergy has not been paying its bills";

    d)     incorrectly alleged that "Cynergy has not been paying its ISOs";

    e)     incorrectly alleged that "Cynergy is in receivership";

    0     "not lived up to its obligations with respect to its own down-lines";

    g)     Spread rumors;

    h)     "tarnished" Defendants alleged stellar reputation; and,

    i)     employed "unethical business practices."

115. Upon information and belief, the defamatory statements listed in the preceding

paragraph were contained in a letter dated June 1, 2009 executed by Paladini and Leavitt and

disseminated, upon information and belief, to all of Tribul Plaintiffs' merchants and Down Lines.

116.    Upon information and belief, Defendants also slandered Tribul Plaintiffs by speaking such defamatory statements verbally to third parties, including, but not limited to Tribul Plaintiffs' merchants and Down Lines.

117.    Upon information and belief, these defamatory statements are false and were known to be false at the time uttered by Defendants.

118.    Upon information in belief, at various times Defendants have also repeatedly tortiously interfered with Tribul Plaintiffs' attempts to sell their merchant accounts and other assets to third parties.

119.    One such example of Defendants' tortious interference is Defendants' letter, dated May 18, 2009 from Aschettino to National Processing Company (hereinafter "NPC") a prospective purchaser of Tribul Plaintiffs' merchant accounts which defamed Tribul Plaintiffs and ultimately caused NPC to withdraw its offer of purchase.

120.    Another such example is Defendants' letter dated March 27, 2009 from Dean M. Leavitt, President of CynergyPreB to Gateway Payment Services Corp. (hereinafter "Gateway") a prospective purchaser of Tribul Plaintiffs' merchant accounts which defamed Tribul Plaintiffs and ultimately caused Gateway to withdraw its offer of purchase.

**C.    CynergyPreB's Fraudulent Attempt to Recoup
        from Plaintiff Tribul on the Classic Closeouts Account**

121.    Upon information and belief, in light of its serious financial difficulties and its need for operating capital, Defendants Paladini and others desperately needed to recoup the sums loaned to Plaintiff SSF in advance of the due date of the CPP Loan. Despite the fact that Plaintiff SSF had never defaulted upon any loan obligations to CynergyPreB or CPP, Defendants

31

Paladini, Ceballos, Ordonez, Aschettino, Leavitt, Unicorn, Targan, Jaffe Rait, Penski, Mark Berman

and Nixon Peabody expressed at a conference in New York the unfounded fear that SSF would be

unable to repay the loan, and scheduled a Foreclosure Sale to take place at the office of Defendants

Targan and Jaffe Raitt

122.   Upon information and belief, Defendants colluded and conspired together to

formulate and execute a malicious and insidious plan to take ownership of the Tribul Merchant

Portfolio and the merchant accounts procured and rightfully belonging to Tribul Plaintiffs in order to

recoup the sums loaned by CPP to SSF.

123.   Upon information and belief, the Defendants executed their plan by exercising

economic duress upon the Tribul Plaintiffs by withholding Residuals and other sums until Tribul

Plaintiffs agreed to sign unilateral collateral agreements presented by Defendants giving Defendants

additional rights against Tribul Plaintiffs.

124.   In the first of such collateral agreements Defendants required Plaintiff Tribul to

assume liability under the SSF Loan Agreement which only applied to SSF (hereinafter "Joinder and

Amendment Agreement").

125.   Defendants subsequently required Tribul to assume liability for a merchant

account associated with a business called Classic Closeouts, LLC (hereinafter "Classic

Closeouts") under another collateral agreement, a one page assumption agreement (hereinafter

"Classic Closeouts Liability Assumption Agreement.") Both of these collateral agreements (the

Joinder and Amendment Agreement and the Classic Closeouts Liability Assumption Agreement)

were executed by Tribul Plaintiffs under duress and without any consideration to Tribul

Plaintiffs. In light of such duress and due to a complete lack of consideration, neither of these

32

purported agreements is enforceable against Tribul Plaintiffs.

126.    Classic Closeouts is an online closeout merchandiser and was not an account boarded or belonging to either of the Tribul Plaintiffs and the Tribul Plaintiffs did not derive any Residual income from the Classic Closeouts account. Neither Plaintiff Chanin nor any other principal or officer of the Tribul Plaintiffs had any ownership interest or benefited in any way from the Classic Closeouts business

127.    Upon information or belief, in or about middle of 2008, Classic Closeouts engaged in questionable businesses practices that led to a significant amount of chargebacks (in which customers challenge credit or debit transactions and the charge is reversed). The allegedly fraudulent activities of Classic Closeouts and Danny Greenberg have been the subject of investigations by the New York Attorney General's office and the United States Attorney's Office. Upon information and belief Mr. Greenberg is currently under federal indictment.

128.    The Tribul Plaintiffs did not have any knowledge or reason to believe that Classic Closeouts was a risky account or would engage in any fraudulent activity.

129.    Upon information and belief, CynergyPreB and Defendants Paladino, Ceballos, Ordonez and Aschettino intentionally ignored warning signs that Classic Closeouts was engaging in suspect behavior, knowing that there would be few "hard losses" to CynergyPreB, and that the Tribul Plaintiffs would be on the hook for any losses, so there was no risk to CynergyPreB.

130.    Suspended funds or so-called questionable merchant ("QM") funds are funds of the merchants boarded by the ISOs which are held by the sponsor bank (in this case, Harris Bank) and used to recover credit and transaction losses which are determined to be fraudulent or improper as a result of the merchant activity. Approximately $630,496.89 in funds had been

33

withheld for this purpose from the Classic Closeouts processing volume (reducing the Residuals accordingly). That money was then taken by CynergyPreB, ostensibly to cover "losses" on the Classic Closeouts account.

131.   Upon information and belief, there were no real losses to CynergyPreB on the Classic Closeouts account, and this was merely a pretext for Defendants to hide their own financial difficulties by using that $630,496.89 in QM funds, and withholding and converting for their own uses approximately $1.5 million worth of Residuals due to be paid to Tribul Plaintiffs in November and December 2008. In an attempt to mitigate their damages, Tribul Plaintiffs repeatedly demanded specific data supporting and substantiating the alleged Classic Closeouts losses. CynergyPreB and a number of the aforementioned individual Defendants repeatedly failed and refused to provide the same. (Defendants Corvino, Cynergy and others continued to keep this information from the Tribul Plaintiffs for almost 3 years, until forced to reveal part of the information on the eve of the trial of the bankruptcy case against the Trustee.)

132.   According to the CynergyPreB residual reports, CynergyPreB withheld residuals in November 2008 from the Tribul Plaintiffs in the amount of $436,657.40. CynergyPreB and Defendants Paladini, Ceballos and Ordonez informed the Tribul Plaintiffs that those funds were being used to cover losses from the Classic Closeouts account. According to CynergyPreB's residual reports, it withheld residuals in December 2008 from the Tribul Plaintiffs in the amount of $964,036.22. CynergyPreB informed the Tribul Plaintiffs that those funds were being used to cover "losses" from the Classic Closeouts account.

133.   Upon information and belief, CynergyPreB withheld $557,242.28 of Residuals due to the Tribul Plaintiffs in December 2008 because of a purported obligation to cover a loan

34

payment ostensibly due from Plaintiff OV to Defendant 6M Investment, a company owned and

operated by former CynergyPreB executive Martillo.

134.    Upon information and belief, no payments were due to 6M in December 2008 under

the 6M loan, Plaintiff OV had never defaulted under the 6M Loan Agreement, none of the Tribul

Plaintiffs were parties to the agreement, and CynergyPreB was not authorized to make any such

payment from the Tribul Plaintiffs' assets to 6M.

135.    Upon information and belief, Plaintiff OV ultimately repaid the full amount due and

owing to 6M on the 6M Loan. (Upon information and belief the 6M Loan agreement was

subsequently assumed by a separate entity, Merchant Processing Systems (hereinafter, "MPS"),

which, as part of a three-party transaction with Plaintiff OV paid off the loan in full.)

136.    Upon information and belief, either (a) CynergyPreB and Defendants Paladini

and Ceballos never truly wired $557, 242.28 (and thus Defendants Paladini and Ceballos are

liable to the Tribul Plaintiffs for their fraudulent acts in connection with that payment), or (b)

Defendants 6M and Martillo did receive the payment from CynergyPreB and failed to credit

Plaintiff OV's account, and thus owes Plaintiff OV the $557, 242.28. This will be known as the

6M Loan Claim.

137.    Upon information and belief, in or about January 2009, CynergyPreB wired

$350,000 to Plaintiff Tribul, and CynergyPreB's accountant booked that wire against a portion

of the December residuals owed to the Tribul Plaintiffs that had not been paid, leaving a balance

of almost $1.2 million in residuals that had been improperly withheld in November and

December of 2008, ostensibly due to the non-existent "losses" to CynergyPreB on the Classic

Closeouts account.

35

138.   Upon information and belief, at no time did the Tribul Plaintiffs waive any of their claims against Defendants for the sums converted by Defendants as a set-off or otherwise relating to the Classic Closeouts merchant account or CynergyPreB's purported losses thereunder.

**D.**   CynergyPreB's Misuse of Reserves and Bankruptcy

139.   Upon information and belief, Defendants scheme of applying additional economic duress and coercion in an attempt to convert the Tribul Plaintiffs' merchant accounts to CynergyPreB's own property without releasing Tribul Plaintiffs from any obligations owed under the CPP Loan Agreement continued. Pursuant to the ISO Agreement, Residuals paid to Tribul Plaintiffs by Cynergy are calculated and aggregated during the month and paid to Tribul Plaintiffs the following month. Cynergy directs Residual payments to Tribul Plaintiffs from the ISO Account (an account maintained at the sponsor bank, Harris Bank, in which Cynergy deposits all funds owed to Tribul Plaintiffs).

140.   Upon information and belief, when merchant funds are received by Harris Bank from Visa, MasterCard and Discover, they are held for one to three days for Cynergy to perform a "risk review" before any portion is remitted to the merchant. Pursuant to many merchant agreements, a merchant may have a reserve account at Harris Bank that is funded with a portion of the merchant's funds. When the balance in the reserve account has reached an amount to satisfy Cynergy's risk department, no additional amounts are held from processing or added to the reserve balance. To the Tribul Plaintiffs' knowledge, all merchant reserve accounts were being held at Harris Bank. Funds remaining in reserve past the liability exposure time frame are released to merchants.

141.   The "Reserve" or "Rolling Reserve" is a condition of most merchant agreements allowing Cynergy and/or Harris Bank to collect and hold a set percentage of the merchant's gross processing volume, in a non-interest bearing account at Harris Bank. These funds are held in trust for the merchant against potential losses to any of these parties resulting from unpaid chargebacks, unpaid return batches, fines and fees assessed by Visa, MasterCard or Discover and other financial risks involved in merchant processing.

142.   An Executive Partner Reserve or so called EP Reserve is a type of rolling reserve established from residuals otherwise due and owing to an ISO that qualifies as an "Executive Partner" that are set aside by holding back a percentage of an ISO's residuals in a separate account. The EP Reserve is then held in a financial institution as an emergency reserve to offset potential future losses by a merchant within an ISO's portfolio.

143.   CynergyPreB was required to keep a separate account for every Executive Partner's EP Reserves, including one combined account for the Tribul Plaintiffs:

144,   Upon information and belief Defendants Paladini, Ceballos, Ordonez and Aschettino intentionally failed to maintain a separate account for every Executive Partner's EP Reserves, and instead commingled these accounts with CynergyPreB's operating account and used those funds for their own expenses. Upon information and belief, they did so knowing that it was contrary to protocol, and intentionally flouted the regulations so that they would have free access to reserve funds. At the time of the bankruptcy filing, it was revealed that Cynergy's rolling reserve accounts were underfunded by at least twenty million dollars ($20 million).

145. Upon information and belief, Defendants Paladini, Ceballos, Ordonez and Aschettino were aware of certain internal accounting problems and financial reporting errors at

CynergyPreB, LLC that contributed to the intentional misstating of revenues and expenses. Upon information and belief, the aforementioned individual Defendants, by their intentional, fraudulent, reckless acts, errors or omissions, caused or permitted commingling of merchants' and ISOs' funds in the Reserve Accounts with CynergyPreB, LLC's operating funds.

146.   Upon information and belief, by their intentional, fraudulent, reckless acts, errors, or omissions, Defendants Paladini, Ceballos, Ordonez and Aschettino caused or permitted the use of merchants' and ISOs' Reserve Account funds to cover CynergyPreB operating losses and to fund their own personal expenses and loans. Tribul Plaintiffs incorporate herein by reference the allegations made by the Official Committee of Unsecured Creditors of CynergyPreB Liquidation Co., LLC, f/k/a Cynergy Prosperity Plus, LLC in the First Amended Complaint against Defendant Marcelo Paladini. Court for the District of Delaware in Chapter 11 Adv. Proc. No. 10-53190.

147.   The Tribul Plaintiffs were considered an EP and had an EP Reserve established from the funds otherwise due to the Tribul Plaintiffs and governed by the ISO Agreement provisions regarding a Reserve Account.

148.   Upon information and belief CynergyPreB withdrew $336,236.84 from the EP Reserves of the Tribul Plaintiffs in November 2008 (the "First EP Fund") and informed the Tribul Plaintiffs that those funds were being used to cover losses from the Classic Closeouts account.

149.   Upon information and belief, CynergyPreB actually made a net profit on the Classic Closeouts account (or alternatively, lost no more than a total of approximately $300,000), and thus had no right to recoup more than $1.5 million in funds due and owing to the Tribul

38

Plaintiffs as Residuals and as a release of the Tribul Plaintiffs' $336,236.84 first EP Reserve account.

150.   From November 2008 to October 2009, the Tribul Plaintiffs funded a second EP Reserve in the amount of $169,065.08 (the "Second EP Reserve Fund"). According to CynergyPreB's books and records, the Tribul Plaintiffs' EP Reserve Fund had that amount in it immediately prior to the Petition Date of the bankruptcy filing.

151.   Under industry practice and the terms of the ISO Agreements (Sec. 3.11.C), the ISO builds up an EP reserve account and then, when the merchant account is closed or the risk abated, the ISO receives back the excess funds in the ISO's EP Reserve account.

152.   Upon information and belief, the Second EP Reserve Fund was never repaid to the Tribul Plaintiffs, and should be on deposit for the Tribul Plaintiffs with Defendant Cynergy or Harris Bank. Upon information and belief, Defendant Cynergy has disavowed responsibility for the Second EP Reserve Fund, despite a bankruptcy court finding that Defendant Cynergy was responsible to replenish such funds.

153.   Upon information and belief Defendants Paladini, Ceballos, Ordonez and Aschettino intentionally also engaged in several fraudulent transactions transferring and using merchant's accounts to pay all of its operating cost. The Tribul Plaintiffs incorporates herein by reference the allegations made by the Official Committee of Unsecured Creditors of CynergyPreB Liquidation Co., LLC, f/k/a Cynergy Prosperity Plus, LLC in the First Amended Complaint against Defendant Marcelo Paladini. Court for the District of Delaware in Chapter 11 Adv. Proc. No. 10-53190.

154.   CynergyPreB's records indicate that approximately 3,500 merchants were

39

transferred from the Tribul Plaintiffs' merchant portfolio between July and October 2009 and were transferred back after the APA (the "missing merchants").

155.   CynergyPreB's records indicate that those missing merchants processed a transaction volume that exceeded $104 million during while they were "missing," which would have resulted in the Tribul Plaintiffs' EP Reserve fund increasing by $31,099.06.

156.   The Second EP Reserve Fund should have totaled $200,164.14 as of October 26, 2009.

157.   On or about October 26, 2009, CynergyPreB, LLC sold all or substantially all of its assets to Defendants Cynergy, PipelineCH and Comvest pursuant to an order of the United States Bankruptcy Court for the District of Delaware in Chapter 11 Case No. 09-13038 (KG), In re CynergyPreB. LLC. et al. (the "Sale Order"). The Bankruptcy Court's Sale Order was entered on October 9, 2009.

158.   Upon information and belief, Defendant Cynergy is currently managed by several of the same members of the management team that engaged in and/or abided the above-referenced fraudulent activity and fraudulent transfers to occur, resulting in the collapse and bankruptcy of CynergyPreB.

159.   Upon information and belief the various merchants and ISO reserves maintained by CynergyPreB and described above were transferred to Defendants Cynergy, PipelineCH and Comvest as part of the sale of substantially all of its assets in October 2009. Section 1.1 of the APA defines "Restricted Cash" to encompass these various reserves relative to contracts assumed and assigned as part of the purchase.

160.   "Restricted Cash" means funds held in connection with a Contract that will be

40

assumed by the Seller and assigned to Defendant Pipeline, on deposit, which are utilized to offset liabilities, losses, fines, penalties and/or uncured contractual obligations, including but not limited to, as related to merchants, independent sales organizations, executive partners, or other contractual relationships. (APA, p. 5). Restricted Cash was included as an asset purchased pursuant to the APA. (See APA § 2.1(g), at p. 9).

E.       **Defendants' Fraudulent Attempt to Foreclose on Tribul Merchant Accounts**

161.    Upon information and belief, Defendants carried out their threat, and in May 2009 again breached the ISO Agreements with Tribul Plaintiffs, this time withholding Residual payments due and owing to Tribul Plaintiffs for the month, in the amount of approximately $601,167.54.

162.    By letter dated May 15, 2009, Defendants provided notice to the Tribul Plaintiffs of an alleged default under the CPP Loan Agreement "predicated upon, among other things, Borrowers' failure to pay the indebtedness due under the Loan Agreement" (hereinafter "Notice of Default").

163.    By another letter also dated May 15, 2009 Defendants provided notice to the Tribul Plaintiffs of their intent to conduct a UCC Foreclosure Sale of all of Tribul Plaintiffs' merchant accounts on June 1, 2009 (hereinafter "Notice of Foreclosure"). The foreclosure sale was to take place at the offices of one of Defendants' legal advisors, Defendant Targan or Defendant Jaffe Raitt.

164.    Defendants had no contractual or UCC rights to declare the Tribul Plaintiffs in default of the CPP Loan Agreement or to conduct a foreclosure sale.

165.    By letter dated May 22, 2009, Plaintiff Chanin, as Chief Executive Officer of the

Tribul Plaintiffs, forwarded a letter to Charles Moore, (hereinafter "Mr. Moore") who upon Plaintiff Chanin's information and belief had assumed authority as a receiver over the business operations of CynergyPreB and CPP at the behest of their secured lenders, requesting that Mr. Moore intervene and stop CynergyPreB from continuing down the mutually destructive path that its scheme had taken. Plaintiff Chanin's letter attached and referenced a copy of the Tribul Plaintiffs' attorneys' letter of May 22, 2009, in which Tribul Plaintiffs' attorneys timely and properly rejected Defendants' Notice of Default and Notice of Foreclosure and demanded the immediate payment of all Residuals due and owing, the production of all financial data regarding the alleged Classic Closeouts losses as well as withdrawal of the Notice of Default and Notice of Foreclosure. Mr. Moore responded to Plaintiff Chanin by email shortly thereafter and informed him that CynergyPreB would respond to Defendants as soon as possible.

166.    During the shortened week after Memorial Day (which included the Jewish holiday of Shavuot that is observed by both Plaintiff Chanin and his two lead counsel), CynergyPreB continued its hard ball tactics, delaying any substantive response until late Wednesday, when its counsel agreed to adjourn the June 1, 2009 Foreclosure Sale if Tribul Plaintiffs accepted even more onerous amendments to the ISO Agreement (including a cross-collaterization of the CPP Loan by assets held by other companies).

167.    The Tribul Plaintiffs understood that the Foreclosure Sale would be postponed until no earlier than Wednesday, June 3, 2009 at 5:00 p.m. in the event that the parties could not come to final agreement by that point.

168.    Just before the start of the Jewish holiday Thursday night, Defendants informed the Tribul Plaintiffs that they would not adjourn the foreclosure sale through Wednesday, but

only day-to-day. After the close of business on Monday, June 1, 2009, Defendants finally proffered a written proposal to the Tribul Plaintiffs and informed the Tribul Plaintiffs that Defendants would proceed with the Foreclosure Sale on Wednesday morning of June 3, 2009, if an agreement was not signed by close of business June 2, 2009.

169.   Upon information and belief, as a direct and proximate result of Defendants' multiple breaches of the ISO Agreement and Loan Agreement, their conversion of the Tribul Plaintiffs' funds, and their refusal to make Residual payments, the Tribul Plaintiffs were not able to make payment of that portion of the Residuals due and owing to their Down Lines.

170.   Tribul Plaintiffs advised Defendants that failure to pay the Down Lines would result in the destruction of Tribul Plaintiffs' businesses and the attrition of the merchant accounts that would be systematically moved by the Down Lines to another ISO and/or credit card processor.

171.   Upon information and belief, Tribul Plaintiffs repeatedly and consistently communicated with their Down Lines in good faith on several occasions (including multiple email transmissions) advising the Down Lines that negotiations with Defendants were ongoing and requesting that no merchant accounts be moved away from either the Tribul Plaintiffs or CynergyPreB at this time.

172.   Upon information and belief, despite the Tribul Plaintiffs' best efforts to control its Down Lines (who for the most part are independent contractors outside of Tribul Plaintiffs' direct control) the Down Lines began to move such accounts away from Tribul Plaintiffs causing significant damage to Tribul Plaintiffs.

173.   Upon information and belief, the Down Lines also either entirely ceased or

43

severely limited procuring new merchant accounts for Tribul Plaintiffs, causing significant

damage to Tribul Plaintiffs.

174.    Upon information and belief, despite the Tribul Plaintiffs' good faith to prevent

attrition of the merchant accounts, Defendants, while pretending to be preparing a good faith

proposal to settle the incipient dispute, made unsolicited communications to all of the Tribul

Plaintiffs' merchants and all of the Tribul Plaintiffs' Down Lines that Defendants could identify,

misinforming them that CynergyPreB had acquired the Tribul Plaintiffs' business and the

merchant accounts and that they had to deal directly with CynergyPreB, and not with the Tribul

Plaintiffs.

175.    Upon information and belief, Defendants instructed CynergyPreB's customer

service representatives to similarly misinform all of the Tribul Plaintiffs' Down Lines and

merchants who called in for customer service.

176.    Upon information and belief, Defendants contacted and/or communicated with the

Tribul Plaintiffs' Down Lines and merchants, defamed the Tribul Plaintiffs and have advised the Down

Lines, amongst other things, that CynergyPreB had acquired and now owns Defendants' merchant

accounts.

177.    Upon information and belief, some of the aforementioned communications were

memorialized in writing by CynergyPreB in its management information system (hereinafter

"VIMAS").

178.    Upon information and belief, the aforementioned statements made by

CynergyPreB representatives, acting on the specific instructions of Defendants, were false and

were known by Defendants to be false when such instructions were made and carried out.

44

179.   In or about June 2009, the Tribul Plaintiffs commenced a lawsuit against a few of the named Defendants and CynergyPreB and procured a temporary restraining order (TRO) that required CynergyPreB to pay that month's residuals.

180.   Upon information and belief instead of complying with the TRO, many of the named Defendants engaged in a conspiracy to frustrate the Tribul Plaintiffs' ability to prosecute the case or procure prospective injunctive relief, continued interfering with the Tribul Plaintiffs' relationships with their agents and merchants, and then filed for bankruptcy protection.

**F.      Defendants Fraudulently Transferred and Converted 3,500 of
Tribul's Merchant Accounts, 1000 of Which Are Still "Missing Merchants"**

181.   Pursuant to the ISO Agreements, the Tribul Plaintiffs were granted a non-exclusive license to utilize VIMAS which allows Tribul and SSF to access the merchant accounts, view their credit card processing reports and provide customer support as required of them under their ISO Agreements.

182.   Upon information and belief, as part of their scheme to paralyze the Tribul Plaintiffs and to seize the Tribul Merchant Portfolio, Defendants Paladini, Ceballos, Ordenez and Aschettino further violated the ISO Agreements by restricting Tribul Plaintiffs' access to the merchant account information on VIMAS, disabling their ability to edit or change merchant account data on VIMAS and otherwise preventing Tribul Plaintiffs and their assigns from being able to properly service Tribul Plaintiffs' merchant accounts (the "VIMAS Breach").

183.   Upon information and belief, the VIMAS Breach was intended by Defendants to, and actually did, have the effect of interfering with the Tribul Plaintiffs' business relationships with the Tribul Plaintiffs' merchants. Upon information and belief, the VIMAS Breach enabled Defendants to open lines of communication with the merchants to further facilitate Defendants'

45

scheme of appropriating the accounts of the Tribul Plaintiffs' merchants, and all residuals due to the Tribul Plaintiffs for such merchants for the benefit of Defendants.

184.    Upon information and belief, as part of their scheme, Defendants Ordonez, Ceballos, Paladini and Aschettino first locked the Tribul Plaintiffs out of the VIMAS processing system and then limited the Tribul Plaintiffs' access.

185.    During the months before the bankruptcy filing, Defendants withheld millions of dollars of Residuals due to the Tribul Plaintiffs, which the the Tribul Plaintiffs believed to be only approximately 4 million dollars, based upon the information that the Tribul Plaintiffs could gather. In reality, the sum was much closer to 7 million dollars.

186.    Part of the residual losses that the Tribul Plaintiffs were unable to recover from the bankruptcy estate were the residuals on account of the more than 3500 "missing merchants" that, unbeknownst to the Tribul Plaintiffs, Defendants had fraudulently transferred out of the Tribul Plaintiffs' Merchant Portfolio and EP account code during the period in 2009 when the Tribul Plaintiffs were locked out of VIMAS.

187.    Immediately after the sale in bankruptcy to the sole bidding group, Defendants Cynergy, PipelineCH and Comvest, the "new regime" at Defendant Cynergy turned the Tribul Parties' VIMAS access back on. When their VIMAS access had been restored, the Tribul Parties saw that more than 3,500 merchants were missing and asked Defendant Cynergy for an explanation.

188.    With no explanation at all, approximately 2,800 merchants magically reappeared in the Tribul Plaintiffs' Merchant Portfolio and EP account code on VIMAS.

189.    Approximately one thousand of the Tribul Merchants were and are still "missing

46

merchants," and the Tribul Parties have not been paid an estimated $5 million dollars due in Residuals on those accounts (assuming that all of the approximately 1,000 missing merchants have continued doing business and accepting credit and debit transactions).

190.    Defendant Cynergy refused to provide information regarding the Tribul Merchants during the bankruptcy proceeding and has continued to refuse the Tribul Merchants' requests for information about the missing merchants.

G.    Unified Defendants and Defendants Cynergy, McCoy and Corvino
Breach LOI And Misappropriate Dalmao Plaintiffs' Assets By Forcing a
Fraudulently Induced Settlement Agreement Under Duress.

191.    The Unified Defendants negotiated with BPS and ultimately entered into a business relationship in which the Unified Defendants would form a new ISO called "MCP" and acquire the BPS Merchant Portfolio from Plaintiffs Chanin, Dalmao, and BPS as part of a Novation Agreement in exchange for assuming debt owed to a company called RBL. It was agreed that in exchange for Plaintiff Dalmao's ongoing assistance in operating MCP and in maintaining and servicing MCP's merchant account portfolio, which now included the BPS Merchant Portfolio, Plaintiff Dalmao would acquire a fifty (50%) membership interest in MCP.

192.    The other fifty (50%) membership interest in MCP would be owned by Defendant STAR CAPITAL JV, LLC (hereinafter "SCJV").

193.    Upon information and belief, SCJV is an investment holding company, which invests in merchant credit card processing accounts by purchasing portfolios of the monthly commissions that result from such accounts, or by purchasing ISO's which own the rights to these Residual portfolios.

194.    Upon information and belief, SCJV and Plaintiff Dalmao began working together as co-owners of MCP soon after MCP acquired the Residual portfolio from BPS in or about October 2009. SCJV and Plaintiff Dalmao later memorialized their business relationship by negotiating and executing an "Operating Agreement" on January 25, 2010.

195.    The Operating Agreement provided that SCN and Plaintiff Dalmao each own a fifty percent (50%) membership interest of MCP.

196.    Ultimately, it was contemplated that the Plaintiffs and the Unified Defendants would merge all of their respective companies, collaborate their efforts and marshal their forces to obtain better pricing for credit card processing through Defendant Cynergy.

197.    Upon information and belief, the Unified Defendants were very interested in this arrangement because it would significantly reduce the processing fees and permit centralized management for all the Residual portfolios belonging to them and their respective companies.

198.    Upon information and belief, Defendant Cynergy was very interested in this arrangement because it would bring in more merchant accounts.

199.    Plaintiff Chanin was very interested in this arrangement because Defendant Cynergy was agreeing to significantly reduce the alleged indebtedness of the Tribul Plaintiffs to Defendant and would accept repayment of the remaining indebtedness through contractual minimums that would be met by credit card processing volume of the merged entities.

200.    After much negotiation, an Agreement and Letter of Intent was executed by Defendant Cynergy, SSF, Tribul, Chanin, MPS and SOY dated February 24, 2010 (hereinafter "LOP").

48

201.    Under the terms of the LOI, each party agreed to act and negotiate in good faith towards finalizing and consummating a deal by April 1, 2010. Under the terms of the LOI, each party agreed not to exercise economic duress and to refrain from withholding payment of any sums due and owing to one another. Under the terms of the LOI, each party agreed to exchange confidential data under the terms of a restrictive covenant of confidentiality.

202.    Indeed, during their discussions and negotiations under the LOI, the Tribul Plaintiffs and Plaintiffs Chanin and Dalmao provided a great deal of confidential and proprietary data and trade secrets (hereinafter Confidential Data") to the Unified Defendants, including, but not limited to, merchant lists, lists of Down Lines, copies of contracts and financial data belonging to each of the Plaintiffs.

203.    Additionally, Chanin introduced the Unified Defendants to the Plaintiffs' business associates, lenders, Down Lines and other third-parties with whom he and they had ongoing confidential business relations.

204.    In or about April 2010, it became apparent to Plaintiffs Chanin and Dalmao that the Unified Defendants had misrepresented themselves and their intent. Upon information and belief Defendants Firer, Goldstein and Sadovsky attempted to usurp control of the negotiations with Defendant Cynergy to their benefit and the benefit of their companies.

205.    Upon information and belief, under the direction of Defendant Corvino, the Unified Defendants circumvented Plaintiffs by cutting them out of the negotiations with Defendant Cynergy.

206.    Upon information and belief, despite the fact that no formal agreement was ever negotiated or executed with Plaintiffs under the terms of the LOI, the Unified Defendants issued

49

a press release in conjunction with Cynergy on or about April 2, 2010 stating "Cynergy and Star

Capital Announce Partnership."

207.    The press release stated "[Defendant Cynergy], a leading provider of transaction

processing services and innovative back office technology and Star Capital Holdings Corp.

("Star Capital"), an industry leading private capital investment firm with multiple investments in

the payment industry, announce a strategic partnership agreement. Under the terms of the

agreement, Star Capital and Cynergy will form a Service Company which will operate as a

centralized shared-resource company for Merchant Processing Services, Card Payment Systems

of NY ("CPS"), Wave Payment Systems, Process Pink Payments, Business Payment Systems,

ACIES, Hospitality Payment Solutions, Tribul Merchant Services and Second Source. The

Service Company will utilize Cynergy's award winning account servicing platform ("VIMAS")

to centralize critical business functions, which include existing and future strategic

relationships, processing platforms and leverage internal talent into a shared-resource within the

Service Company. The partnership is an exclusive, multi-year shared services agreement which

will utilize products and services of CynergyPreB to facilitate Star Capital's focus on exploring

opportunities within the payment processing industry."

208.    None of the Plaintiffs ever consented to the issuance of this or any other press

release.

209.    The Plaintiffs assert that the press release was completely false.

210.    Upon information and belief, the Unified Defendants circumvented Plaintiffs

from the acquisitions they had been discussing, including, but not limited to the purchase of

Defendant Process Pink and MMOA, Inc., which were deals that Plaintiff Chanin had personally brought to the table.

211.    Upon information and belief, the Unified Defendants borrowed money from Defendant Comvest and its investment partners against the MCP Residuals without the consent or knowledge of Plaintiffs Chanin or Dalmao. Upon information and belief, the Unified Defendants used these funds to make payroll payments for their other companies, including but not limited to a publicly traded company controlled by the Unified Defendants called ACIES Corporation.

212.    Upon information and belief the Unified Defendants fraudulently stated that they exclusively owned MCP and several of the Plaintiffs' entities, which they did not.

213.    Upon information and belief, the Unified Defendants used Confidential Data to their benefit in breach of the LOI and in violation of the restrictive covenant of confidentiality contained therein.

214.    Upon information and belief, the Unified Defendants executed settlement agreements with two sub-ISO 's with whom Plaintiffs had ongoing business disputes, after falsely representing that they were authorized by Plaintiffs to execute the agreements on their behalf.

215.    Upon information and belief, neither SCJV nor its principals, Defendants Firer, Goldstein and Sadovsky, nor any of the Unified Defendants, had any intention or ability to make the required capital contributions required by the MCP Operating Agreement, including, but not limited to the One Million ($1,000,000.00) Dollars for the purchase of the Down Lines' share of the monthly Residuals and 2.7 Million ($2,700,000.00) Dollars due be paid to Plaintiff Dalmao.

216.    In light of the foregoing, Plaintiffs Chanin and Dalmao advised the Unified

Defendants that Plaintiffs Chanin and Dalmao would no longer agree to pursue the more robust

business relationship contemplated in the LOT and that Plaintiffs Chanin and Dalmao desired an

amicable separation.

217.    Plaintiffs Chanin and Dalmao made repeated good faith attempts to negotiate the

separation to no avail as the Unified Defendants would not agree to any proposal that did not include

Plaintiffs Chanin and Dalmao's agreement to walk away from Dalmao's share of MCP (and the

revenue to be derived from the BPS Merchant Portfolio).

218.    Upon information and belief, the Unified Defendants utilized their various

companies including, but not limited to SCJV, MPS, Unified Payments LLC, Process Pink and

MMOA, Inc. to engage in an intentional and malicious campaign to lock Plaintiffs Chanin and

Dalmao out of MCP, circumvent their rights and deprive Plaintiffs Chanin and Dalmao of their

rightful share of the business and ruin Plaintiff Chanin's relationships with those parties that he had

introduced them to, including, but not limited to Defendant Cynergy.

219.    Upon information and belief, the Unified Defendants then utilized their influence

and control to convince Defendant Cynergy to withhold payment from Plaintiff Chanin's other

companies — the Tribul Plaintiffs -- which caused each of them significant damages.

220.    Upon information and belief, Defendant Corvino was complicit and active in this

improper withholding of Residuals from the Tribul Plaintiffs, due to her personal interest in the

Unified Defendants.

221.    Upon information and belief under the express direction of the Unified

Defendants, Defendants SCHC, SCM, SCJV, MPS, Unified, Pink and MMOA began

systematically contacting the sales agents who were contracted to the Tribul Plaintiffs, and advised

them that their merchant accounts and agent agreements were now owned by Unified rather than

MCP.

222.    On or about July 28, 2010, Process Pink systematically contacted all of the Down

lines by email and advised them in writing that their Residual portfolios had been acquired by Unified

Payments LLC.

223.    Tribul Plaintiffs contend that at all times hereinafter mentioned, this information was

false. In fact, Residual portfolios subject to the Novation Agreement were transferred to Unified

Payments, LLC by Defendants without any consideration to MCP and without the knowledge or

consent of Dalmao.

224.    Upon information and belief, the email further advised that the Down Lines'

Residual portfolios would now be serviced by Pink and MMOA. The email further referenced

"new contracts" which Defendants would require all the Down Lines to sign with Defendants in

order for them to be paid their rightful Residuals. These new contracts would require the Down

Lines to breach their agreements with Business Payment Systems, Tribul and SSF and solicit

new business for the Defendants rather than Tribul Plaintiffs.

225.    Upon information and belief, the Unified Defendants coerced the Down Lines to

enter such contracts by withholding and threatening to continue to withhold Residuals.

Defendants then collected and kept all the profits resulting from the new contracts they coerced

the Down Lines to enter.

226.    Upon information and belief, neither SCHC, SCM, SCJV, MPS, Unified, Pink or

MMOA had the knowledge, experience or technical ability to calculate and pay the Residuals to

the Down Lines.

227.   Therefore many of the Down Lines were not paid or were paid incorrectly. Upon information and belief, in a concerted effort to injure Chanin's goodwill in the industry, the Unified Defendants directed SCHC, SCM, SCJV, MPS, Unified, Pink and MMOA, Inc. not to pay any Residuals to certain Down Lines having a close and personal relationship with Chanin.

228.   As a direct and proximate result of these actions by the Defendants, significant damages have resulted to the Residual portfolio owned by MCP and to Dalmao. Based upon the aforementioned facts, the Plaintiffs Chanin and Dalmao filed a New York State Action against defendants in *Dalmao Ventures LLC et. al. v. Oleg Firer Leon Goldstein, et al.* (Index No. 651510/2010).

229.   Upon information and belief, the Unified Defendants, in further attempt to defraud the Tribul Plaintiffs, approached Defendants Cynergy and Corvino in order to force Plaintiffs to sign a settlement agreement, release all claims against Firer, and dismiss Tribul Plaintiffs' New York State Court action.

230.   Upon Information and belief, Defendants Cynergy, Corvino and Comvest co-conspired to force the Tribul Plaintiffs to sign the settlement agreement and release Firer and his companies by improperly and fraudulently withholding the Tribul Plaintiffs' earned residuals.

231.   Upon information and belief, as part of the settlement discussions, the Parties entered into a Letter of Intent, which would serve as the basis for a settlement agreement.

232.   Upon information and belief, the Unified Defendants were plainly aware of the dire financial situations of the Tribul Plaintiffs caused by Defendants illegal and inappropriate withholding Tribul Plaintiffs residuals from MPS, illegally diverting Down Lines and other

business assets for their own use, and making all efforts to deny the Tribul Plaintiffs their

rightful share based on their business agreements.

233.   Upon information and belief, the Unified Defendants knew that Tribul Plaintiffs

were reliant upon the monthly residual payments illegally being withheld by Defendant Cynergy and

redirected to the Unified Defendants.

234.   Upon information and belief, Defendant Cynergy brought undue pressure to bear

upon the Tribul Plaintiffs, thereby violating the specific terms of the Letter of Intent that had been

signed between the parties on February 24, 2010. The letter of intent signed February 24, 2010,

Section 3 states in part: "The parties expressly agree that good faith negotiations shall require that

neither party will threaten the other or attempt to use economic coercion to induce the other to

capitulate to demands including but not limited to withholding of any payment due and owing by

either party to the other..."

235.   Upon information and belief, Defendant Cynergy was negotiating a new Executive

Partner Agreement with the Tribul Plaintiffs that would solve some of the outstanding issues between

the Tribul Plaintiffs and Cynergy.

236.   Upon information and belief, Cynergy dictated that in order for a new Executive

Partner Agreement to be signed, including new terms which that would satisfy the alleged 8 million

dollar Cynergy Prosperity loans by requiring the Tribul Plaintiffs to meet 7.2 million dollars in

minimum billings, the Tribul Plaintiffs would have to sign a the settlement and release with the

Unified Defendants.

237.   Upon information and belief, Defendants Cynergy, McCoy and Corvino dictated that

the settlement and release would require Plaintiffs Chanin and Dalmao to dismiss their

lawsuit, release Plaintiff Dalmao's 50% equity share in MCP, and release the Unified Defendants from claims worth almost $6 million (the $2 million dollar note to Dalmao, another $2.7 million dollar note for equity and $1 million dollars owed to the Down Lines on those merchant accounts for which Dalmao maintained responsibility.).

**H.    Defendants Cynergy et al. Forced An Onerous New ISO Agreement**
**Upon the Tribul Plaintiffs Fraudulently, and Under Duress**

238.    Upon information and belief, Defendant Cynergy never paid any consideration or properly acquired or assumed the CPP Loan Agreement and the Tribul Plaintiffs' $8 million debt obligations thereunder and Plaintiff Chanin's personal guaranty thereof.

239.    Upon information and belief, Defendants Cynergy, PipelineCH and Comvest reached a firm purchase price for all of the assets of CynergyPreB, and then, immediately prior to closing the APA transaction, reallocated $2 million worth of debt forgiveness and other consideration to be paid by the Comvest group as part of the purchase to the purchase of the CPP Loan Agreement.

240.    Upon information and belief, Defendants Cynergy, McCoy and Corvino deceived the Tribul Parties and fraudulently induced them to sign the Cynergy EP Agreement, along with replacement loan documents, in or about January 2011. As part of the Cynergy EP Agreement, Cynergy required unreachable minimum performance requirements on the Tribul Parties, with steep financial penalties.

241.    Upon information and belief, the minimum performance requirements and the financial penalties, along with the UCCs on file, make it virtually impossible for the Tribul Parties to sell the Tribul Merchant Portfolio for fair market value.

242.    Upon information and belief, the Tribul Parties have received bona fide offers

worth up to $40 million for the Tribul Merchant Portfolio, but such deals are contingent upon Defendant Cynergy releasing the minimums and the right of first refusal.

243.    Upon information and belief, throughout 2009, Defendant Cynergy refused to renegotiate, let alone forgive, the minimums or the right of first refusal, scuttling a deal with a bona fide offer on the table.

244.    Upon information and belief, the Tribul Parties could sell the Tribul Merchant Portfolio for a fair market value of up to$40 million if Defendant Cynergy would release the minimums and the right of first refusal.

I.    **Defendant Cynergy's 2012 Breaches of ISO Agreement and Defendants Cynergy, Fitzsimmons and Corvino's Interference <u>With Tribul Plaintiffs' Merchants and Down Lines and Contempt of Court</u>**

245.    Upon information and belief, the ISO Agreement provides that the merchant accounts belong to Tribul, not to Defendant Cynergy. Upon information and belief, Defendant Cynergy's new CEO, **Defendant** Fitzsimmons, encourages the practice of different Cynergy ISOs cannibalizing each others' merchant portfolios.

246.    Upon information and belief, in a brazen circumvention of the Tribul Plaintiffs rights under the ISO Agreements and at law, Defendants Cynergy, Fitzsimmons and Corvino instructed Plaintiff's Agent Rory Cypers ("Cypers") to interfere with Tribul's largest boarded Merchant, Insomniac, Inc. (hereinafter "Insomniac") and to attempt to entrap the Tribul Plaintiffs in a violation of the Visa and MasterCard rules that would justify Defendant Cynergy's attempt to extract more onerous contractual terms from the Tribul Plaintiffs or worse, de-list the Tribul Plaintiffs and seize the Tribul Merchant Portfolio for itself.

247.    Upon information and belief, Defendants Cynergy, Fitzsimmons and Corvino

commenced an audit of the Tribul Plaintiffs based upon their attempted entrapment of the Tribul

Plaintiffs, and used the audit as a pretext to further forestall negotiations with the Tribul Plaintiffs, and

to communicate directly with the Agent, Cypers, and the merchant, Insomniac.

248.    Upon information and belief, Insomniac accounts for a significant percentage the

Tribul Plaintiffs' business and the loss of this Merchant and the other accounts controlled by this Agent

would be catastrophic to the Tribul Plaintiffs' business.

249.    Plaintiff Tribul immediately sought to enjoin and restrain Mr. Cypers and others from

interfering with Tribul Plaintiffs' merchants and harassing Tribul Plaintiffs' administrator, members,

assign and agent by obtaining a Temporary Restraining Order by Order to Show Cause on June 27,

2012 *See Tribul Merchant Services, LLC v. Rory ("Reuven') Cypers and Residual Income*

*Opportunities, Inc.,* Index No. 13301-12 (the "2012 TRO").

250.    Upon information and belief Defendants Cynergy, Fitzsimmons and Corvino

instructed Rory Cypers to violate the 2012 TRO and encouraged him with assurances that Defendant

Cynergy would directly pay him a higher residual on his merchant portfolio if he sought a TRO

(similar to the one procured by the Tribul Parties against CynergyPreB in 2009), declaring that

Cypers' residuals had to be paid.

251.    Upon information and belief, Defendants Cynergy, Fitzsimmons and Cynergy

knowingly violated the specific prohibitions of the 2012 TRO and are in contempt of court.

J.    Summary of Specific Fraudulent Acts Committed by Cynergy's Advisors

252.    Mr. Charles Moore, the restructuring agent for CynergyPreB during the months

prior to the Petition Date -- including the period of time when Cynergy was withholding the Tribul

Plaintiffs' residuals and attempting to foreclose on the Tribul Plaintiffs' merchant

portfolio -- served as the Liquidation Trustee in the Chapter 11 Case No. 09-13038 (KG), *In re CynergyPreB. LLC. et al*, in which Tribul Plaintiffs were creditors seeking $4 million of the $7 million worth of cure claims on account of withheld residuals and improperly charged fees.

253 Mr. Moore was hired as the CynergyPreB restructuring agent by Defendants Paladini and Leavitt, and his hiring was recommended and approved by the secured lenders. In his role as restructuring agent, Mr. Moore had weekly status meetings with those same banks, and with the CynergyPreB team of executives and legal/business advisors.

254.    Upon information and belief, Defendants CynergyPreB was advised during those meetings to improperly and fraudulently foreclose on Tribul Plaintiffs merchant accounts and to improperly and fraudulently withhold Tribul Plaintiffs residuals to cover operating losses in preparation for bankruptcy. Upon information and belief, that advice and approval came from Defendants Penski, Berman, Nixon Peabody, Targan and Jaffe Rait, despite the fact that there was no basis in law or fact to institute foreclosure proceedings.

255.    Upon information and belief, Defendants Aschettino, Penski, Berman and Nixon Peabody acted in bad faith to delay the Court proceedings in the case brought by the Tribul Plaintiffs in June 2009, advised others to violate the then-pending TRO, failed to engage in good faith efforts to mediate the dispute in the Court-ordered mediation, and insured that more residuals would be withheld from the Tribul Plaintiffs in the months leading up to the bankruptcy filing.

256.    Upon information and belief, Defendants Aschettino, Penski, Berman and Nixon Peabody implemented this plan in concert with Defendants Targan, Jaffe Rait, Paladini, Ordonez Ceballos, Leavitt and Unicorn in an attempt to raise the potential sale price of CynergyPreB and

59

to insure that sufficient cash was on hand to pay their own professional fees.

257.    Upon information and belief, Cynergy timely paid the bills of its lawyers, financial advisors and other consultants, including those fees of Defendants Penski, Berman, Nixon Peabody, Targan, Jaffe Rait, Leavitt and Unicorn throughout 2009, while failing to cover its trade debt and its ongoing financial obligations to the Tribul Plaintiffs and their Down Lines, causing significant damage to the value of the Tribul Plaintiffs' businesses.

258.    Upon information and belief, Defendant Corvino, in order to cover up the full extent of the fraudulent activities of her colleagues (and the duress under which she and Defendants McCoy and Cynergy forced the Tribul Plaintiffs to sign the new onerous ISO Agreement documents in January 2011 and forced the Tribul Plaintiffs to settle their dispute with the Unified Defendants), in a further attempt to defraud and deceive, withheld valuable and pertinent information from the Tribul Plaintiffs, refused to allow employees to provide true accounting of the Classic Closeouts and sufficiently obstructed the Tribul Plaintiffs' efforts in obtaining correct calculations of losses on the Classic Closeouts account.

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract — Against Defendant Cynergy)

259.    Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

260.    Tribul Plaintiffs entered into the CynergyPreB ISO Agreement with CynergyPreB, and that agreement was assumed by Defendant Cynergy.

261.    Tribul Plaintiffs entered into the Cynergy EP Agreement with Defendant Cynergy.

60

262.   Defendant Cynergy was obligated to perform all of its obligations under the CynergyPreB ISO Agreement and the Cynergy EP Agreement.

263.   Tribul Plaintiffs have, to date, fulfilled their obligations under these agreements with Defendant Cynergy in good faith.

264.   Defendants conspired and committed multiple, intentional and malicious breaches of their agreements with Tribul Plaintiffs as stated above in an attempt to acquire Tribul Plaintiffs' merchant accounts and to put the Tribul Plaintiffs out of business or to divert valuable merchant accounts and residual streams to Defendants, instead of to Plaintiff Tribul.

265.   These acts and omissions by Defendants constitute a material breach of the agreements by Defendant Cynergy.

266.   Tribul Plaintiffs have been damaged by Defendants' actions and are entitled to recover against Defendant Cynergy in an amount to be determined at trial.

267.   Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential additional profits that would be either unquantifiable or deemed speculative, putting Tribul Plaintiffs out of business, preventing a fair market value sale of the Tribul Merchant Portfolio, and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment — Against Defendants Cynergy, Targan, Jaffe Rait, Penski, Berman and Nixon Peabody)

268.   Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

61

269.    Tribul Plaintiffs procured thousands of merchant accounts for Defendant Cynergy, which generate millions of dollars of Residuals each year. Defendant Cynergy has enjoyed the benefit of the Residuals earned due to Tribul Plaintiffs good faith efforts and have inappropriately withheld and converted Tribul Plaintiffs' rightful share of such Residuals and other sums (a) attributable to the missing merchants, (b) due to the set-offs that Defendant Cynergy has taken by enforcing the unconscionable and otherwise unenforceable terms of the Cynergy EP Agreement, and (c) by withholding the approximately $800,000 of the Tribul Plaintiffs' Second EP Reserve and the merchant reserves that were transferred to Defendant Cynergy at the time of the APA.

270.    Tribul Plaintiffs had a reasonable expectation of consideration for the merchant accounts it procured for Defendant Cynergy.

271.    Defendants have conspired and intentionally and maliciously withheld and converted the Residuals and other funds rightfully belonging to the Tribul Plaintiffs.

272.    The Advisor Defendants were unjustly enriched by the fact that they were paid their full professional fees by CynergyPreB at a time when the Tribul Plaintiffs' Residuals were being improperly and fraudulently withheld

273.    The principles of equity and good conscience require restitution by the Defendants to Tribul Plaintiffs.

274.    Defendants have thus been unjustly enriched at Tribul Plaintiffs' expense and Tribul Plaintiffs are entitled to recover against Defendants in an amount to be determined at trial.

275.    Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential

additional profits that would be either unquantifiable or deemed speculative, putting Tribul

Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could

not be rectified by a monetary judgment.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty — Against Defendants Cynergy, Paladini, Ceballos, Ordonez, Aschettino, McCoy, Fitzsimmons and Corvino)**

276.   Tribul Plaintiffs repeat and reiterate each and every allegation contained in the

preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth

at length herein.

277.   By virtue of Defendant Cynergy's exclusive and sole control over the Residual

stream it receives and distributes to Tribul Plaintiffs and on Tribul Plaintiffs' behalf, and by

virtue of the confidential nature of the relationship between Defendants and Tribul Plaintiffs,

Defendant Cynergy and Defendants Paladini, Ceballos, Ordonez, Aschettino, McCoy,

Fitzsimmons and Corvino, owed the Tribul Plaintiffs and their Down Lines a fiduciary duty.

278.   By virtue of their fraudulent, intentional and malicious actions including, but not

limited to, converting and withholding Residuals and other funds and those other actions stated above,

Defendants Cynergy, Paladini, Ceballos, Ordonez, Aschettino, McCoy, Fitzsimmons and Corvino

Defendants breached their fiduciary duty to Tribul Plaintiffs and their Down Lines.

279.   Tribul Plaintiffs have been damaged by Defendants' actions and are entitled to

recover against them in an amount to be determined at trial.

280.   Upon information and belief, unless enjoined, Defendants' actions will cause

further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential

additional profits that would be either unquantifiable or deemed speculative, putting Tribul

Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing — Against Defendants Cynergy, Paladini, Ceballos, Ordonez, Aschettino, McCoy, Fitzsimmons and Corvino)

281.     Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

282.     By virtue of the relationship between the parties herein, Defendants were bound to Tribul Plaintiffs by a covenant of good faith and fair dealing.

283.     Such covenant precluded Defendants from acting in a manner of destroying or injuring Tribul Plaintiffs' rights to receive the fruits of their relationship with Defendants.

284.     Defendants conspired and breached their covenant of good faith and fair dealing to Tribul Plaintiffs by their aforesaid intentional and malicious acts and by destroying and injuring Tribul Plaintiffs' rights to receive the fruits of their relationship with Defendants.

285.     Tribul Plaintiffs have been damaged by Defendants' actions and are entitled to recover against them in an amount to be determined at trial.

286.     Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential additional profits that would be either unquantifiable or deemed speculative, putting Tribul Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

64

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Tortious Interference with Contract — Against All Defendants)

287.    Plaintiffs repeat and reiterate each and every allegation contained in the

preceding·paragraphs of this Verified Complaint with the same force and effect as if fully set forth

at length herein.

288.    Plaintiffs had a valid contract with Merchant Processing Systems (hereinafter

"MPS") whereunder MPS was and is obliged to provide customer service support to the many

thousands of merchant accounts belonging to the Plaintiffs.

289.    Defendants had knowledge of this valid contract.

290.    Defendants willfully, intentionally and maliciously interfered with MPS' valid

contract with Plaintiffs by restricting Plaintiffs' access to VIMAS, thus causing through improper

means, MPS to breach its valid contract with Plaintiffs.

291.    Tribul Plaintiffs had valid contracts with their Down Lines whereunder the Down

Lines have agreed to procure new merchant accounts and maintain existing accounts previously

procured for Tribul Plaintiffs.

292.    Defendants had knowledge of these valid contracts.

293.    Plaintiff Dalmao had a valid contract with MCP and Star.

294.    Defendants Cynergy, McCoy and Corvino had knowledge of this valid contract.

295.    Defendants willfully, intentionally and maliciously interfered with Tribul

Plaintiffs' valid contracts with their Down Lines, with MPS and with MCP andStar by contacting and/or

communicating directly with the other parties to the contracts, defaming Tribul Plaintiffs and coercing

the other parties to breach their valid contracts with Tribul Plaintiffs and to work

65

directly for and with Defendants, under the threat that Defendant Cynergy would continue to withhold the Residuals and through other improper means if the other parties did not comply.

296.    Tribul Plaintiffs have been damaged as a result of Defendants' intentional and malicious interference with their valid contracts and is entitled to recover against them in an amount to be determined at trial.

297.    That at all times hereinafter mentioned, Defendants' actions were intentional, malicious and reckless, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

298.    Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential additional profits that would be either unquantifiable or deemed speculative, putting Tribul Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

### AS AND FOR A SIXTH CAUSE OF ACTION (Tortious Interference with Prospective Business Relations — Against All Defendants)

299.    Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

300.    At various times over the past two years, Tribul Plaintiffs were engaged in discussions with business relations who were prospective and interested purchasers willing and able to purchase Tribul Plaintiffs' merchant accounts or the rights to receive the Residual payments associated with such merchant accounts.

66

301.   Defendants Cynergy, Paladini, Ceballos, Ordonez, Aschettino, McCoy and Corvino had knowledge of these prospective purchasers.

302.   Defendants Cynergy, Fitzimmons and Corvino willfully, intentionally and maliciously interfered with Tribul Plaintiffs' relations with such prospective purchasers, including, but not limited to NPC and Gateway, as described above.

303.   Defendants' willful, intentional and malicious interference with Tribul Plaintiffs' relations with such prospective purchasers proximately and directly caused the prospective purchasers to either withdraw their offers of purchase or to notify Tribul Plaintiffs that they were no longer interested in conducting business with Tribul Plaintiffs in the manner contemplated.

304.   Tribul Plaintiffs have been damaged as a result of Defendants' intentional and malicious interference with its prospective business relations and are entitled to recover against them in an amount to be determined at trial.

305.   That at all times hereinafter mentioned, Defendants' actions were intentional, malicious and reckless entitling Plaintiff to punitive damages in an amount to be determined at trial

306.   Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Tribul Plaintiffs by, among other things, denying Tribul Plaintiffs potential additional profits that would be either unquantifiable or deemed speculative, putting Tribul Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

**AS AND FOR A SEVENTH CAUSE OF ACTION(Unfair Competition — Against All Defendants Except Targan,Jaffe Rait, Penski, Berman and Nixon Peabody)**

307.    Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

308.    A confidential and fiduciary relationship existed between the Tribul Plaintiffs and Defendants.

309.    In contravention and breach of this confidential and fiduciary relationship, Defendants acted unfairly by conspiring against Tribul Plaintiffs for their own commercial advantage and by unfairly competing with Tribul Plaintiffs in an intentional, and malicious attempt to pirate Tribul Plaintiffs clients and agents instead of working with Tribul Plaintiffs in good faith as required by their confidential and fiduciary relationship and agreements.

310.    Tribul Plaintiffs have been damaged as a result of Defendants' unfair competition and are entitled to recover against them in an amount to be determined at trial.

**AS AND FOR AN EIGHTH CAUSE OF ACTION
(Promissory Estoppel — Against All Defendants Except
Targan, Jaffe Rait, Penski, Berman and Nixon Peabody)**

311.    Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

312.    Defendants made clear and unambiguous promises to Plaintiffs to work together with Plaintiffs in good faith, including, but not limited to promises to manage Tribul Plaintiffs' funds and Residuals in good faith, to withhold only those sums due and owing, to provide Tribul Plaintiffs access and rights to VIMAS and to pay Tribul Plaintiffs their rightful Residuals.

313.    Among other things, Defendant Paladini, McCoy and Corvino promised to procure a dedicated bank identification number ("BIN") for Tribul Plaintiffs to use for Tribul Plaintiffs merchants.

314.    Defendants failed to keep their promises.

315.    Plaintiffs reasonably relied upon such promises to their detriment.

316.    Plaintiffs suffered damages as the result of their reasonable and foreseeable reliance on Defendants' promises and is entitled to recover against them in an amount to be determined at trial.

317.    Upon information and belief, unless enjoined, Defendants' actions will cause further harm to Plaintiffs by, among other things, denying Tribul Plaintiffs potential additional profits that would be either unquantifiable or deemed speculative, putting Tribul Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Conversion — Against All Defendants)

318.    Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

319.    Tribul Plaintiffs have possessory rights and interests in the Residuals and other sums which were and continue to be withheld and converted by Defendants.

320.    Defendants' dominion over these Residuals and other sums is in derogation of Tribul Plaintiffs' possessory rights and interests in same.

321.    Tribul Plaintiffs demanded the payment of its rightful Residuals and other sums

69

and Defendants have refused and failed to make payment of same.

322.     Upon information and belief, the approximately $1 million that was held in the QM

account and the Second Reserve Fund are both owed to the Tribal Plaintiffs and were fact in the

possession of Cynergy Data after the APA.

323.     Tribul Plaintiffs have been damaged by virtue of Defendants' conversion and are

entitled to recover against them in an amount to be determined at trial.

324.     Upon information and belief, unless enjoined, Defendants' actions will cause

further harm to Tribul Plaintiffs by, among other things, denying Tnbul Plaintiffs potential

additional profits that would be either unquantifiable or deemed speculative, putting Tribul

Plaintiffs out of business and otherwise irreparably harming Tribul Plaintiffs in a manner that could

not be rectified by a monetary judgment.

AS AND FOR A TENTH CAUSE OF ACTION
(Declaratory Judgment — Against All Defendants)

325.     Plaintiffs repeat and reiterate each and every allegation contained in the preceding

paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length

herein.

326.     At all relevant times, S SF was bound to repay its loan from CPP under the terms of

the Loan Agreement.

327.     At all relevant times CynergyPreB was required under the terms of the Loan

Agreement to retain that portion of Tribul Plaintiffs' Residuals.

328.     At all relevant times, CynergyPreB was in exclusive and complete control over the

Residual stream and thus, was and is wholly and completely liable to make all payments on SSF's

behalf to CPP.

70

329.    At all relevant times, CynergyPreB was contractually obligated by the Loan Agreement to make such payments to CPP on SSF's behalf.

330.    Upon information and belief, CynergyPreB did at all times make such payments to CPP on SSF's behalf and that at no time did SSF default on its loan obligations to CPP. Alternatively, SSF could not have defaulted on such loan obligations inasmuch as CPP's corporate affiliate, CynergyPreB retained exclusive and complete control over the Residual stream.

331.    Alternatively, if any default of SSF's loan obligations to CPP did occur, by virtue of CynergyPreB's exclusive and complete control over the Residual stream, such default by definition was a direct and proximate result of CynergyPreB's breach of its obligations to make such payments on behalf of S SF.

332.    Upon information and belief, Defendant Cynergy did not pay any consideration for or properly assume the CPP Loan; and accordingly, Plaintiffs are entitled to a declaration that Defendant Cynergy can not enforce the CPP Loan Agreement, the Note or the Personal Guarantee.

333.    Alternatively, Plaintiffs are entitled to a declaration that Defendant Cynergy could recover at most $2 million from the Tribul Plaintiffs on account of the CPP since the bankruptcy petition listed the CPP Loan at $2 million and the amount of the purchase price allocated to that loan was only $2 million.

334.    Given the fact that the Cynergy EP Agreement was entered into under duress caused by the improper, fraudulent representations by Defendants Cynergy, McCoy and Corvino regarding the enforceability of the CPP Loan in the amount of $8 million (along with the Note

and the Guarantee), Plaintiffs are entitled to a declaration that the Cynergy EP Agreement is null, void and unenforceable, and Defendant Cynergy can not enforce the Cynergy EP Agreement or any of the collateral/ancillary documents, including the Personal Guarantee.

335.     Given the fact that the Dalmao Settlement and Release was signed under duress from and as a result of improper, fraudulent undue pressure and misrepresentations by Defendants Cynergy, McCoy and Corvino, Plaintiffs are entitled to a declaration that the Dalmao Settlement and Release is null, void and unenforceable.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### (Judicial Accounting — Against All Defendants)

336.     Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

337.     At all relevant times, and pursuant to the agreements between the parties, Defendants were and are in exclusive control of all data concerning fees, rate structures, processing activity, Residuals and related financial information concerning Tribul Plaintiffs' merchant accounts.

338.     At all relevant times, Defendants have improperly withheld and converted the Residuals and other sums rightfully due and owing to Tribul Plaintiffs including sums withheld due to the alleged Classic Closeouts losses and those attributable to the missing merchants.

339.     Upon information and belief, Defendants have also improperly charged additional unauthorized fees and costs to Tribul Plaintiffs.

340.     By reason of the foregoing, Tribul Plaintiffs are entitled to a judicial accounting

of all fees and costs charged by Defendants to Tribul Plaintiffs, of all Residuals and other sums improperly converted and withheld by Defendants from Tribul Plaintiffs and of all residuals or fees that should have been paid on the missing merchants accounts, and were paid on the MCP merchants and the BPS merchant portfolio to the Unified Defendants or to anyone other than Plaintiff Dalmao.

### AS AND FOR A TWELFTH CAUSE OF ACTION
(Fraud — Against All Defendants)

341.    Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

342.    Defendants represented to Tribul Plaintiffs that the sums they withheld for alleged losses from the Classic Closeouts merchant were accurate.

343.    Defendants represented to Tribul Plaintiffs that the data they provided to Tribul Plaintiffs to substantiate such losses was complete and accurate as well.

344.    Defendants represented to Tribul Plaintiffs that they would procure a unique BIN identifier for SSF in consideration of SSF's agreement not to seek financing or a BIN from other sources.

345.    Defendants represented to Plaintiffs that they had not and would not solicit Tribul Plaintiffs' merchants and Down Lines or contract directly with them.

346.    Defendants represented to Plaintiffs that they had not and would not solicit Tribul Plaintiffs' merchants and Down Lines or contract directly with them.

347.    Defendants represented to Plaintiffs that Defendant Cynergy had properly assumed and could enforce the CPP Loan, the Note and Plaintiff Chanin's guaranty.

73

348.   Defendants represented that they could not locate the missing reserve funds (approximately $1 million) or the missing merchants and could not calculate the amount of the residuals that were paid to others or should have been paid to the Tribul Plaintiffs with respect to the missing merchants.

349.   Defendants McCoy, Fitzsimmons and Corvino represented that they were working with the Plaintiffs in good faith and in Plaintiffs' best interests.

350.   That at all times hereinafter mentioned, upon information and belief, Defendants' representations were false.

351.   Defendants made such misrepresentations with knowledge that they were false purposefully and with intent to defraud Plaintiffs, deprive them of their funds and destroy their businesses.

352.   Plaintiffs justifiably relied upon Defendants' misrepresentations.

353.   Plaintiffs have been damaged as a direct result of Defendants' frauds in an amount to be determined at trial,

354.   Punitive damages should be added to any award of compensatory damages as a result of the willful and wanton nature of Plaintiff's acts.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION
(Tortious Interference with Prospective Business Relations -
Against Defendants Cynergy, McCoy, Fitzsimmons and Corvino)

355.   Tribul Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

74

356.   At various times over the past two years, Tribul Plaintiffs were engaged in discussions with business relations who were prospective and interested purchasers willing and able to purchase Tribul Plaintiffs' merchant accounts or the rights to receive the Residual payments associated with such merchant accounts.

357.   Defendants had knowledge of these prospective purchasers.

358.   Defendants willfully, intentionally and maliciously interfered with Tribul Plaintiffs' relations with such prospective purchasers, including, but not limited to National Processing Company and Gateway.

359.   Tribul Plaintiffs have been damaged as a result of Defendants' tortious interference and are entitled to recover against them in an amount to be determined at trial.

### AS AND FOR A FOURTEENTH CAUSE OF ACTION
(Breach of Contract — Against Unified Defendants)

360.   Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

361.   Plaintiiff Dalmao entered into the MCP Operating Agreement and the LOI with the Unified Defendants.

362.   The MCP Operating Agreement and the LOI are enforceable agreements.

363.   Plaintiff Dalmao has to date fulfilled its obligations under the agreements with the Unified Defendants in good faith.

364.   The Defendants conspired and committed multiple, intentional and malicious breaches of their agreements with Plaintiff Dalmao as stated above in an attempt to avoid the Unified Defendants' obligations to Plaintiff Dalmao, to acquire Plaintiff Dalmao's interest in

MCP without any consideration, to seize Plaintiff Dalmao's ownership share of the MCP

merchant accounts (including those that previously belonged to BPS, to put Plaintiff Dalmao out

of business or to divert valuable merchant accounts and residual streams to the Unified

Defendants or others, instead of to Plaintiff Dalmao.

365.   These acts and' omissions by Defendants constitute a material breach of the MCP

Operating Agreement and the LOI by the Unified Defendants.

366.   Tribul Plaintiffs have been damaged by Defendants' actions and are entitled to

recover against them in an amount to be determined at trial.

367.   Upon information and belief, unless enjoined, Defendants' actions will cause

further harm to Plaintiff Dalmao by, among other things, denying Plaintiff Dalmao's potential

additional profits that would be either unquantifiable or deemed speculative, and otherwise

irreparably harming Plaintiff Dalmao in a manner that could not be rectified by a monetary

judgment.

### AS AND FOR A FIFTEENTH CAUSE OF ACTION
**(Breach of Fiduciary Duty — Against The Unified Defendants
and Defendants Comvest, Cynergy, McCoy and Corvino)**

368.   Plaintiffs repeat and reiterate each and every allegation contained in the preceding

paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length

herein.

369.   By virtue of the Unified Defendants' position as partners of Plaintiff Dalmao in

the MCP entity, the Unified Defendants owed the Tribul Plaintiffs and their Down Lines a

fiduciary duty.

370.   By virtue of their fraudulent, intentional and malicious actions including, but not limited to, forcing Plaintiff Dalmao to enter into the Dalmao Settlement Agreement without any consideration and under duress, the Unified Defendants breached their fiduciary duty to Plaintiff Dalmao.

371.   Plaintiffs Dalmao and Chanin have been damaged by the Unified Defendants' actions and are entitled to recover against them in an amount to be determined at trial.

372.   Upon information and belief, Defendants Comvest, Cynergy and Corvino are responsible for the damages as co-conspirators who induced, participated in and personally benefited from the breach by the Unified Defendants.

373.   Upon information and belief, unless enjoined, the Unified Defendants will improperly deplete, encumber, hide or transfer the assets which Plaintiff Dalmao expects to recover from the Unified Defendants, frustrating this Court's ability to mete out justice in this action and/or denying Plaintiff Dalmao potential additional profits that would be either unquantifiable or deemed speculative, and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

### AS AND FOR A SIXTEENTH CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing — Against The Unified Defendants and Defendants Comvest, Cynergy, McCoy and Corvino)**

374.   Plaintiffs repeat and reiterate each and every allegation contained in the preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth at length herein.

375.   By virtue of the relationship between the parties herein, Defendant Corvino and the Unified Defendants were bound to Plaintiffs Chanin and Dalmao by a covenant of good faith

and fair dealing.

376.   Such covenant precluded the Unified Defendants from acting in a manner of destroying or injuring Plaintiff Dalmao's rights to receive the fruits of its relationship with Defendants.

377.   The Unified Defendants conspired and breached their covenant of good faith and fair dealing to Plaintiff Dalmao by their aforesaid intentional and malicious acts and by destroying and injuring Plaintiff Dalmao's rights to receive the fruits of its relationship with the Unified Defendants.

378.   Plaintiff Dalmao has been damaged by Defendants' actions and is entitled to recover against them in an amount to be determined at trial.

379.   Upon information and belief, Defendants Comvest, Cynergy, McCoy and Corvino are responsible for the damages as co-conspirators who induced, participated in and personally benefited from the breach by the Unified Defendants.

380.   Upon information and belief, unless enjoined, the Unified Defendants will improperly deplete, encumber, hide or transfer the assets which Plaintiff Dalmao expects to recover from the Unified Defendants, frustrating this Court's ability to mete out justice in this action and/or denying Plaintiff Dalmao potential additional profits that would be either unquantifiable or deemed speculative, and otherwise irreparably harming Tribul Plaintiffs in a manner that could not be rectified by a monetary judgment.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
(Contempt of Court for Violations of 2012 TRO -
Against Defendants Cynergy, Fitzimmons and Corvino)

381.    Tribul Plaintiffs repeat and reiterate each and every allegation contained in the

preceding paragraphs of this Verified Complaint with the same force and effect as if fully set forth

at length herein.

382.    On June 26, 2012, in a matter entitled *Tribul Merchant Services, LLC v. Rory*

*("Reuven') Cypers and Residual Income Opportunities,* Justice David Schmidt of the New York

Supreme Court, County of Kings, signed an order to show cause that included a temporary

restraining order (the "2012 TRO") which, pursuant to CPLR § 6301, enjoined and restrained

the Defendants, their attorneys, agents, employees, representatives and/or servants, and/or any

other persons or entities acting by or on their behalf, or under their direction or supervision,

from [among other things] (1) contacting, soliciting or contracting with, directly or indirectly,

for themselves or for any third party any business, merchant, person or entity that has

previously entered into a "Merchant Agreement" and to which Tribul provided or provides

services (hereinafter, "Merchant") (as such terms are defined and/or incorporated into the

Independent Sales Organization Agreement dated October 1, 2008 between Plaintiff and

Defendants); (2) interfering with Plaintiff's business, including but not limited to interfering

with Plaintiff's business relations with any of Plaintiff's Merchants . .

383.    Defendants Cynergy, Fitzsimmons and Corvino had full knowledge of the

existence and terms of the 2012 TRO as of 8:51 p.m. on June 27, 2012 when they received a copy

of the 2012 TRO.

384.    Upon information and belief, after they were on notice of the 2012 TRO, and

obligated to comply its terms or held in contempt *(Matter of McCormick v. Axelrod*, 59 NY2d 574,

583 (1983)), Defendants Cynergy, Fitzsimmons and Corvino knowingly, willfully, and

contemptuously violated the 2012 TRO.

385.    Tribul Plaintiffs have been damaged as a result of Defendants Cynergy,

Fitzsimmons and Corvino's knowing, willful, and contemptuous violations of the 2012 TRO.

386.    Plaintiffs respectfully submit that this Court should, pursuant to Judiciary Law §

§773 and 774, impose a term of imprisonment or levy a fine upon Defendants Cynergy,

Fitzsimmons and Corvino to indemnify Plaintiffs for damages, costs and attorneys fees incurred

as a result of Defendants' willful violations of the lawful Order of this Court and to deter all

future violations of the lawful Orders of this Court;


WHEREFORE, Plaintiffs demand judgment as follows:

(a)    On each and every cause of action judgment for compensatory damages in varying

amounts between $800,000.00, and $40,000,000.00;

(b)    On each and every cause of action above for which punitive damages are recoverable and

warranted, judgment for punitive damages in an amount exceeding $50,000,000.00;

(c)    An order compelling Defendants to account to the Plaintiffs for all Residuals and other

sums converted and withheld from the Tribul Plaintiffs, the fees and costs charged by

Defendants to Tribul Plaintiffs, the alleged losses sustained as a result of the Classic

Closeouts merchant account, the disposition and whereabouts of the remaining missing

merchants, the amount of termination fees or residuals paid (and to whom) on account of

the remaining missing merchants between June 1, 2009 and October 26, 2009, and

80

between October 26, 2009 and the present, and the amount of residuals paid on the MCP

merchant accounts to the Unified Defendants or to anyone other than Plaintiff Dalmao;

(d)    A declaratory judgment declaring that Tribul Plaintiffs are not and have never been in default

of any loan obligations to the Defendant Cynergy, CynergyPreB or CPP, and that if such

default did occur that same occurred by reason solely and proximately due to the acts or

omissions of the Defendants;

(e)    A declaratory judgment declaring that the Cynergy EP Agreement is null, void and

unenforceable, and that the Tribul Plaintiffs are free to sell the Tribul Merchant Portfolio,

without any minimum requirements, penalties or right of first refusal, and that Defendant

Cynergy may not unilaterally offset fees or costs from the residuals otherwise due and owing

the Tribul Parties (or their successor in interest) unless such fees or costs are commercially

reasonable under industry standards;

(f)    A declaratory judgment declaring that the Dalmao Settlement Agreement and Releases

are null, void and unenforceable, and that Plaintiff Dalmao is free to prosecute those

claims against the Unified Plaintiffs and that the Unified Partners are liable to Plaintiff

Dalmao for the sum of $6 million (plus interest and costs since 2010) and 50% of all

residuals paid on the MCP Merchant Portfolio (which includes the former BPS Merchant

Portfolio) to the Unified Defendants or to anyone other than Plaintiff Dalmao;

(e)    A declaratory judgment declaring that Defendants Cynergy, Fitzsimmons and Corvino

are contempt of court for their willful and knowing violations of the 2012 TRO; and

(d)    Such other, further and different relief as may be just, proper and equitable, including

interest, costs, disbursements and attorney's fees.

81

Dated: New York, New York
      August 25, 2012

Yours, etc.,

SHAPIRO TAMIR LAW GROUP PLLC

By:_____

    Priscilla Cheng, Esq.
    Jonathan Cohen, Esq.
    Elie B. Gold, Esq.
    Jacob Nemon, Esq.
    Mitchell C. Shapiro, Esq.
    Zaki Isaac B. Tamir, Esq.
    Dawn Lynette Yuster, Esq.
245 West 17th Street, 5th Floor
New York, New York 10011
(t) 212.444.9974
(f) 212.444.9971
(e) comvestcase@shapirotamirlaw.com
(w) www. shapirotamirlaw.com

*Attorneys for Plaintiffs*

82

<u>VERIFICATION BY OFFICER OF CORPORATE PLAINTIFFS</u>

STATE OF NEW YORK )

COUNTY OF NEW YORK) ss.:

      SHMUEL ("SAM") CHANIN, being duly sworn, deposes and says:

      That he is the sole individual named plaintiff in the instant action and the Chief Executive

Officer of TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH, LLC,

SECOND SOURCE FUNDING LLC, DALMAO, INC., the corporate Plaintiffs in the instant

action, and that he has read the foregoing Verified Complaint and knows the contents thereof; that

the same is true to his knowledge, except as to the matters therein stated to be alleged upon

information and belief, and that as to those matters he believes them to be true.

Dated:     August 25, 2012
            New York, New York

                               INDIVIDUALLY AND ON BEHALF OF
                               TRIBUL MERCHANT SERVICES, LLC,
                               TRIBUL LLC, TRIBUL CASH, LLC,
                               SECOND SOURCE FUNDING LLC and
                               DALMAO, INC.

                         By: _____
                               SHMUEL CHANIN

Sworn to before me this
27  day of August, 2012

_____ Notary
          Public

      **ELIE B. GOLD**
**NOTARY PUBLIC-STATE OF NEW**
**YORK No. 02G06260834**
**Qualified In New York County**
**My Commission Expires May 07, 2016**

                        83

# Exhibit <u>2</u>

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

_____

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH
LLC, SECOND SOURCE FUNDING LLC, DALMAO, INC. and
SHMUEL CHANIN,

                        Plaintiffs,

        -vs-

THE COMVEST GROUP a/k/a COMVEST GROUP HOLDINGS, LLC,     Index No. 502672/2012
  COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, LLC, CYNERGY     **ACKNOWLEDGEMENT OF**
EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE      **RECEIPT OF SUMMONS AND**
CYNERGY, INC., PIPELINE DATA, INC., RANDY McCOY, KIM     **COMPLAINT**
FITZSIMMONS, SHEILA CORVINO, MARCELO PALADINI, GUSTAVO
CEBALLOS, ANDRES ORDONEZ, STEPHEN ASCHETTINO, DEAN M.
LEAVITT, JAFFE RAITT HELTR & WEISS P.C., HOLLI HART TARGAN,
NIXON PEABODY, LLP., FRANK PENSKI, MARK N. BERMAN,
UNICORN PARTNERS LLC, JOHN MARTILLO, 6M INVESTMENT, LP,
MERCHANT PROCESSING SYSTEMS CORP., OLEG FIRER, LEON
GOLDSTEIN, VLADIMIR SADOVSKY, MERCHANT CAPITAL
PORTFOLIO, LLC, NEW EDGE PAYMENTS, LLC, PROCESS PINK
PAYMENTS LLC, and UNIFIED PAYMENTS, LLC,

                        Defendants.

_____

### ACKNOWLEDGEMENT OF RECEIPT OF SUMMONS AND COMPLAINT

        The Summons and Complaint in the above-captioned matter was received at 1300 Clinton
Square, Rochester, New York 14604.

        PLEASE CHECK ONE OF THE FOLLOWING; IF 2 IS CHECKED, COMCPLETE AS INDICATED:

        __X__        I am not in military service.

        _____        I am in military service, and my rank, serial number and branch of service are as follows:

Rank:_____ Serial number:_____ Branch of
Service:_____

TO BE COMPLETED REGARDLESS OF MILITARY STATUS:

Date:___October 9, 2012_____        (Date this Acknowledgement is executed)

                        **THE WOLFORD LAW FIRM LLP**

                        By:_____
                            Michael R. Wolford, Esq.
                        *Attorneys for Defendants*
                        *Nixon Peabody LLP, Frank Penski and*
                          *Mark N. Berman*
                        600 Reynolds Arcade Building
                        16 East Main Street
                        Rochester, New York 14614
                        Telephone: (585) 325-8000

**Exhibit 3**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
--------------------------------------------------------------------x
TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC,
TRIBUL CASH LLC, SECOND SOURCE FUNDING
LLC, DALMAO, INC. and SHMUELCHANIN,

                                    Plaintiffs,

      - against -

THE COMVEST GROUP aka COMVEST GROUP
HOLDINGS, LLC,COMVEST CYNERGY HOLDINGS,
INC., PIPELINE CYNERGY HOLDINGS, LLC,
CYNERGY EQUITY HOLDINGS, LLC, CYNERGY
EQUITY HOLDINGS, INC., CYNERGY DATA, INC.,
PIPELINE CYNERGY, INC., PIPELINE DATA, INC.,
KIM FITZSIMMONS, SHEILA CORVINO,  MARCELO
PALADINI et. al.,

                                  Defendants.

--------------------------------------------------------------------x

**Index No: 502672/2012**

**NOTICE OF MOTION FOR
PRELIMINARY INJUNCTION**

     **PLEASE TAKE NOTICE** that, upon the affidavit of Shmuel ("Sam" ) Chanin,

sworn to on September 29, 2012, the exhibits attached hereto, the Memorandum of Law, dated

September 29, 2012, the Verified Complaint herein, and upon all and proceedings had hereto,

Plaintiffs  TRIBUL MERCHANT SERVICES LLC, TRIBUL  LLC, TRIBUL CASH LLC,

SECOND SOURCE FUNDING LLC and SHMUEL CHANIN (the "Tribul Plaintiffs"), by and

through their attorneys, SHAPIRO TAMIR LAW GROUP PLLC, will move this Court at the

Courthouse thereof located at 360 Adams Street, IAS part 47, Brooklyn, New York, on

Thursday, October 11, 2012, at 10:30 o'clock in morning or as soon thereafter as counsel may be

heard, for an Order issuing a preliminary injunction, restraining and enjoining "the New Cynergy

Defendants" -- Defendants THE COMVEST GROUP aka COMVEST GROUP HOLDINGS,

LLC, COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC,

CYNERGY EQUITY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC.,

CYNERGY DATA, INC., PIPELINE CYNERGY, INC., PIPELINE DATA, INC., KIM

FITZSIMMONS AND SHEILA CORVINO (and their agents, representatives, employees, and

any others acting for, with or on their behalf) -- from:

1.  Contacting directly or indirectly any merchants procured or signed for by the Tribul Plaintiffs (the "Tribul Merchants") for any purpose other than routine customer service calls initiated by the Tribul Merchants, including but not limited to contracting directly with same so as to deprive the Tribul Plaintiffs of the benefits of their contracts and or contractual relations with the Tribul Merchants;

2.  Contacting, either directly or indirectly, any independent sales representative, independent sales organization, agent, employee or independent contractor of the Tribul Plaintiffs (hereinafter, "Agents" or "Downlines") for any purpose, including but not limited to contracting directly with same so as to deprive the Tribul Plaintiffs of the benefits of their contracts and or contractual relations with the Agents or Downlines;

3.  Contacting, either directly or indirectly,(i) any prospective purchaser that the New Cynergy Defendants know or have any reason to believe are considering purchasing the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts ("Prospective Purchasers") or (ii) any prospective lender or other financing source that the New Cynergy Defendants know or have any reason to believe are considering providing the Tribul Plaintiffs with capital in order to finance their business operations in exchange for, inter alia, a security interest in the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts ("Prospective Lenders");

2

4.  Defaming, disparaging or demeaning Plaintiffs, their principals, parent companies, subsidiaries, affiliates, agents or employees or the value of the Tribul Plaintiffs' merchant portfolio, merchant accounts or the residual stream associated with the Tribul Merchants;

5.  Interfering with the Tribul Plaintiffs' business including but not limited to interfering with the Tribul Plaintiffs' business relations with their Merchants, Downlines, Prospective Purchasers and Prospective Lenders; and

6.  Not promptly and properly paying to the Tribul Plaintiffs during the pendency of this action the total Net Residuals due to the Tribul Plaintiffs (*e.g.,* all transaction fees resulting from credit or debit transactions processed for the Tribul Merchants, as calculated in accordance with the terms and conditions contained in the EP Agreement referenced in the Verified Complaint herein (without any deductions for minimums, assessments, loan or debt servicing or any fees other than the remaining standard processing fees set forth on Schedule A of the EP Agreement.)

*Plaintiffs further request that the Court issue an order compelling Defendants to:*

7.  Issue retractions of all defamatory, disparaging or demeaning statements previously made by or on behalf of any of the New Cynergy Defendants concerning, relating or pertaining to Plaintiffs, their principals, parent companies, subsidiaries, affiliates, agents or employees or the value of the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts;

8.  Return approximately $800,000 in improperly retained EP and QM reserves that should have been returned to the Tribul Plaintiffs;

9.  Identify, Locate and Return to the Tribul Merchant Portfolio the approximately 1,000

3

Tribul Plaintiffs' Merchants that are still "missing merchants" and which the New

Cynergy Defendants have refused to locate and return to the Tribul Merchant

Portfolio;

10. Recommence Residual payments to the Tribul Plaintiffs for the aforementioned

"missing merchants" and establish a repayment schedule for the approximately $4

million in Residuals improperly withheld and/or not paid to the Tribul Plaintiffs on

the accounts of the still "missing merchants" by the New Cynergy Defendants since

October 26, 2012;

11. Immediately establish and activate a segregated bank identification number

("BIN/ICA") for all existing Tribul Merchants and those that the Tribul Plaintiffs and

their Downlines/Agents continue to board with Defendant Cynergy each and every

week;

12. Waive any "right of first refusal" and otherwise fully cooperate with the Tribul

Plaintiffs' attempts to sell its merchant portfolio at fair market value to a third party in

an arms-length transaction (the "Prospective Transaction"); and

13. Waive any liens (and effectively withdraw any UCC filing statements) against the

Tribul Plaintiffs' merchant portfolio or other assets of Plaintiffs so as to enable the

Tribul Plaintiffs to procure financing of their business operations with the Tribul

Plaintiffs' merchant portfolio as collateral, and with the lender taking first position

(*e.g.*, having any liens or rights against the Tribul Plaintiffs' Merchant portfolio

allegedly or potentially belonging to the New Cynergy Defendants subordinated to

any Prospective Tribul lenders' interests).  Based on the foregoing, and the facts and

arguments presented below, the Court should grant Plaintiffs Motion for a

Preliminary Injunction against the New Cynergy Defendants; and

14. Such other relief as this Honorable Court deems just and proper.

**PLEASE TAKE FURTHER NOTICE** that Plaintiffs respectfully request that the Court set an

expedited schedule for discovery relating to the relief sought by Plaintiffs herein and an

evidentiary hearing of this motion for a preliminary injunction.

Dated: New York, New York
      September 29, 2012

                    Respectfully submitted by,

                    SHAPIRO TAMIR LAW GROUP PLLC

By:    Priscilla Cheng
        Elie B. Gold
        Jacob H. Nemon
        Mitchell C. Shapiro
        Zaki Isaac B. Tamir
        Dawn L. Yuster
245 West 17th Street, 5th Floor
New York, New York 10011
(T)212.444.9974
(F)212.444.9971
(E)ComvestCase@ShapiroTamirLaw.com
www. ShapiroTamirLaw.com
*Attorneys for Plaintiffs*

To
  Scott Kessler, Esq.
  Akerman Senterfitt LLP
  335 Madison Avenue  26th Floor
  New York, NY 10017
  Tel: 212.880.3874
  Fax: 212.905.6411
  *Attorneys for New Cynergy*
  *Defendants, Including Pipeline*
  *Data, Inc., Cynergy Data, Inc.,*
  *Kim Fitzsimmons and Sheila*
  *Corvino*

        Sheila Corvino, Esq.
        4400 North Point Pkwy., Suite 260
        Alpharetta, GA 30022
        sheila.corvino@pipelinedata.com
        sheila.corvino@cynergydata.com

        *Attorney for Defendants Pipeline Data, Inc.*
        *and Cynergy Data, Inc.*

Index # 502672/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH LLC, SECONDSOURCE FUNDING LLC, DALMAO, INC. and SHMUELCHANIN,

Plaintiffs,

- against -

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC,COMVESTCYNERGY HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC, CYNERGYEQUITY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC., CYNERGY DATA,INC., PIPELINE CYNERGY, INC., PIPELINE DATA, INC.,  KIM FITZSIMMONS, SHEILACORVINO,  MARCELO PALADINI, et al.,

Defendants.

---

**NOTICE OF MOTION**

---

**SHAPIRO TAMIR LAW GROUP, PLLC**
*Attorneys for Plaintiffs*
245 West 17th Street, 5th Floor
New York, NY 10011
(T) 212.444.9974
(F) 212.444.9971
(E) ComvestCase@ShapiroTamirLaw.com
(W) www.ShapiroTamirLaw.com

**"WE DO NOT ACCEPT SERVICE BY ELECTRONIC TRANSMISSION (FAX)"**

6

Case 1:12-cv-05063-FB-VMS   Document 1-3   Filed 10/10/12   Page 99 of 187 PageID #: 111
RECEIVED NYSCEF: 09/28/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
------------------------------------------------------------------x
TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC,
TRIBUL CASH LLC, SECOND SOURCE FUNDING LLC,
DALMAO, INC. and SHMUEL CHANIN,

                                               Plaintiffs,

                    - against -

THE COMVEST GROUP aka COMVEST GROUP
HOLDINGS, LLC, COMVEST CYNERGY HOLDINGS,
INC., PIPELINE CYNERGY HOLDINGS, LLC,
CYNERGY EQUITY HOLDINGS, LLC, CYNERGY
EQUITY HOLDINGS, INC., CYNERGY DATA, INC.,
PIPELINE CYNERGY, INC., PIPELINE DATA, INC.,
KIM FITZSIMMONS, SHEILA CORVINO,  MARCELO
PALADINI, et.al.,

                                   Defendants.

------------------------------------------------------------------x

Index No.502672/2012

**AFFIDAVIT IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION
AGAINST NEW CYNERGY
DEFENDANTS**

STATE OF NEW YORK    )
                          ) SS:
COUNTY OF NEW YORK  )

      SHMUEL ("SAM") CHANIN, under penalties of perjury, hereby swears as follows:

      1.      I am the Chief Executive Officer of all of the company Plaintiffs in this Action,

and in particular for purposes of the instant motion, Plaintiffs TRIBUL MERCHANT

SERVICES, LLC, TRIBUL LLC, TRIBUL CASH LLC AND SECOND SOURCE FUNDING

LLC (hereinafter, the "Tribul Plaintiffs") and I am fully familiar with the facts and circumstances

surrounding this matter.  I make the factual allegations contained herein based upon my own

personal knowledge, information and belief, and my review of the Tribul Plaintiffs' books and

records. If called to testify, I would do so truthfully and consistent with the following, which I

submit in support of the within application for an order pursuant CPLR § 6301 against the "New

Cynergy Defendants" -- Defendants THE COMVEST GROUP aka COMVEST GROUP

HOLDINGS, LLC, COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY

HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, LLC, CYNERGY EQUITY

HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE CYNERGY, INC., PIPELINE DATA,

INC., KIM FITZSIMMONS AND SHEILA CORVINO.  In sum, unless the relief sought in this

motion – which essentially is asking the New Cynergy Defendants to act in good faith and abide

by their enforceable contractual and legal obligations to the Tribul Plaintiffs during the pendency

of this case -- is granted, the Tribul Plaintiffs will almost certainly go out of business.  (The

relationship and history of the parties are described more fully in the 82 page, 386-paragraph

Verified Complaint in this Action that I signed on or about August 25, 2012, and which detailed

Plaintiffs' Seventeen Causes of Action, a true and correct copy of which annexed hereto as

Exhibit A.)

      2.      Like the entity whose assets the New Cynergy Defendants bought in bankruptcy

proceedings on October 26, 2009 ("CynergyPreB"), the New Cynergy Defendants seem to be

attempting to prop up their dwindling revenues and sagging EBIDTA by improperly withholding

residuals in order to weaken the Tribul Plaintiffs and seize their business. In order to stop the

executives and advisors of the predecessor to Defendant Cynergy, we commenced a lawsuit

against some of the named Defendants (the "Cynergy PreB Defendants") and CynergyPreB in

June 2009 and procured a temporary restraining order that required CynergyPreB to pay that

month's residuals. (A true and correct copy of the "2009 TRO" procured by Plaintiff Tribul in

the case of *Tribul Merchant Services, LLC v. Cynergy Data, LLC*, Index No. 650322/2009 (New

York County) (Schweitzer, J.), is annexed hereto as Exhibit B. ")  Instead of complying with the

2009 TRO, many of the Old CynergyPreB Defendants engaged in a conspiracy to frustrate the

Tribul Plaintiffs' ability to prosecute the case or procure prospective injunctive relief, continued

2

interfering with the Tribul Plaintiffs' relationships with their agents and merchants, and then filed for bankruptcy protection. During the months before the bankruptcy filing, the Old CynergyPreB Defendants withheld millions of dollars of Residuals due to the Tribul Plaintiffs, which the Tribul Plaintiffs believed to be only approximately $4 million, based upon the information that the Tribul Plaintiffs could gather.  In reality, the sum was much closer to $7 million.  Thus, the Tribul Plaintiffs' efforts to fully recover from the CynergyPreB Estate (and the Old CynergyPreB Defedants) were actively thwarted by the New Cynergy Defendants. See Exhibits C and D (Emails between Tribul lawyer Shapiro and Defendant Corvino). Indeed, many of the New Cynergy Defendants against whom the current injunction is sought joined forces with the Old CynergyPreB Defendants in an attempt to bury the past and continue similar bad acts.

3.      Based on statements made to me and the Tribul Plaintiffs' advisors by Defendant Corvino, I am concerned that Defendant Cynergy is in a precarious financial situation and that the New Cynergy Defendants' recent course of conduct portends a repeat of the events of 2009, in which the SuperISOs' executives have targeted the Tribul Plaintiffs' book of business as a source of revenue that is available for them to take by improper means.

## BACKGROUND OF THE DISPUTE AND PLAINTIFFS' CLAIMS

4.      At all relevant times, continuing through the present, each of the Tribul Plaintiffs were and are an independent sales organization (hereinafter "ISO"), in the business of providing merchants with services, including bank card and credit card processing services and factoring of future accounts receivables. The Tribul Plaintiffs do not provide these processing services themselves. Rather, like CynergyPreB, Defendant Cynergy Data Inc. is known in the industry as a credit card processor, but is technically a "SuperISO" that provides the actual credit card transaction processing services through a contract with another entity.  (Defendant Cynergy Data

3

Inc.and the various other interrelated Defendant entities that the Plaintiffs believe are mere alter egos of Defendant Cynergy Data, Inc. and are hereinafter collectively referred to as "Cynergy".) Both CynergyPreB and Cynergy are referred to individually as a "SuperISO" or collectively as the "the SuperISOs."

5.      In or about October 2006, the Tribul Plaintiffs entered into two virtually identical ISO Conduit Processing Agreements with CynergyPreB (true and correct copies of which is annexed hereto as Exhibit E) (hereinafter, the "CynergyPreB ISO Agreement"). In or about January 2011, the Tribul Plaintiffs entered into a new ISO Agreement (titled "Executive Partner Card Processing Agreement") with Defendant Cynergy (the "Cynergy EP Agreement"; collectively, with the CynergyPreB ISO Agreement referred to as the ISO Agreements. (A true and correct copy of the Cynergy EP Agreement is annexed hereto as Exhibit F). The Tribul Plaintiffs fulfilled their obligations under the CynergyPreB ISO Agreement, and continue to perform under the Cynergy EP Agreement through the present, despite the Tribul Plaintiffs' claims that the Cynergy EP Agreement is unconscionable and was procured through fraud or duress.

6.      Pursuant to the ISO Agreements, the Tribul Plaintiffs recruited merchants, provided many customer service and other functions for merchants, and held liability for the risk that certain merchants may incur charge-backs and reversal that result in losses that are passed along to the Tribul Plaintiffs by the SuperISOs.

7.      In order to do so, Plaintiffs engaged the services of various agents and other ISOs who act as subcontractors for Tribul Plaintiffs and who canvas the marketplace in order to recruit merchants (hereinafter "Agents" or "Downlines"). The merchants then contract directly with the SuperISO and Harris Bank (the financial institution that sponsored the merchants into the Visa

4

Inc. and MasterCard Inc. card organization for the SuperISOs and their ISOs) for the credit and debit transaction processing services.

8.      The Tribul Plaintiffs then collect commissions, known in the industry as "residuals" (hereinafter "Residuals") generated from each credit and debit transaction processed by the SuperISOs on behalf of merchants procured by Tribul Plaintiffs.  Residuals include other fees that are charged to merchants on an annual, periodic or occasional basis by the SuperISOs.

9.      The Agents and Downlines are paid a percentage of the Residuals collected by Tribul Plaintiffs for processing generated by the specific merchants recruited by the Agents and the Downlines pursuant to marketing agreements, between Tribul Plaintiffs and Sub-ISOs.  The amount of Residuals to be paid to a particular Agent or Downline is usually dependent on a variety of factors, including the cost of servicing that Agent's merchant portfolio, the risk undertaken by the ISO due to the Agent's merchant portfolio, the Agent's level of commitment to book new business or meet minimum performance standards, whether the Agent is exclusive to the ISO, and the Agent's compliance with other obligations (such as not soliciting the ISOs merchants away to competing ISOs, not breaching Visa/MasterCard rules and following ethical standards).

10.      Beginning in or about October 2006 and continuing through the present, aided by their Agents and Downlines, the Tribul Plaintiffs have continuously performed under their respective ISO agreements with the SuperISOs in good faith and collectively procured well over 10,000 new merchant accounts.  As of June 2012, the Tribul merchants were generating over $7 million dollars a year in Residuals; *e.g.,* $600,000 per month on average due and owing to the Tribul Plaintiffs from Defendant Cynergy.  Ironically, immediately before the initial dispute arose with CynergyPreB in the Spring of 2009, the Tribul Plaintiffs' Residuals were also at a

similar level (*e.g.*, $600,000 per month). After the disruption to the Tribul Plaintiffs' business caused by the actions of the Old CynergyPreB Defendants in 2009, the Tribul Plaintiffs' Residuals were down to approximately $120,000 a month at the end of 2009, and have since built back up to $600,000 a month.

11.     At one point in 2008, the Tribul Plaintiffs were earning close to $1 million per month in Residuals, and if their volume was aggregated, were considered to be CynergyPreB's largest ISO.  Through a management agreement with another company (Defendant MPS, one of the "Unified Defendants" discussed in the Verified Complaint), Plaintiffs also managed the second largest ISO portfolio at CynergyPreB (one of the Unified Defendants).

12.     At all relevant times through the present, CynergyPreB and Defendant Cynergy – as the entity that authorizes the credit and debit card transactions for the merchant and collects the fees from the cardholders' depository account electronically through the credit card systems (*e.g.*, Visa and MasterCard) – have been in exclusive and complete control of the money flowing from the credit and debit transactions processed for the Tribul Plaintiffs' merchants, including the Residuals.

13.     At all relevant times, the Tribul Plaintiffs have been and are wholly and completely reliant upon their SuperISO at the time (either CynergyPreB or Defendant Cynergy) to make proper payment of the Residuals due and owing to them.

14.     At all relevant times, the Tribul Plaintiffs have been and are required to pay a portion of these Residuals to their Downlines. Payment to the Downlines is crucial to the existence, survival and continuity of the Merchant accounts (and to the Tribul Plaintiffs' solvency) because the Downlines maintain the personal relationships with the merchants, rely on receipt of their portion of the Residuals as their income stream and can and will move merchant

accounts to competing ISOs and credit card processors if they are not paid (despite the fact that doing so would be in violation of the agreements between the Downlines and the Tribul Plaintiffs). The recent conduct by the New Cynergy Defendants has made it impossible for the Tribul Plaintiffs to pay all of their Downlines each month. If this trend continues for very much longer, it is likely that the Downlines will abandon the Tribul Plaintiffs and take the Tribul merchants elsewhere.

### THE UNCONSCIONABLE CYNERGY EP AGREEMENT

15.      It is clear to that various contractual provisions contained in the EP Agreement – including the right of first refusal, the minimum performance requirements and the financial penalties for missing minimums, along with Cynergy's security interest and liens on the Tribul merchant portfolios (and the UCCs on file) (collectively, hereinafter, the "Unconscionable Terms"), make it virtually impossible for the Tribul Plaintiffs to sell the Tribul Merchant Portfolio for fair market value or procure financing or loans against the residuals. See Ex. F, Sec. 2.8.

16.      Based on their conduct since the signing of the EP Agreement, it is my belief and understanding that these Unconscionable Terms were placed in the EP Agreement by the New Cynergy Defendants in January 2011 (effective 2010), for the purpose of insuring that the Tribul Plaintiffs would be unable to sell the merchant portfolio (or use it as collateral for future financing) and would remain dependent upon and at the mercy of Defendant Cynergy.

17.      I signed the EP Agreement containing the Unconscionable Terms under extreme financial duress and fraudulent misrepresentations by the New Cynergy Defendants (and its then-President, Defendant Randy McCoy).

18.     The New Cynergy Defendants and the Unified Defendants proposed a tri-party agreement in which they would merge operations with my remaining companies, the Tribul Plaintiffs. As part of those negotiations The New Cynergy Defendants tentatively agreed to reduce the Tribul Plaintiffs' purported $8 million debt (from the CPP Loan) to $4 million, to convert the remaining $4 million in alleged debt to minimum fee obligations and to split these $4 million in fee obligations evenly between my companies and the Unified Defendants. A true and correct copy of this Draft LOI is annexed as Exhibit G.

19.     I rejected that deal when the Unified Defendants attempted to take additional equity in the proposed entity as a reward for them having negotiated the Tribul Plaintiffs' purported $8 million debt.  After I rejected these terms the New Cynergy Defendants and the Unified Defendants conspired together in a campaign to put me and my companies out of business.  One of their first acts was to issue a false press release informing the world that they had purchased our businesses. See Exhibit A (Verified Complaint), ¶¶ 206-209 and Exhibit H (copy of the press release). This caused many of the Tribul Plaintiffs' ISOs to sign "renewals" with the Unified Defendants and Defendant Cynergy instead of with the Tribul Plaintiffs and made it difficult for the Tribul Plaintiffs to find financing for their cash-starved business or to open discussions with other SuperISOs.  This was another chapter taken out of the CynergyPreB playbook by the New Cynergy Defendants, who had done the very same thing when they improperly attempted to foreclose on and seize the Tribul Plaintiffs' portfolio in the Spring of 2009.

20.     As discussed in the Verified Complaint, Plaintiffs were owed approximately $5.7 million from the Unified Defendants, and had commenced a lawsuit to recover on those financial obligations and for damages (including their right to manage the business for a monthly fee of

8

$135,000) and their rightful ownership of 50% of a growing business. See Exhibit A (Verified Complaint), ¶¶ 191-237.

21.     Plaintiffs, the Unified Defendants and the New Cynergy Defendants executed a series of standstill agreements and letters of intent aimed at resolving our differences in an amicable manner. Or so I thought. Instead, the New Cynergy Defendants -- for the benefit of themselves and Comvest Investment Partners Holdings, LLC, a named party to the last LOI -- systematically pressured me to accept a series of new financial arrangements with them and with the Unified Defendants, one more onerous than the next, so that the New Cynergy Defendants and the Unified Defendants could effectively take control of all my companies' businesses.

22.     They were partially successful in seizing control of Plaintiff Dalmao's business (and the NPC book of business held by two of my other companies) -- which were to become property of the Tribul Plaintiffs as part of the last LOI that the New Cynergy Defendants and the Unified Defendants signed on or about November 4, 2010. As part of the November 4, 2010 LOI, the New Cynergy Defendants induced and forced me to effectively release the Unified Defendants from their almost $6 million of financial obligations to my companies for absolutely no consideration. A true and correct copy of this LOI is annexed as Exhibit I. In an email conversation with the Tribul Plaintiffs', Defendant Corvino unequivocally stated that she had to force a full release of the Unified Defendants by Plaintiffs, since Defendant Comvest's loans to the Unified Defendants were secured by the assets which the Plaintiffs were seeking to recover from the Unified Defendants.   Attached as Exhibit J is a true and correct copy of an email from Defendant Corvino to me in which she threatens to withhold the Tribul Plaintiffs' residuals if we did not agree to convert Plaintiffs' dismissal of their claims against the Unified Defendants into one "with prejudice."

23.     Having relinquished all rights to our other sources of revenue, I and the Tribul Plaintiffs had to rely completely upon the Tribul Plaintiffs' merchant portfolio at Defendant Cynergy to generate revenue to build our business and pay our bills.  From a record monthly residual of $1,193,098.40 in December 2008 (plus the additional income that my other companies were receiving as fees for managing the BPS and Second Source Funding portfolios that the New Cynergy Defendants helped the Unified Defendants steal from me, financed by Defendant Comvest), I found myself being forced to negotiate with the New Cynergy Defendants in the months before signing the EP Agreement with a monthly residual of $240,903.83 in October 2010.  A true and correct copy of the Tribul Residual reports for these months are annexed as Exhibit K.

24.     On October 26, 2010, New Cynergy Defendant employee Kevin Smith wrote me an email and gave me the choice between two unpalatable options, with the first option being more attractive, but, as he knew, unattainable in the short time frames.  A true and correct copy of this email is annexed as Exhibit J.

25.     Later that same day, Mr. Smith wrote to me again to stress the need for me to quickly make up my mind and said: *"Hey – I can not stress to you enough that these guys don't mess around … It has been over a year that you and I have been working on this.  Time to put it to bed."*  Mr. Smith's statement should have read that it had been more than a year that Defendant Cynergy had been "working me and Tribul over" and should have had us in a submissive position long before.  The "guys" that "don't mess around" to whom Mr. Smith was referring was Defendant Comvest, as confirmed by the fact that the email string began with a proposal from a principal of Defendant Comvest. *Id.* Based on my history of dealing with many of the same executives of Defendant Cynergy at CynergyPreB, I understood Mr. Smith's and

10

Defendant Corvino's statements to me in these emails and over the phone as clear threats that the New Cynergy Defendants and Defendant Comvest were going to repeat history; if I did not sign a deal on their terms they would attempt to improperly withhold the Tribul Plaintiffs' residuals, foreclose on our merchant contracts and seize the Tribul Plaintiffs' businesses.

26.    On October 29, 2010, I wrote back to Mr. Smith complaining that the New Cynergy Defendants and Defendant Comvest had given me and the Tribul Plaintiffs "no choice" but to take their one-sided deal.  A true and correct copy of my response to Mr. Smith is annexed as Exhibit M.

27.    On January 19, 2011 Mr. Smith informed one of my colleagues by email that the New Cynergy Defendants (apparently financed by Defendant Comvest) had taken a controlling interest in the Unified Defendants. A true and correct copy of this email is annexed as Exhibit N. This made it clear to me that the New Cynergy Defendants effectively controlled all of my companies' books of business and were not going to negotiate the terms of any EP Agreement in good faith.

28.    Finally, on January 24, 2011, a day before I executed the EP Agreement, and knowing full well how uncomfortable I was with amount of duress being placed on me, Mr. Smith emailed me and demanded, *"Sign, sign, sign!"* A true and correct copy of this email is annexed as Exhibit O.  Faced with this unrelenting pressure and needing an infusion of cash to pay our mounting bills, I signed the EP Agreement on January 25, 2011.

29.    It is important to note that the EP Agreement provides that the Tribul Plaintiffs were to receive $1 million of capital upon signing the agreement. See Exhibit P (A true and correct copy of the "Residual Advance Agreement").  In fact, we received only $800,000 since Defendant Cynergy retained $200,000 as a so called repayment of prior advances, which in fact

11

were price concessions that had been given to the Tribul Plaintiffs as an inducement to continue to negotiate. A true and correct redacted copy of the bank record showing the $800,000 deposit is annexed as Exhibit Q.

30.     It also important to note that through August 31, 2012, Defendant Cynergy has taken $624,587.85 from Tribul Plaintiff's residuals at $41,639.19 per month, ostensibly to service this $1 million debt, yet still records this debt balance as $555,601.39 and maintain the same level of UCCs and liens on the Tribul Merchant portfolio as when it purportedly held an $8 million note. See Exhibit P, Schedule A.

31.     The hubris of the New Cynergy Defendants is remarkable. Having withheld almost $800,000 from missing EP and QM Reserves that the Bankruptcy Trustee confirmed had been transferred to New Defendant Cynergy on the Tribul Plaintiffs' account and should have been returned to the Tribul Plaintiffs, the New Cynergy Plaintiffs then turned around and provided a "fully secured loan" in roughly the same amount at the high interest rate of 18% per annum (when the original CPP Loan was at the commercially reasonable rate of LIBOR + 6%).

32.     This continued the long standing practice of CynergyPreB and the New Cynergy Executives of providing short term inducements in the form of "advances" in order to "assist" me and my companies in paying debts that the New Cynergy executives had induced us to incur with the promise that they would forgive certain obligations as part of ongoing negotiations, only to threaten to withhold those "advances" from me and my companies at crucial times when we could ill afford a cash flow reduction as a method of pressuring me to sign new documents. For example, the LOIs that I signed with the New Cynergy Defendants and the Unified Defendants in 2010 held out the assurances that I would get back assets from the Unified Defendants, and New Cynergy would release me from my personal guarantee of the CPP Loan, release

12

Cynergy's liens against the Tribul Plaintiffs portfolio and provide a dedicated BIN which would enable the Tribul Plaintiffs to quickly and easily move their merchants in the event that the relationship between Cynergy and the Tribul Plaintiffs would terminate.

33.     It is my belief that the New Cynergy Defendants and Defendant Comvest managed to have their cake and eat it too by negotiating separate deals with me and the Unified Defendants. For example, the November 4, 2010 LOI specified that there would be a $2 million reduction in the Tribul Plaintiffs purported debt in exchange for an assignment of $2 million worth of debt owed to my other companies by the Unified Defendants. See Exhibit I. It is my belief that the New Cynergy Defendants and Defendant Comvest managed to increase the Unified Defendants' debt to them without reducing the Tribul Plaintiffs' purported debt to Defendant New Cynergy.

34.     I recently learned that Defendant Cynergy never paid any consideration or properly acquired or assumed the CPP Loan Agreement (defined in Verified Complaint), the Tribul Plaintiffs' $8 million debt obligations thereunder, or my personal guaranty thereof.

35.     It is my understanding that the New Cynergy Defendants reached a firm purchase price for all of the assets of CynergyPreB, and then, immediately prior to closing the APA transaction, merely reallocated $2 million worth of debt forgiveness and other consideration to be paid by the Comvest group as part of the purchase of all of the assets of Cynergy Prosperity Plus, of which the Tribul Plaintiffs CPP Loan was but a small part. (Email from Trustee to Sam showing no actual allocation of the CPP Loan, is attached as Exhibit R) Indeed, the email from the Bankruptcy Trustee representative confirms that there was no formal allocation in the APA schedule, and thus no consideration given by Defendants for Cynergy Prosperity Plus' assets, or the Tribul CPP Loan. *Id.*

36.     Defendants Cynergy, McCoy and Corvino – for the benefit of themselves and the New Cynergy Defendants – deceived and fraudulently induced me to sign the Cynergy EP Agreement on behalf of the Tribul Plaintiffs under duress, along with a new $1 million loan agreement, the proceeds of which were partially paid to Defendant Cynergy and which included yet another personal guarantee and a UCC1 first priority lien on the entire company. *See* Exhibit P.

37.     The economic duress that the Tribul Plaintiffs were suffering in or about 2011 was directly caused by Defendant Cynergy's withholding of approximately $50,000 per month in debt service on the loan and the imposition of additional fees and annual assessments, as well as the New Cynergy Defendants' refusal to locate and return to the Tribul Plaintiffs the approximately $800,000 in missing EP and QM Reserves and the approximately $4 million in Residuals due from the approximately 1,000 "missing merchants" since October 26, 2009.In January 2011, after already having received approximately $1.5 million in fees from the Tribul Plaintiffs since the acquisition of the business from CynergyPreB in bankruptcy, the New Cynergy Defendants converted the purported balance remaining on the CPP Loan into minimum performance standards that guaranteed Defendant Cynergy $7.2 million in profits over the four year life of the Cynergy EP Agreement.

38.     Shortly after Defendant Fitzsimmons took over Defendant Cynergy in or about February 2012, she conceded that the minimums were totally "out of whack." In our conversation, she admitted that there was no conceivable way that a portfolio the size of the Tribul Plaintiffs' Cynergy portfolio could ever generate the fees called for under the Cynergy EP Agreement. Indeed, during our conversation, Defendant Fitzsimmons agreed that such a book would likely grow to the point that it would generate up to $1.8 million in fees for Defendant

14

Cynergy over the term of the contract, a mere 25% of the amount of the "minimums" required in the Cynergy EP Agreement. With these "out of whack" minimum profits in place, the Tribul Plaintiffs portfolio is not marketable to Potential Purchasers or Lenders. Moreover, Downlines like Cypers have expressed fear that the New Cynergy Defendants will eventually withhold such a high proportion (if not all) of the Residuals to satisfy their own greed, leaving nothing to pay Downlines.

39.     Indeed, the minimum fee shortfall to withheld from the Tribul Plaintiff's residuals in December 2012 is projected to be an additional $200,000 or more.  Then, the monthly minimum fee shortfall for each month in 2013 is going to be $225,000. See Exhibit F, Schedule A.  This will result in Defendant Cynergy withholding the Tribul Plaintiffs' entire monthly residual, putting the Tribul Plaintiffs out of business once and for all.

40.     I understand that the Court must balance the equities in determining whether or not to grant a preliminary injunction.  How could it possibly be an equitable outcome to allow the New Cynergy Defendants to take the entire Tribul Plaintiffs' business away from me, the Tribul Plaintiffs and our Downlines who have worked so hard to rebuild this modest book of business?  The answer is clear.  It would be inequitable to reward the New Cynergy Defendants for their malicious acts in which they convinced large ISOs and Merchants to move business away from the Tribul Plaintiffs after having improperly withheld millions of dollars in residuals and missing reserves which we could have used to build the business.

41.     Based upon my 14 years in this business, and recent conversations that I and some of my colleagues have had with Prospective Purchasers, including the entity that offered almost $40 million for the book back in 2011, it is clear that for so long as the Unconscionable Terms are allowed to remain in force, the Tribul Plaintiffs will be unable to sell or finance their

merchant portfolio and stream of Residuals and will remain at the mercy of the New Cynergy Defendants.

42.     The Tribul Plaintiffs maintain that Cynergy should be precluded from reducing the Tribul Plaintiffs' monthly Residuals in order to service the additional $1 million in debt that was assumed by the Tribul Plaintiffs in The New Cynergy Defendants continue to take monthly set-offs against the Tribul Plaintiffs' Residuals of approximately $42,000 to service the $1 million loan from the already shrinking net residuals otherwise due and owing the Tribul Plaintiffs. I believe that this is part of the New Cynergy Defendants' strategy to further weaken, and ultimately dismember the Tribul Plaintiffs entirely..

43.     Second, despite its acknowledgement of the Tribul Plaintiffs' cash flow problems, and their prior promise to forbear from assessing a minimums shortfall reduction against the Tribul Plaintiffs' residuals until January 2013, Defendant Cynergy withheld a significant sum from the Tribul Plaintiffs' Residuals in August 2012 and has asserted its right to withhold future minimums (and debt service) as Defendant Cynergy maintains that it is entitled to do under the Unconscionable Terms of the EP Agreement.

44.     Thus, while keeping the Tribul Plaintiffs and their merchant portfolio firmly tethered to Defendant Cynergy, the New Cynergy Defendants are contributing to the attrition of the Tribul Merchant Portfolio and positioning themselves to dismember the Tribul Plaintiffs for their own benefit.

**Breach – New Cynergy Defendants' Continued Refusal to Locate
and Return Almost $800,000 in EP and Merchant Reserves**

45.     Approximately $800,000 in funds that were supposed to be held on reserve for the Tribul Plaintiffs and their merchants by the New Cynergy Defendants (and their sponsor, Harris Bank), and which should have been returned to the Tribul Plaintiffs, have been improperly withheld by the New Cynergy Defendants.

46.     The Tribul Plaintiffs were considered an executive partner ISO (or "EP") and had an EP Reserve established from the funds otherwise due to the Tribul Plaintiffs and governed by the CynergyPreB ISO Agreement provisions regarding a Reserve Account. See Exhibit E, sec 3.11 (C)

47.     From November 2008 to October 2009, the Tribul Plaintiffs funded an EP Reserve in the amount of $169,065.08 (the "Second EP Reserve Fund"). According to CynergyPreB's books and records, the Tribul Plaintiffs' Second EP Reserve Fund had that amount in it immediately prior to the transfer of all accounts to the New Cynergy Defendants on or about October 26, 2009.

48.     Under industry practice and the terms of the CynergyPreB ISO Agreement which Defendant Cynergy assumed (the ISO builds up an EP reserve account and then the ISO receives back the excess funds in the ISO's EP Reserve account. *See* Exhibit E, sec 3.11 (C)).

49.     According to the individual who served as the restructuring agent for CynergyPreB, the Trustee for the CynergyPreB and CPP estates, and the Liquidation Trustee, those reserves were transferred to Defendant Cynergy when Defendant Cynergy took over the CynergyPreB business.

50.     The Second EP Reserve Fund was never repaid to the Tribul Plaintiffs, and should be on deposit for the Tribul Plaintiffs with Defendant Cynergy or Harris Bank, however,

17

Defendant Cynergy has disavowed responsibility for the Second EP Reserve Fund, despite a bankruptcy court finding that Defendant Cynergy was responsible to replenish such funds. See Exhibit S (Order dated August 4, 2010).

51.     CynergyPreB's records indicate that approximately 4,000 merchants were transferred from the Tribul Plaintiffs' merchant portfolio between July and October 2009 and were transferred back after the sale of the assets of CynergyPreB to the New Cynergy Defendants.

52.     CynergyPreB's records indicate that those "missing merchants" processed a transaction volume that exceeded $104 million during the period prior to October 26, 2009, while they were "missing," which would have resulted in the Tribul Plaintiffs' Second EP Reserve fund increasing by $31,099.06.

53.     The Second EP Reserve Fund should have totaled $200,164.14 as of October 26, 2009.

54.     There is no basis for Defendant Cynergy to continue to withhold any of the Second EP Reserve Funds, particularly since the Cynergy EP Agreement caps the amount of EP Reserve Funds that Defendant Cynergy can hold on the Tribul Plaintiffs' accounts at $250,000, and yet another EP Reserve Fund (the "current EP Reserve") was established by the Tribul Plaintiffs and currently stands at $250,000.

55.     According to the individual who served as the restructuring agent for CynergyPreB, the Trustee for the CynergyPreB and CPP estates, and the Liquidation Trustee, those reserves were transferred to Defendant Cynergy when Defendant Cynergy took over the CynergyPreB business.

18

**Violations of the ISO Agreement and the EP Agreement**
**By the New Cynergy Defendants – Enforcing the Unconscionable Terms**

56.     In direct violation of the express terms of both the CynergyPreB ISO Agreement and the Cynergy EP Agreement, the New Cynergy Defendants have failed to use best efforts to provide Tribul a segregated bank identification number ("BIN"), and miscalculated and underpaid residuals.

57.     From 2006 all the way through 2011, each and every agreement or letter of intent signed by CynergyPreB or Defendant New Cynergy and the Tribul Plaintiffs included as a material deal point that the SuperISO would provide the Tribul Plaintiffs with a dedicated BIN. It is now clear that they never had any intention. The Tribul Plaintiffs' inability to quickly and easily move the Tribul Plaintiffs' merchants away from Cynergy provides Cynergy with inherent advantage in negotiating financial terms with the Tribul Plaintiffs. To induce me to keep the Tribul Plaintiffs growing portfolio with New Cynergy, its executives assured me that our dedicated BINs "came in today" or "The BIN/ICA's are registered". See Exhibit T. It would be equitable to require the New Cynergy Defendants to immediately place all of the Tribul Plaintiffs Merchants into a segregated BIN/ICA giving Tribul's potential purchaser or lender the ability to quickly and easily move its merchant portfolio in the event that the Defendant Cynergy becomes unable or unwilling to fulfill its obligations to the ISOs, Downlines or Merchants.

58.     The New Cynergy Defendants also breached the confidentiality provisions of the agreement by revealing to third parties, including Cypers, the percentage of the Tribul Plaintiffs' business that Cypers' merchants (and in particular, Insomniac) constituted. These are clear breaches of the terms of both the ISO Agreement and the EP Agreement. Recognizing that the relationship with Defendant Cynergy's employees (a number of whom were hired by Defendant Cynergy post-bankruptcy as employees, officers or advisors) had been poisoned by their 2009

battle with the Old CynergyPreB Defendants and others who were working for CynergyPreB prior to the bankruptcy filing ("CynergyPreB"), , the Tribul Plaintiffs sought to end their toxic relationship with Cynergy and to sell their merchant portfolio. The New Cynergy Defendants were aware of the Tribul Plaintiffs' decision to sell their portfolio.

59.     The Tribul Plaintiffs received bona fide offers ranging from $17 million to $40 million for the Tribul Merchant Portfolio as late as 2011.

60.     However, the New Cynergy Defendants exercised Defendant Cynergy's contractual right of first refusal to interfere with the Prospective Transaction and to make it clear to the Prospective Purchaser that Defendant Cynergy would not renegotiate the minimum performance requirements (and steep financial penalties), and the right of first refusal for future sales of the portfolio and residuals by the Prospective Purchaser.

### Breach – New Cynergy Defendants' Conspiracy to Refuse to Look For and Return Approximately 1000 Missing Merchants to the Tribul Portfolio

61.     Part of the residual losses that the Tribul Plaintiffs were unable to recover from the bankruptcy estate were the residuals on account of the 4000 "missing merchants" that, unbeknownst to the Tribul Plaintiffs, certain of the CynergyPreB Defendants had fraudulently transferred out of the Tribul Plaintiffs' Merchant Portfolio and EP account during the period in 2009 when the Tribul Plaintiffs were locked out of the VIMAS system.

62.     Immediately after the sale in bankruptcy to the sole bidding group, the "new regime" at Defendant Cynergy turned the Tribul Parties' VIMAS access back on.  When our VIMAS access had been restored, the Tribul Parties saw that approximately than 4,000 merchants were missing and asked Defendant Cynergy for an explanation.

63.     With no explanation at all, approximately 2,800 merchants magically reappeared in the Tribul Plaintiffs' Merchant Portfolio and EP account code on VIMAS.

64.     More than 1000 of the Tribul Merchants were and are still "missing merchants," and the Tribul Parties have not been paid any residuals on those missing merchants from June 2009 to the present. The Tribul Plaintiffs repeatedly asked the New Cynergy Defendants for a complete accounting dating back through the date of the CynergeryPreBe bankruptcy filing, which accounting would have revealed the identity and total number of these missing merchants and their residual stream, yet were stonewalled by the New Cynergy Defendants. See Exhibit U.

65.     Defendant Cynergy refused to provide information regarding the Tribul Merchants during the bankruptcy proceeding.  See Exhibits C and D (Emails between Tribul lawyer Shapiro and Defendant Corvino).  This effectively prevented the Tribul Merchants from amending their proofs of claim or seeking those missing residuals for the pre-bankruptcy period from the Trustee.  In addition to those fees, Defendant Cynergy has improperly failed to pay the Tribul Plaintiffs more than $4 million dollars of Residuals due on the missing merchants from October 26, 2009 to the present.

66.     The New Cynergy Defendants have continued to refuse the Tribul Merchants' requests for information about the missing merchants, including those approximately 1000 merchants who are still missing.

67.     Even though the Tribul Plaintiffs settled their claims with the Trustee handling the Estate of CynergyPreB, it was never my intention to release any of the named Defendants herein from their malicious actions which nearly put the Tribul Plaintiffs out of business in 2009 and 2010. Indeed, as part of the Confidential Settlement with the Bankruptcy Trustee, each and every one of the named Defendants was carved out of the releases that were given to the Trustee.

**New Cynergy Defendants' Recent Tortious Interference With
Tribul Plaintiffs' Contracts and Contractual Relations and Breaches of
EP Agreement By Soliciting Tribul Merchants and ISOs**

68.     Defendant Cynergy's new CEO, Defendant Kim Fitzsimmons ("Fitzsimmons") and Chief Legal Officer Sheila Corvino ("Corvino") have recently begun actively encouraging Cynergy ISOs to cannibalize the merchant portfolios of other Cynergy ISOs, including the Tribul Plaintiffs' Merchants. It is my understanding that such a policy violates the terms of the Cynergy EP Agreement (and the CynergyPreB ISO Agreement that preceded it), and the course of conduct between the parties dating back to 2006

69.     It is clear that Defendants Cynergy, Fitzsimmons and Corvino encouraged, coached and instructed one of Plaintiffs' Agents -- Rory ("Reuven") Cypers (hereinafter, "Cypers") (who was the sole Agent working for Residual Income Opportunities, Inc. (hereinafter, "RIO"), one of the Tribul Plaintiffs' Downlines that was ostensibly solely owned and operated by Cypers) – to (i) interfere with the Tribul Plaintiffs relationship with our largest Merchant, Insomniac, Inc. (hereinafter "Insomniac") and (ii) to attempt to entrap the Tribul Plaintiffs in a violation of the Visa and MasterCard rules (a true and correct copy of the Cypers – Tribul Marketing Agreement, redacted to hide social security numbers and the confidential pricing terms, is annexed hereto as Exhibit V). My belief is based upon numerous conversations with Mr. Cypers that confirmed my suspicions and belief.

70.     It is my understanding that, the New Cynergy Defendants undertook this plan (as, among other things) as a pretext to forestall negotiations with the Tribul Plaintiffs over correcting the onerous and unconscionable terms of the EP Agreement, and to communicate directly with the Tribul Plaintiffs' Agent, Cypers, and the Tribul Plaintiffs' largest merchant, Insomniac, as part of the New Cynergy Defendants' ongoing campaign to undercut the Tribul Plaintiffs and to seize the Tribul Plaintiffs' Merchants for themselves or for other ISOs that would allow Cynergy to get away with its improper manner of doing business.

71.    Plaintiff Tribul sought to enjoin and restrain Cypers and others from interfering with Plaintiff Tribuls' Merchants and harassing Plaintiff Tribul's' administrators, members, assigns and agents by obtaining a Temporary Restraining Order on June 27, 2012. *See Tribul Merchant Services, LLC v. Rory ("Reuven") Cypers and Residual Income Opportunities, Inc.,* Index No. 13301/12 (N.Y. Sup., Kings County) (Schmidt, J.) (hereinafter, the "Cypers Case"), dated June 27, 2012 (the "June 27 TRO"). A copy of the June 27 TRO is annexed hereto as Exhibit W. Additionally, copies of additional orders of the Court in that action are annexed hereto as Exhibit X and Y. (The 17th Cause of Action in this case seeks damages from the New Cynergy Defendants arising from their breaches of the June 27 TRO).

72.    It was my belief that Cypers would attempt to contract directly with Defendant Cynergy, resulting in both Cynergy and Cypers making more money and the Tribul Plaintiffs receiving no revenue at all on these Tribul Merchants' accounts. Mr. Cypers later confirmed that was indeed the case.

73.    Accordingly no later than June 12, 2012 (but presumably before), the Tribul Plaintiffs notified Defendant Cynergy of the ongoing issue with Plaintiffs' Agent Cypers and reminded Defendant Cynergy of its contractual obligations under the EP Agreement not to interfere with the Tribul Plaintiffs' Merchants and Downlines.

74.    Defendant Cynergy, through Defendants Fitzsimmons and Corvino, pretending to be bound by their obligations to the sponsoring financial institution, Harris Bank, commenced an overbroad and expensive audit of the Tribul Plaintiffs' business operations. This audit was based upon the unfounded, self-interested allegations of Tribul Agent Cypers that related to reserves allegedly held by the Tribul Plaintiffs on two merchant accounts. Indeed, Mr. Cypers confirmed

to me that Defendants Fitzsimmons and Corvino told him (either directly or through his lawyer or his new ISO) how to try and entrap the Tribul Plaintiffs.

75.     Defendant Cynergy, again through Defendants Fitzsimmons and Corvino, gave the Tribul Plaintiffs false assurances that Defendant Cynergy was not going to interfere in a disagreement between the Tribul Plaintiffs and any of their Downlines or merchants.

76.     It is my understanding that The Tribul Plaintiffs put Defendant Cynergy on notice of the June 27 TRO at approximately 8:51 p.m. Eastern on June 27, 2012.  The mere notice of the June 27 TRO should have prevented Cynergy from dealing directly with anyone on Tribul Agent Cypers' behalf, or aiding and abetting in any way, Tribul Agent Cypers' attempts to move any Tribul Merchants to an ISO other than Tribul.

77.     Mr. Cypers confirmed to me that, contrary to the representations and assurances that they have given to the Tribul Plaintiffs, Defendants Cynergy, Fitzsimmons and Corvino in fact instructed and encouraged Cypers to violate the terms of his agreement with Tribul, violate the terms of the EP Agreement and violate the terms of the June 27 TRO with assurances that Defendant Cynergy would directly pay him a higher residual on his merchant portfolio if he sought a competing temporary restraining order declaring that Cypers' residuals had to be paid directly to him by Cynergy.

78.     On July 31, 2012 beginning at approximately 2:12 PM EST I had a conversation with Rory Cypers in which he explained to me the various actions taken by The New Cynergy Defendants to undermine the business of Tribul Merchant Services (Tribul).  This conversation lasted almost two hours as Mr. Cypers tried to make peace and undo the wrong that he caused.

79.     I held near daily conversations with Cypers for a period of three weeks thereafter, specifically a total of at least 147 conversations, in which Cypers confirmed many times the

24

actions taken by the New Cynergy Defendants with respect to their efforts to move both Cypers individually as a sales agent along with his portfolio of business away from the Tribul Plaintiffs.

80.     Cypers admitted to me that he has wanted to move his business away from my company and into a direct relationship with the New Cynergy Defendants for quite some time and there is past precedent for this when we at Tribul allowed Cypers to be paid on a direct basis under a very strict set of circumstances as memorialized in a General Release and Direct Payment Agreement signed on July 29, 2009.  See Exhibit Z.

81.     However, this was not enough for Cypers and due to various disagreements I had with him, he approached management at the New Cynergy Defendants requesting that they cut Tribul out of his business in direct violation of both Tribul's contracts with New Cynergy Defendants and contracts with Cypers.

82.     Specifically, Cypers told me that the New Cynergy Defendants' current Chief Legal Officer and General Counsel Sheila Corvino said that they would be happy to assist him so long as Cypers gave them the cover of legal and regulatory means, in particular his obtaining a TRO against me.

83.     While this was happening, Tribul was working with one of its largest merchants to set up a reserve fund in order to offset any potential future risk inherent in my company processing credit and debit card transactions for this merchant.

84.     This merchant was boarded by an ISO that Cypers worked for at that time with Tribul and from there Tribul placed the merchant with the New Cynergy Defendants.

85.     This merchant was responsible for nearly $2 million of Tribul's annual revenue while Cypers received a significant portion.

86.     Cypers admitted to me that he and New Cynergy agreed that Tribul's ongoing discussions with Cypers about Tribul's request for a sizable reserve on the Insomniac account provided the perfect opening for them to put me and the Tribul Plaintiffs in legal and regulatory jeopardy. Mr. Cypers also told me that Defendant Corvino wanted to pin blame on my legal counsel, Mitch Shapiro, in order to drive a wedge between us and to potentially prevent him from being able to represent and defend me and my companies, as he has successfully done on numerous matters since the first battle with CynergyPreBe in 2009.

87.     While Cypers was trying to use the Insomniac merchant as a pawn in his negations with Tribul, management at New Cynergy Defendants, including CEO Kim Fitzsimmons and Shelia Corvino, reached out to this merchant's executives and instructed them to not do business the Tribul Plaintiffs in direct violation of the CynergyPreBe ISO Agreement and the EP Agreement. Cypers admitted to me that he was in constant contact with management at the New Cynergy Defendants throughout this time despite Tribul eventually obtaining a TRO against Cypers which specifically barred any contact between him and the New Cynergy Defendants and which the New Cynergy Defendants were well aware of.

88.     Cypers told me that the New Cynergy Defendants found a proxy intermediary to work through which allowed them to circumvent the restrictions placed on them by the TRO, but more specifically, to transact business with Cypers directly and to move his portfolio of merchants away from the Tribul Plaintiffs. Cypers told me this proxy intermediary is Darrin Ginsburg and his companies Super G Funding and Fast Transact. He said that, as a way to cut out Tribul, the New Cynergy Defendants offered Ginsburg an 80/20 residual split, which was a far better deal than Cypers was getting with Tribul.

89.    Cypers said that when he had asked Defendant Fitzsimmons how she could legally and morally justify their moving away Tribul's merchants and sales agent, she replied that it is the policy of the New Cynergy Defendants not to intervene when two sales offices are fighting over a merchant or sales agent and further explained that she maintained this same policy at her previous employer First Data.

90.    I asked Cypers if Defendant Fitzsimmons showed him this policy in writing and he said no. According to Cypers, Defendant Fitzsimmons was telling all Cynergy's large ISOs about this policy allowing ISOs to cannibalize each other's Cynergy portfolios.

91.    I have asked Cypers numerous times whether the New Cynergy Defendants have taken over this merchant account and whether they are processing directly with them and he has refused to confirm or deny this fact.

92.    Furthermore, Cypers has bragged numerous times that he has absolute control over this merchant account and they would go where ever he advised them to go.

93.    As a result of these conversations, it is my belief that Defendant Cynergy has taken over this merchant account, either directly or through proxy intermediary Darrin Ginsburg, in direct violation of an ongoing and active TRO and in direct violation of Plaintiff Tribul's contract with Defendant Cynergy.

94.    It is my understanding that the New Cynergy Defendants are actively soliciting Plaintiffs' merchant customers, attempting to move them to Plaintiffs' competitors or directly to Defendant Cynergy to pilfer the valuable book of business that the Tribul Plaintiffs rebuilt after the CynergyPreB bankruptcy, and to put the Tribul Plaintiffs out of business.

95.    The Tribul Plaintiffs have already been damaged as a result of the malicious plan of Defendants Cynergy, Fitzsimmons and Corvino. I understand that, with Cynergy Data's

knowledge and acquiescence, Cypers arranged to have all of the approximately $5,000,0000 in credit and debit transactions for Insomniac's last event processed under a different merchant identification number (hereinafter, "MID") that was not boarded through any of the Tribul Plaintiffs.  Accordingly, the Tribul Plaintiffs lost a significant amount of revenue that we sorely needed at the time that Cynergy was putting additional financial pressure upon the Tribul Plaintiffs.

96.     A permanent loss of the Merchant accounts controlled by Agent Cypers would be catastrophic to the Tribul Plaintiffs' business.

97.     As detailed below, the Tribul Plaintiffs will almost certainly go out of business if the Court does not grant the injunctive relief sought by Plaintiffs, and hundreds of people will lose their ability to earn a living.

## IRREPARABLE HARM – TRIBUL PLAINTIFFS WILL GO OUT OF BUSINESS UNLESS THE NEW CYNERGY DEFENDANTS ARE ENJOINED

98.      The Tribul Plaintiffs' business operations will be effectively destroyed, and the Tribul Plaintiffs (as well as their Downlines and Agents) irreparably harmed, long before this case proceeds to trial if the New Cynergy Defendants are not enjoined and restrained from continuing to damage the Tribul Plaintiffs during the pendency of this lawsuit.

99.      Logically, a business cannot be run if its source of income is drastically cut, let alone completely eliminated. How will we be able to grow our business and operate without an income for me or any of our employees, many of whom have helped me grow this business not once, but twice over the past 6 years?

100.      How are we going to pay our Downlines if the New Cynergy Defendants withhold all the Residuals?  The New Cynergy Defendants are well aware that our cash flow is precariously low, and that if they continue to withhold our Residuals or assess fees, an irreversible and irreparable run on the ISOs, Agents and Merchants will occur in the next few weeks or months, shutting down the Tribul Plaintiffs' business for good.  We barely averted this catastrophe in 2009, under similar circumstances.

101.      If the New Cynergy Defendants are permitted to withhold all of the Tribul Plaintiffs' Residuals beginning in December, then there is no doubt that we will be out of business.

## BALANCING OF EQUITIES – RELIEF SOUGHT BY PRELIMINARY INJUNCTION

102.      If the Court granted the preliminary injunction sought, and restrained the New Cynergy Defendants, this would merely enable the Tribul Plaintiffs to pay their reduced staff of

29

employees, Downlines and Agents and to stay in business with the merchants that they have signed and serviced for years.

103.   Therefore, on behalf of the Tribul Plaintiffs and the hundreds of people dependent upon us for an income, I request that this court use its power to grant injunctive relief in this case to stop the New Cynergy Defendants from interfering with our Downlines, Agents or Merchants, unfairly competing by undercutting our prices and encouraging other Cynergy ISOs to cannibalize our merchants or Downlines/Agents and improperly interfering with our attempts to sell the merchant portfolio at fair market value or to finance our business by taking loans with the merchant portfolio and residuals as collateral (not subjugated to any liens or UCC1s of the New Cynergy Defendants).

104.   To enable us to operate competitively, the Tribul Merchants also request an injunction requiring the New Cynergy Defendants to comply with the few fair terms of the Cynergy EP Agreement (and the assumed CynergyPreB ISO Agreement).  For example, the New Cynergy Defendants should be ordered to comply with the one term that appeared in every draft agreement and LOI between the parties, the immediate establishment and activation of a segregated BIN/ICA for all existing Tribul Merchants and those that the Tribul Plaintiffs and their Downlines/Agents continue to board with Defendant Cynergy each and every week.  The Court should also require the New Cynergy Defendants to allow the Tribul Plaintiffs to finance the merchant portfolio or residuals without such lenders being placed in a subordinate position to the New Cynergy Defendants.  The New Cynergy Defendants should also be compelled to locate and restore to the Tribul Plaintiffs the approximately 1000 so called "missing merchants" and the residual stream owed on those merchants, and to repay the Tribul Plaintiffs the almost $800,000 of EP and QM reserves that were transferred on the Tribul account by CynergyPreB to the New

Cynergy Defendants so that the Tribul Plaintiffs have sufficient funds to pay their Downlines/ Agents and employees, including back pay and residuals owed. The Court should also prevent the New Cynergy Defendants from withholding any residuals due to debt service or the minimums, both charges that the Tribul Plaintiffs have established are unfair and were forced upon me under extreme financial duress, during the pendency of this case.

105.    The New Cynergy Defendants will not be harmed by the injunctive relief sought during the pendency of this case.

_____
SHMUEL ("SAM") CHANIN

Sworn to before me this 28
day of September, 2012

_____
Notary Public

JACOB H. NEMON
NOTARY PUBLIC-STATE OF NEW YORK
No. 02NE6260838
Qualified in Kings County
My Commission Expires May 07, 2016

31

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------------x

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC,
TRIBUL CASH LLC, SECOND SOURCE FUNDING LLC,
DALMAO, INC. and SHMUEL CHANIN,

                                              Plaintiffs,

           - against -                                Index No.502672/2012

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS,
LLC,COMVEST CYNERGY HOLDINGS, INC., PIPELINE
CYNERGY HOLDINGS, LLC, CYNERGY EQUITY
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC.,
CYNERGY DATA, INC., PIPELINE CYNERGY, INC.,
PIPELINE DATA, INC.,  KIM FITZSIMMONS, SHEILA
CORVINO,  MARCELO PALADINI, et al.,

                                      Defendants.

-------------------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'MOTION FOR PRELIMINARY INJUNCTION AGAINST NEW CYNERGY DEFENDANTS

SHAPIRO TAMIR LAW GROUP, PLLC
    Priscilla Cheng
    Elie B. Gold
    Jacob H. Nemon
    Mitchell C. Shapiro
    Zaki Isaac B. Tamir
    Dawn L. Yuster
245 West 17th Street, 5th Floor
New York, New York 10011
(T)  212.444.9974
(F)  212.444.9971
(E)  ComvestCase@ShapiroTamirLaw.com
(W) www.ShapiroTamirLaw.com
*Attorneys for Plaintiff*

Dated: New York, New York
       September 28, 2012

## PRELIMINARY STATEMENT

This is a complex action seeking more than $50 million in damages from a group of interrelated individuals and entities that have acted in concert to cripple Plaintiffs, a group of once-valuable companies (and their Chief Executive Officer), through a continuing campaign of fraudulent and illegal acts.  Plaintiffs' Verified Complaint alleges (a) multiple breaches of contract, fiduciary duty, and the covenant of good faith and fair dealing, (b) conversion, (c) tortious interference with contract and prospective business relations, (d) unfair competition, (e) promissory estoppel and (f) defamation. Plaintiffs also seek a judicial accounting and a declaratory judgment.  Defendants THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC,COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE CYNERGY, INC., PIPELINE DATA, INC. and SHEILA CORVINO (together, with Defendant Kim Fitzsimmons, the "New Cynergy Defendants"), purchased the assets of Cynergy Data, LLC ("Old CynergyPreB") in bankruptcy on or about October 26, 2009.Plaintiffs have also joined as Defendants MARCELO PALADINI, GUSTAVO CEBALLOS, ANDRES ORDONEZ, STEPHEN ASCHETTINO, DEAN M. LEAVITT, JAFFE RAITTHEUR& WEISS P.C, HOLLI HART TARGAN, NIXON PEABODY LLP, FRANK PENSKI, MARK N. BERMAN and UNICORN PARTNERS LLC (collectively, the "Old CynergyPreB Defendants").

Certain of the claims against the Old CynergyPreB Defendants were brought prior to the Old CynergyPreB bankruptcy filing but were stayed by Old CynergyPreB's bankruptcy petition filing.  The Old CynergyPreB Defendants were not Debtors in the Old CynergyPreB bankruptcy proceeding nor did they receive releases of Plaintiffs' claims as part of the bankruptcy proceeding.  In addition, Plaintiffs have joined a third group of Defendants – MERCHANT PROCESSING SYSTEMS CORP., OLEG

FIRER, LEON GOLDSTEIN, VLADIMIR SADOVSKY, MERCHANT CAPITAL PORTFOLIO LLC,

NEW EDGE PAYMENTS, LLC, PROCESS PINK PAYMENTS LLC and UNIFIED PAYMENTS,

LLC (hereinafter referred to collectively as the "Unified Defendants")– who, along with certain of the

Old CynergyPreB Defendants and certain of the New Cynergy Defendants, engaged in illegal acts that

were intended to similarly injure Plaintiffs DALMAO, INC. and SHMUEL("SAM") CHANIN.

Due to the recent actions by the New Cynergy Defendants, including, but not limited to, their

imminent threat of actively soliciting the merchant accounts of Plaintiffs TRIBUL MERCHANT

SERVICES, LLC, TRIBUL LLC, TRIBUL CASH LLC AND SECOND SOURCE FUNDING LLC

(hereinafter, the "Tribul Plaintiffs"), their ongoing tortious interference with the Tribul Plaintiffs'

merchant accounts and independent sales agents, their improper withholding of more than $4 million

dollars of residual payments that are essential to maintain the business operations of the Tribul Plaintiffs,

and their stated intention to withhold additional residual payments in the near future based upon

contractual provisions that the Tribul Plaintiffs believe to be unenforceable, it is imperative that a

preliminary injunction be issued and maintained during the pendency of this action.  Only the injunctive

relief sought by the Tribul Plaintiffs herein will prevent irreparable harm to the Tribul Plaintiffs and the

hundreds of people (including the families of Tribul Plaintiffs' employees and sales representatives)

who depend upon the Tribul Plaintiffs for their livelihood, and the incalculable loss of the Tribul

Plaintiffs' goodwill and business reputation.   Left unrestrained, the ongoing conduct of the New

Cynergy Defendants will result in the total destruction and insolvency of the Tribul Plaintiffs' entire

remaining business within a matter of months, if not weeks.

In view of the New Cynergy Defendants' past and threatened conduct, the Tribul Plaintiffs

respectfully request (as enumerated in the accompanying Notice of Motion) that this Court issue a

preliminary injunction restraining and enjoining the New Cynergy Defendants (and their agents,

representatives, employees, and any others acting for, with or on their behalf) from:

1. Contacting directly or indirectly any merchants procured or signed for by the Tribul Plaintiffs (the "Tribul Merchants") for any purpose other than routine customer service calls initiated by the Tribul Merchants, including but not limited to contracting directly with same so as to deprive the Tribul Plaintiffs of the benefits of their contracts and or contractual relations with the Tribul Merchants;

2. Contacting, either directly or indirectly, any independent sales representative, independent sales organization, agent, employee or independent contractor of the Tribul Plaintiffs (hereinafter, "Agents" or "Downlines") for any purpose, including but not limited to contracting directly with same so as to deprive the Tribul Plaintiffs of the benefits of their contracts and or contractual relations with the Agents or Downlines;

3. Contacting, either directly or indirectly,(i) any prospective purchaser that the New Cynergy Defendants know or have any reason to believe are considering purchasing the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts ("Prospective Purchasers") or (ii) any prospective lender or other financing source that the New Cynergy Defendants know or have any reason to believe are considering providing the Tribul Plaintiffs with capital in order to finance their business operations in exchange for, inter alia, a security interest in the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts ("Prospective Lenders");

4. Defaming, disparaging or demeaning Plaintiffs, their principals, parent companies, subsidiaries, affiliates, agents or employees or the value of the Tribul Plaintiffs' merchant portfolio, merchant accounts or the residual stream associated with the Tribul Merchants;

5. Interfering with the Tribul Plaintiffs' business including but not limited to interfering with the Tribul Plaintiffs' business relations with their Merchants, Downlines, Prospective Purchasers and Prospective Lenders; and

6. Not promptly and properly paying to the Tribul Plaintiffs during the pendency of this action the total Net Residuals due to the Tribul Plaintiffs (*e.g.,* all transaction fees resulting from credit or debit transactions processed for the Tribul Merchants, as calculated in accordance with the terms and conditions contained in the Cynergy EP Agreement referenced in the Verified Complaint herein (without any deductions for minimums, assessments, loan or debt servicing or any fees other than the remaining standard processing fees set forth on Schedule A of the Cynergy EP Agreement.)

Plaintiffs also requested affirmative injunctive relief, requesting that the Court issue an order

compellingthe New Cynergy Defendants to:

Issue retractions of all defamatory, disparaging or demeaning statements previously made by or on behalf of any of the New Cynergy Defendants concerning, relating or pertaining to Plaintiffs, their principals, parent companies, subsidiaries, affiliates, agents or employees or the value of the Tribul Merchants accounts or the residuals belonging to the Tribul Merchants' accounts;

7. Return approximately $800,000 in improperly retained EP and QM reserves that should have

been returned to the Tribul Plaintiffs;

8. Identify, Locate and Return to the Tribul Merchant Portfolio the approximately 1,000 Tribul Plaintiffs' Merchants that are still "missing merchants" and which the New Cynergy Defendants have refused to locate and return to the Tribul Merchant Portfolio;

9. Recommence Residual payments to the Tribul Plaintiffs for the still "missing merchants" and establish a repayment schedule for the approximately $4 million in Residuals improperly withheld and/or not paid to the Tribul Plaintiffs on the accounts of the still "missing merchants" by the New Cynergy Defendants since October 26, 2012;

10. Immediately establish and activate a segregated bank identification number ("BIN/ICA") for all existing Tribul Merchants and those that the Tribul Plaintiffs and their Downlines/Agents continue to board with Defendant Cynergy each and every week;

11. Waive any "right of first refusal" and otherwise fully cooperate with the Tribul Plaintiffs' attempts to sell its merchant portfolio at fair market value to a third party in an arms-length transaction (the "Prospective Transaction"); and

12. Waive any liens (and effectively withdraw any UCC filing statements) against the Tribul Plaintiffs' merchant portfolio or other assets of Plaintiffs so as to enable the Tribul Plaintiffs to procure financing of their business operations with the Tribul Plaintiffs' merchant portfolio as collateral, and with the lender taking first position (*e.g.,* having any liens or rights against the Tribul Plaintiffs' Merchant portfolio allegedly or potentially belonging to the New Cynergy Defendants subordinated to any Prospective Tribul lenders' interests). Based on the foregoing, and the facts and arguments presented below, the Court should grant Plaintiffs Motion for a Preliminary Injunction against the New Cynergy Defendants.

## STATEMENT OF FACTS[1]

The Tribul Plaintiffs are independent sales organizations (hereinafter "ISOs") in the business of providing merchants with services, including credit card processing services and factoring of future accounts receivables. Chanin Aff. ¶2. The New Cynergy Defendants (*e.g.,* Pipeline Cynergy Holdings, LLC and Cynergy Holdings LLC) acquired complete ownership of and operational control over substantially all of the assets of Old CynergyPreB, including the assumed contractual rights and obligations such as the virtually identical two ISO Agreements between Old CynergyPreB and the

---

[1] . In sum, unless the unjunctive relief sought in this motion – which essentially is asking the New Cynergy Defendants to act in good faith and abide by their enforceable contractual and legal obligations to the Tribul Plaintiffs during the pendency of this case -- is granted, the Tribul Plaintiffs will almost certainly go out of business. The facts and evidence behind these contentions are contained in the Affidavit of Plaintiff Shmuel ("Sam") Chanin, CEO of the Tribul Plaintiffs, sworn to on September 28, 2012 and submitted herewith, along with Exhibits A-Z annexed thereto. Additional facts are contained in the 82 page, 386-paragraph Verified Complaint in this Action that Mr. Chanin verified on or about August 25, 2012, and which detailed Plaintiffs' 17 Causes of Action; a true and correct copy of the Verified Complaint is annexed to the Chanin Aff. as Exhibit A.)

Tribul Parties (collectively referred to as the "Old CynergyPreB ISO Agreement", copies of which are annexed as Chanin Aff., Exhibit E)). Chanin Aff. ¶5;Exh. A¶¶ 4,5. In or about January 2011, the New Cynergy Defendants (other than Defendant Fitzsimmons, who was not in the employ of Cynergy at the time), subsequently entered into a new ISO Agreement with the Tribul Parties, called the Executive Partner (hereinafter, the "Cynergy EP Agreement"); Chanin Aff. . ¶5, Exh. F. As detailed below and in the Chanin Affidavit, the Cynergy EP Agreement was procured through fraudulent misrepresentations and duress by the New Cynergy Defendants and is unconscionable and therefore unenforceable. *Id.* The Old CynergyPreB ISO Agreement and the EP Agreement provide that the merchant accounts belong to Tribul, not to Defendant Cynergy. Chanin Aff. Exh. E, ¶2.7; Exh. F, ¶2.8.

Defendant Cynergy' new CEO, Defendant Kim Fitzsimmons ("Fitzsimmons") and Chief Legal Officer Sheila Corvino ("Corvino") have recently begun actively encouraging Cynergy ISOs to cannibalize the merchant portfolios of other Cynergy ISOs, including the Tribul Plaintiffs' portfolio. Chanin Aff. ¶¶68, 89-90. (The Tribul Plaintiffs contend that such a policy violates the Cynergy EP Agreement. *Id.*)

The Tribul Plaintiffs' have learned that the New Cynergy Defendants actively conspired with a Downline sales agent of Plaintiffs to attempt to entrap the Tribul Plaintiffs in a violation of the Visa and MasterCard rules. Chanin Aff. ¶¶ 69-74, 77-85 This gave the New Cynergy Defendants the pretext to forestall negotiations with the Tribul Parties over the correction of the onerous and unconscionable terms of the Cynergy EP Agreement *Id* .It also provided the New Cynergy Defendants with the cover to communicate directly with the Tribul Plaintiffs' Agent, Cypers, and the Tribul Plaintiffs' largest merchant, Insomniac, as part of the New Cynergy Defendants' ongoing campaign to undercut the Tribul Plaintiffs and to seize the Tribul Plaintiffs' Merchants for themselves or for other ISOs that would allow Cynergy to get away with its improper manner of doing business. Chanin Aff. ¶¶85-88, 94.

A permanent loss of the Merchant accounts controlled by this particular Agent would be catastrophic to Plaintiff Tribul's business. Chanin Aff. ¶96.  Plaintiff Tribul sought to enjoin and restrain the agent and others from interfering with Plaintiff Tribal's' Merchants and harassing Plaintiff Tribul's' administrators, members, assigns and agents by obtaining a Temporary Restraining Order in a pre-existing case  (the "June 27 TRO").  Chanin Aff. ¶ 71; Exh. W.  Plaintiff Tribul grew suspicious of the New Cynergy Defendants' conduct, and notified Defendant Cynergy of the ongoing issue with the agent and reminded Defendant Cynergy of its contractual obligations under the Cynergy EP Agreement not to interfere with the Tribul Plaintiffs' Merchants and Downlines. Chanin Aff. ¶73.  The New Cynergy Defendants gave the Tribul Plaintiffs false assurances that Defendant Cynergy was not going to interfere in a disagreement between Plaintiff Tribul and one of its Downlines or Tribul's merchants. Chanin Aff. ¶75.  The Tribul Plaintiffs later learned – from the Agent's own admissions that -- contrary to the representations and assurances that they had given to the Tribul Plaintiffs -- Defendants Cynergy, Fitzsimmons and Corvino in fact instructed the agent to violate the terms of his agreement with Tribul, violate the terms of the Cynergy EP Agreement, violated the terms of the June 27  TRO and encouraged him  to do all of the above with assurances that Defendant Cynergy would directly pay him a higher residual on his merchant portfolio if he sought a competing temporary restraining order declaring that Cypers' residuals had to be paid directly to him by Cynergy. Chanin Aff. ¶77.     Plaintiff has learned that they all conspired to solicit the portfolio of Plaintiff's business, to move them to Plaintiff's competitor or directly to Cynergy to eliminate the Tribul Plaintiffs. Chanin Aff. ¶77-90

The Tribul Plaintiffs have already been damaged as a result of the malicious acts of the New Cynergy Defendants, and as a direct result, more than $5,000,0000 in credit and debit transactions for a merchant's event processed under a different merchant identification number (hereinafter, "MID") that was not boarded through Tribul. Chanin Aff. ¶95.  Accordingly, Tribul lost a significant amount of

7

revenue that it sorely needed at the time that Cynergy was putting additional financial pressure upon the Tribul Plaintiffs. Chanin Aff. ¶95.

Recognizing that their relationship with Cynergy had been poisoned by the 2009 battle with the Old CynergyPreB Defendants --a number of whom were hired by Defendant Cynergy post-bankruptcy as employees, officers or advisors -- the Tribul Plaintiffs sought to end their toxic relationship with Defendant Cynergy and to sell their merchant portfolio. Chanin Aff. ¶¶58-60. The Tribul Plaintiffs received bona fide offers worth up to $40 million for the Tribul Merchant Portfolio as late as 2011. *Id.*. Cynergy exercised its contractual right of first refusal and scuttled the deal by making it clear to the Prospective Purchaser that Defendant Cynergy would not renegotiate the minimum performance requirements (and steep financial penalties), and the right of first refusal for future sales of the portfolio and residuals by the Prospective Purchaser. *Id.*. It is clear to the Tribul Plaintiffs that various contractual provisions contained in the Cynergy EP Agreement – including the right of first refusal, the minimum performance requirements and the financial penalties for missing minimums, along with Cynergy's security interest and liens on the Tribul merchant portfolios (and the UCCs on file) (collectively, hereinafter, the "Unconscionable Terms") -- make it virtually impossible for the Tribul Plaintiffs to sell the Tribul Merchant Portfolio for fair market value or to receive financing to support their business operations and development, since Defendant Cynergy maintains the priority lien on the entire book of business, valued at more than $17 million, ostensible to secure approximately $555,000 in remaining debt (and the $2.7 million in minimum profits guaranteed to Defendant Cynergy under the unconscionable Cynergy EP Agreement). Chanin Aff. ¶¶38, 41.

The Tribul Plaintiffs maintain that they were forced to sign the Cynergy EP Agreement containing the Unconscionable Terms under extreme financial duress and fraudulent misrepresentations by the New Cynergy Defendants (and Defendant McCoy) regarding Defendant Cynergy's ability to

enforce an $8 million loan and personal guaranty that Tribul and Chanin had executed with an Old

CynergyPreB affiliate.   Chanin Aff. ¶30. The Tribul Plaintiffs have learned that Defendant Cynergy

never paid any consideration or properly acquired or assumed the CPP Loan Agreement (defined in

Verified Complaint), or its ancillary documents. Chanin Aff. ¶31-32.  The New Cynergy Defendants–

for the benefit of themselves (and in particular Defendant Comvest, the proponent of the unconscionable

deal terms in 2010/11)– deceived the Tribul Plaintiffs and fraudulently induced them to sign the

Cynergy Cynergy EP Agreement under duress (Chanin Aff. ¶17-30; Exhs. G-P ), along with a new $1

million loan agreement, the first $200,000 of which were withheld by Defendant Cynergy to cover

obligations purportedly owing to Defendant Cynergy from prior "revenue advances" (which in reality

were negotiated fee reductions that Defendant Cynergy later retroactively removed when the Tribul

Plaintiffs finally had no choice but to agree to the one-side, unconscionable deal in January 2011.) .

Chanin Aff. ¶29-32; Exhs. P, Q, R.  The duress that the Tribul Plaintiffs were suffering in or about 2011

was directly caused by Defendant Cynergy's withholding of approximately $50,000 per month in debt

service on the loan and the imposition of additional fees and annual assessments, while having assisted

the Unified Defendants (as defined in the Verified Complaint) in pilfering a significant book of business

from Plaintiff Dalmao and which revenues Plaintiff Dalmao could have used to loan significant sums of

money to the Tribul Plaintiffs. Chanin Aff. ¶18-22, 37.

     In January 2011, after already having received approximately $1.5 million in fees from the

Tribul Plaintiffs since the acquisition of the book in bankruptcy, the New Cynergy Defendants converted

the purported balance remaining on the CPP Loan into minimums that guaranteed Defendant Cynergy

$7.2 million in profits over the four year life of the Cynergy EP Agreement.  Chanin Aff. ¶35; Exh. L,

M.  Shortly after Defendant Fitzsimmons took over Defendant Cynergy in or about February 2012, she

conceded that the minimums were totally "out of whack," particularly when viewed in light of the fact

that the fees to be reasonably expected under Schedule A of the Cynergy EP Agreement, based upon reasonable growth of the book, to be closer to $1.8 million, not $7.2 milion.. Chanin Aff. ¶38-9. Indeed, the monthly minimum fee shortfall is projected to increase above $225,000.00 by December 2012, which will wipe out the Tribul Plaintiffs' entire Residuals (leaving nothing for the Tribul Plaintiffs' employees or Downlines).   Chanin Aff. ¶39.  As long as the Unconscionable Terms are allowed to remain in force, the Tribul Plaintiffs will be unable to sell or finance their merchant portfolio and residuals and will remain at the mercy of the New Cynergy Defendants.  Chanin Aff. ¶41.  The analogy that comes to mind is a tethered lamb, powerless to defend itself while the circling jackals rip away pieces of flesh until they are ready to dismember the lamb entirely.

The New Cynergy Defendants have already begun to dismember the Tribul Plaintiffs.  First, Defendant Cynergy has continued to take monthly reductions of approximately $42,000 to service the $1 million loan from the already shrinking net residuals otherwise due and owing the Tribul Plaintiffs. Chanin Aff. ¶42; Exh. P.  Second, despite its acknowledgement of the Tribul Plaintiffs' cash flow problems, and their prior promise to forbear from assessing a minimums shortfall reduction against the Tribul Plaintiffs' residuals until January 2013, Defendant Cynergy withheld a significant sum from Tribul's residuals in August 2012 and has asserted its right to withhold minimums and debt service as Defendant Cynergy maintains that it is entitled.  Chanin Aff. ¶43.

Additionally, almost $800,000 in reserves that were supposed to be held on reserve for Tribul Plaintiffs and their merchants by Harris Bank, the financial sponsor of CynergyPreB and Defendant Cynergy, have been improperly withheld by Defendant Cynergy.  Chanin Aff. ¶¶ 45-55.  According to the individual who served as the restructuring agent for CynergyPreB, the Trustee for the CynergyPreB and CPP estates, and the Liquidation Trustee, those reserves were transferred to Defendant Cynergy and should have been kept on account and returned to the Tribul Plaintiffs.  Chanin Aff. ¶ 55.

Lastly, CynergyPreB's records indicate that approximately 4,000 merchants were transferred from the Tribul Plaintiffs' merchant portfolio between July and October 2009, when the Tribul Defendants were locked out of Old CynergyPreB's VIMAS and only about 2,800 were transferred back after the sale of the assets of CynergyPreB (the "missing merchants").  Chanin Aff. ¶¶ 61-66, Exh. C, D. During the months before the bankruptcy filing, Defendants withheld millions of dollars of Residuals due to the Tribul Plaintiffs., Based upon the information that the Tribul Plaintiffs could gather without the cooperation of the OldCynergyB Defendants (later assisted by the New Cynergy Defendants), they agreed to cap their potential recovery at $3.95 million, when in fact the sum improperly withheld was much closer to $7 million.   Chanin Aff. ¶ 2, 65.  In order to stop the Old CynergyPreB Defendants from their actions, the Tribul Plaintiffs commenced a lawsuit against a few of the named Old CynergyPreB Defendants and CynergyPreB in June 2009 and procured a temporary restraining order that required CynergyPreB (the "2009 TRO") to pay residuals.  Chanin Aff. Ex. B.  Instead of complying with the 2009 TRO, many of the named Defendants in this case engaged in a conspiracy to frustrate the Tribul Plaintiffs' ability to prosecute the case or procure prospective injunctive relief, continued interfering with the Tribul Plaintiffs' relationships with their agents and merchants, and then filed for bankruptcy protection. Chanin Aff. ¶ 65-67; Exh. C and D.

When the Tribul Defendants' VIMAS access had been restored right after the bankruptcy sale of the assets to the New Cynergy Defendants, in late 2009, the Tribul Parties saw that approximately than 4,000 merchants were missing and asked the New Cynergy Defendants for an explanation. *Id.* While approximately 2,800 merchants magically reappeared in the Tribul Plaintiffs' Merchant Portfolio and EP account code on VIMAS, more than 1,000 of the Tribul Merchants were and are still "missing merchants," and the Tribul Parties have not been paid any residuals on those missing merchants from June 2009 to the present, which residuals the Tribul Plaintiffs estimate to be more than $4 million.

Chanin Aff. ¶ 64-65. Additionally, the New Cynergy Defendants refuse to perform their contractual

obligation to provide the Tribul Plaintiffs with a segregated BIN/ICA, which would make it possible for

the Tribul Plaintiffs to move their merchants *en masse* in the event that Defendant Cynergy continues to

breach the parties agreement or fails to properly service the Tribul Merchants or ISOs.

  The Tribul Plaintiffs' business operations will be effectively destroyed, and the Tribul Plaintiffs

irreparably harmed, long before this case proceeds to trial if the New Cynergy Defendants are not

enjoined and restrained from continuing to damage the Tribul Plaintiffs during the pendency of this

lawsuit. Chanin Aff. ¶96-101. The improper withholds have put Tribul in a position where their

Downlines are not going to be paid. Compared to the great benefit to the Tribul Plaintiffs, there would

be no discernible harm to the New Cynergy Defendants as a result of the granting of the preliminary

injunction sought by the Tribul Plaintiffs. Chanin Aff. ¶96-101

**ARGUMENT**

I.  THE LEGAL STANDARD FOR ISSUANCE OF A PRELIMINARY INJUNCTION

  A party seeking the remedy of a preliminary injunction has the burden of demonstrating, by clear

and convincing evidence: (1) a likelihood of ultimate success on the merits, (2) the prospect of

irreparable injury if the provisional relief is withheld, and (3) a balancing of the equities in the movant's

favor. *See* CPLR § 6301; *S.J.J.K. Tennis, Inc. v Confer Bethpage, LLC*, 81 A.D.3d 629, 630 (2nd Dept.

2011); *Reichman v. Reichman*, 930 N.Y.S.2d 262 (2nd Dept. 2011); *Winchester Global Trust Co. Ltd. v.*

*Donovan*, 58 A.D.3d 833, 834 (2nd Dept. 2009); *Coinmach Corp. v. Alley Pond Owners Corp.*, 25

A.D.3d 642, 643, 808 N.Y.S.2d 418 (2nd Dept. 2006).

  The purpose of a preliminary injunction is to maintain the status quo and prevent the dissipation

of property that could render a judgment ineffectual." *Ruiz v. Meloney*, 26 A.D.3d 485, 486, 810

N.Y.S.2d 216 (2nd Dept. 2006). However, it is well-established that a court sitting in equity may enter a

12

preliminary injunction to revert to the *status quo ante*. *XL Specialty Ins. Co. v. Level Global Investors,*

*L.P.,* 2012 U.S. Dist. LEXIS 82164, 19-20 (S.D.N.Y. June 13, 2012).  The status quo ante is defined as

the last actual, peaceable uncontested status which preceded the pending controversy (and not just the

last moment before the action was filed).  *Id.; Davis v. Shah,* 2012 U.S. Dist. LEXIS 62295, 13-14

(W.D.N.Y. May 2, 2012). "The decision to grant or deny a preliminary injunction lies within the sound

discretion of the Supreme Court." *Arcamone–Makinano v. Britton Prop., Inc.,* 83 A.D.3d 623, 625, 920

N.Y.S.2d 362 (2nd Dept. 2011). "The mere existence of an issue of fact will not itself be grounds for the

denial of the motion" *Id.*

## II.   THE TRIBUL PLAINTIFFS HAVE DEMONSTRATED LIKELIHOOD OF SUCCESS ON MERITS

The Tribul Plaintiffs have asserted claims against the New Cynergy Defendants for, among other

things, breach of contract, breach of duty of good faith and fair dealings, tortious interference with

contract, tortious interference with business relations and a declaration that the Cynergy EP Agreement

was procured under duress and by fraud, and thus is void and unenforceable. The preliminary evidence

presented with this motion shows that Plaintiffs likely will prevail on the merits of these claims and will

be entitled to ultimate relief.

To demonstrate a likelihood of success on the merits of any one of those claims, Plaintiffs need

only make a *prima facie* showing of a right to relief, but actual proof of the case should be left to future

proceedings. *McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co.,* 114 A.D.2d 165, 172 (2d Dept.

1986); *Terrell v. Terrell,* 279 A.D.2d 301, 303 (1st Dept. 2001).  Furthermore, where, as here, denial of

injunctive relief would render the final judgment ineffectual , the degree of proof required to establish

the element of likelihood of success on the merits should be accordingly reduced. *Schlosser v. United*

*Presbyterian Home, Inc.,* 56 A.D.2d 615 (2d Dept. 1977); *Republic of Lebanon v. Sotheby's,* 167 A.D.2d

142, 145 (1st Dept. 1990).  Finally, Plaintiffs need only show likelihood of success on the merits under

the causes of action related to the preliminary injunction sought and the relief granted by the Court. *See, e.g., Bingham v. Struve*, 184 A.D.2d 85, 89 (1st Dep't 1992) (in an action for libel and intentional infliction of emotional distress, plaintiff's showing of likelihood of success of libel cause of action was sufficient for court to issue preliminary injunction).

### A. Tribal Plaintiffs Will Likely Succeed on Their Claims That the Cynergy EP Agreement is Unconscionable and Unenforceable

An unconscionable contract has been defined as one which is so grossly unreasonable as to be unenforceable because of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. *King v. Fox*, 7 N.Y.3d 181, 191(2006). This definition has been broken down into two elements: procedural unconscionability and substantive unconscionability. *See Day Op Of North Nassau, Inc. v. Viola*, 847 N.Y.S.2d 901 (Sup. Ct Nassau County 2007); *Gillman v. Chase Manhattan Bank*, 73 N.Y.2d at 10, 537 N.Y.S.2d 787 (1988); Agreement*Matter of Friedman*, 64 A.D.2d 70, 85 (1978) (procedural unconscionability elements can be identified by "evidence of the contract formation process and meaningfulness of the choice"). In general, it can be said that procedural and substantive unconscionability operate on a 'sliding scale'; the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa. *State of New York v. Wolowitz*, 96 A.D.2d 47, 68 (2d Dept. 1983).

First, as for substantive unconscionability, some of the examples of unconscionable terms include: inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty. *Day Op Of North Nassau, Inc. v. Viola*, 847 N.Y.S.2d 901 (Sup. Ct Nassau County 2007). Like in *Day Op Of North Nassau*, the substantive terms of the Cynergy EP Agreement are unconscionable because Cynergy EP AgreementCynergy EP Agreementthe Unconscionable Terms of the Cynergy EP Agreement Cynergy EP Agreementinclude minimums of $7.2 million in fees to be paid to Defendant Cynergy that, according to Defendant Cynergy's own CEO,

14

Defendant Fitzsimmons, were totally "out of whack." Cynergy EP AgreementChanin Aff. ¶¶38-9. In fact, the minimum fee shortfall is projected to approach $200,000.00 by December 2012, and it will be impossible for the Tribul Plaintiffs to cover those minimum fees. Chanin Aff. ¶39,100- 102, . Other Unconscionable Terms include Defendant Cynergy's contractual right of first refusal to purchase the future sales and residuals of Tribul Plaintiff's merchant portfolio, steep financial penalties for Tribul Plaintiff's failure to meet minimum performance requirements, and unduly burdensome security interests and liens (including UCC filings) that encumber Tribul Plaintiff's merchant portfolio. Chanin Aff. ¶56-60. Collectively, these Unconscionable Terms make it virtually impossible for Tribul Plaintiffs to sell its merchant portfolio to Prospective Purchasers or to procure financing, using the portfolio as collateral. Chanin Aff. ¶3, 56-60. Cynergy EP Agreementfor fair market value or use it as collateral for future financing, forcing Tribul Plaintiffs to remain wholly dependent upon – and at the mercy of – Defendant Cynergy. Chanin Aff. ¶41.

Second, it is clear that the duress that New Cynergy had placed the Tribul Plaintiffs under in January 2011 amounts to procedural unconscionability. Examples of procedural unconscionability include, but are not limited to, "high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties." *Matter of Friedman,* 64 A.D.2d at 85. As in *Matter of Friedman*, the Tribul parties maintain that the Unconscionable Terms were inserted into the Cynergy EP Agreement and were forced to sign Cynergy EP Agreement under extreme financial duress and fraudulent misrepresentations. Chanin Aff. ¶¶15-29; Exh. G-P. The Tribul Plaintiff's duress was caused in part by Defendant Cynergy's fraudulent misrepresentations that it had the right to enforce all of the terms of the CynergPreB ISO Agreement AND the terms of a loan made by Cynergy Prosperity Plus ("CPP") in the

amount of $8 million, personally guaranteed by Plaintiff Chanin, that Defendant Cynergy purportedly assumed from CynergyPreB. See Chanin Aff. ¶¶34-6; Exh. A, at 6.

The Tribul Plaintiffs have learned that Defendant Cynergy never paid any consideration or properly acquired or assumed the CPP Loan Agreement, the Tribul Plaintiffs' $8 million debt obligations thereunder or Plaintiff Chanin's personal guaranty thereof. Id. The New Cynergy Defendants reached a firm purchase price for all of the assets of CynergyPreB, and then, immediately prior to closing the APA transaction, reallocated $2 million worth of debt forgiveness and other consideration to be paid by the Comvest Group as part of the purchase of the CPP Loan Agreement. Chanin Aff. ¶35; Exh. R.

The New Cynergy Defendants deceived the Tribul Plaintiffs regarding the New Cynergy Defendants' ability to enforce the CPP Loan and fraudulently induced the Tribul Plaintiffs to sign the Cynergy Cynergy EP Agreement under duress, along with a new $1 million loan agreement, the proceeds of which were paid to Defendant Cynergy to cover obligations purportedly owing to it under the CPP Loan Agreement. Chanin Aff. ¶36. The duress that the Tribul Plaintiffs were suffering in or about January 2011 was directly caused by Defendant Cynergy's withholding of approximately $50,000 per month in debt service on the loan and the imposition of additional fees and annual assessments, while having assisted the Unified Defendants in pilfering a significant book of business from Plaintiff Dalmao and which revenues Plaintiff Dalmao could have used to loan significant sums of money to the Tribul Plaintiffs. Chanin Aff. ¶34; Exs. F-J

### B. Tribul Plaintiffs Will Likely Succeed On Their Claims Alleging Breach Of Contract and Breach of the Covenant of Good Faith

The Court should enter a preliminary injunction against the New Cynergy Defendants because Plaintiffs will likely succeed on the merits of their claims that New Cynergy Defendants breached, and continue to breach, the terms of the original ISO Agreement that they acquired and assumed from

CynergyPreB and the Cynergy Cynergy EP Agreement. *S.J.J.K. Tennis, Inc.*, 81 A.D.3d at 630.To state

a claim for breach of contract under New York law, a plaintiff must allege: (1) the making of an

agreement; (2) due performance by plaintiff; (3) breach thereof by defendant; and (4) causing damage to

the plaintiff. *Stratton Group, Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1217 (S.D.N.Y. 1978); *see also*

*Ascoli v. Lynch*, 2 A.D.3d 553, 554-555 (2d Dept. 2003).

First, as for the existence of a valid agreement, in this case there is a clear existence of an

Agreement that delineated the parties' right and obligation under the contract. Chanin Aff. Exh. E.As an

alternative to the Tribul Plaintiffs' claim to have the Cynergy EP Agreement declared void and

unenforceable, the Tribul Plaintiffs have asserted claims that Defendant Cynergy breached many of the

identical terms contained in the Old CynergyPreB ISO Agreement.  Second, the Tribul Plaintiffs have

been fully performing under the terms of the Old CynergyPreB ISO Agreement and the Cynergy EP

Agreement.  Chanin Aff. ¶ 4-5.  For example, the Tribul Plaintiffs have engaged the services of the Sub-

ISOs and Downlines to survey the market and to sign merchants and has worked hard to maintain those

relationships. *Id.* Tribul Plaintiffs maintains its relationship with these Agents and has been actively

marketing Cynergy's services to merchants, handling customer service for the Tribul Merchants. Chanin

Aff. ¶ 4-5. Third, it is clear that Defendant Cynergy has breached the terms of the Old CynergyPreB ISO

Agreement and the Cynergy EP Agreement. Chanin Aff. ¶ ¶ 45-67.

In direct violation of the agreements between the parties, the New Cynergy Defendants have (i)

failed to use best efforts to provide Tribul a segregated bank identification number ("BIN/ICA") that

would have given the Tribul Plaintiffs the ability to quickly and easily move large groups of merchants

from Defendant Cynergy upon the termination or breaches of the agreements with Defendant Cynergy

(*See* Chanin Aff. ¶57; Exhs. E, F, T), (ii) miscalculated and underpaid residuals, (iii) have

misappropriated Merchant Reserves and EP reserves that should have been returned to the Tribul

Plaintiffs : (iv) have thwarted the Tribul Plaintiffs' attempts to locate the almost 1000 still "missing merchants",. *Id.* . Chanin Aff. ¶¶ 45-67.   The New Cynergy Defendants also breached the confidentiality provisions of the agreements by revealing to third parties, including Cypers, the percentage of the Tribul Plaintiffs' business that Cypers' merchants (and in particular, Insomniac) constituted, and have improperly instructed merchants not to continue to do business with the Tribul Plaintiffs.  Chanin Aff. ¶58, 87; Exh. E, F.

As an even more egregious breach of the clear language of the parties' agreements, and the course of dealing between the Tribul Plaintiffs and the Cynergy entities dating back to 2006, the New Cynergy Defendants recently established a new policy of allowing, and actually encouraging, Cynergy ISOs to cannibalize the merchant portfolios of other Cynergy ISOs, including the Tribul Plaintiffs' portfolio. Chanin Aff. ¶18.  Indeed, in violation of the Cynergy EP Agreement,  the New Cynergy Defendants  encouraged, coached and instructed one of Plaintiffs' Agents to (i) interfere with the Tribul Plaintiffs' relationship with its largest Merchant, Insomniac, Inc. and (ii) attempt to entrap the Tribul Plaintiffs in a violation of the Visa and MasterCard rules.  Chanin Aff. ¶¶ 89-96.  Defendants Cynergy Data, Fitzsimmons and Covina's actions are in clear violation and breach of the Cynergy EP Agreement between the Tribul Plaintiffs and Defendant Cynergy.  Chanin Aff. ¶ 58, 68; Exs E, F.

Fourth, the damages to the Tribul Plaintiffs from the acts of the Defendants, including Defendant Cynergy's breaches of the ISO Agreement and the Cynergy EP Agreement are in the millions.  Chanin Aff. ¶¶3, 9, 30-32, 36-77 .  The Tribul Plaintiffs' ongoing cash flow difficulties would be ameliorated if Defendant Cynergy would be compelled to return the approximately $800,000 in reserves that should have been returned to the Tribul Plaintiffs back in 2009-10, let alone the more than $ 4million in residuals from the missing merchants that the New Cynergy Defendants have refused to locate and return to the Tribul Merchant Portfolio. Chanin Aff. ¶ 83-95.  Most recently, the Tribul Plaintiffs have

lost a considerable percentage of their monthly revenues through the New Cynergy Defendants' breach

of the non-solicitation clauses of the ISO Agreement and the Cynergy EP Agreement and interference

with the portfolio controlled by Tribul Agent Rory Cypers and RIO.  Any further loss of revenue by

continued breaches of the agreements would be catastrophic to the Tribul Plaintiffs' business. Chanin

Aff. ¶96.

Furthermore, Plaintiffs can and will succeed in showing on the merits that Defendants' conduct

herein has breached, and continues to breach, the covenant of good faith and fair dealing that is implicit

in the Old CynergyPreB ISO Agreement and the Cynergy EP Agreement. *Murphy v. American Home*

*Products Corp.*, 58 N.Y.2d 293, 304 (1983); *Van Valkenburgh, Nooger& Neville, Inc. v. Hayden*

*Publishing Co., Inc.* 30 N.Y.2d 34, 45 (1972), *cert. den.*, 409 U.S. 875 (1972). This covenant includes an

implied undertaking on the part of each party that it will not intentionally and purposefully do anything

to prevent the other party from carrying out the agreement on its part.  *Jaco Electronics, Inc. v. Hitachi*

*America, Ltd.*, 207 A.D.2d 328 (2d Dept. 1994).

### C. The Tribul Plaintiffs Will Likely Succeed On Their Claims for Tortious Interference With Contractual Relations

The Tribul Plaintiffs have demonstrated that they will likely succeed on their claims for tortious

interference with contractual relations against the New Cynergy Defendants. *S.J.J.K. Tennis, Inc.*, 81

A.D.3d at 630. In order to prevail on a claim for tortious interference with business relations, a plaintiff

must show (1) the existence of a valid contract between itself and a third party; (2) defendant's

knowledge of that contract; (3) defendant's intentional inducement of the third party to breach that

contract; and (4) damages to plaintiffs. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993); *see Guard–*

*Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189–190 (1990).  "Improper intentional

interference is generally evidenced by a tortfeasor inducing or otherwise causing a third person not to

perform his contractual obligations to plaintiff." *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536, 541 (2d Cir. 1989) (quotations omitted).

In the case at bar, the Tribul Plaintiffs have a valid and existing agreement with Tribul Agent Cypers and a business relationship with Tribul Merchants, including Plaintiff Tribul's largest merchant, Insomniac. Chanin Aff. ¶¶ 68-73, Exh. V. Second, the New Cynergy Defendants knew of the Tribul Plaintiffs' agreement with Cypers and RIO. The New Cynergy Defendants' actual knowledge of Cypers' non-compete Marketing Agreement with Plaintiffs is evidenced by Cypers' statement to Plaintiff Chanin that Cypers had discussed his Marketing Agreement with the New Cynergy Defendants and the New Cynergy Defendants had nevertheless decided to proceed with instructing him on how to solicit and move Tribul Merchant Insomniac to a competing ISO despite the agreement between Cypers and Tribul. Chanin Aff. ¶ 72- 82, 86. Cypers was a very attractive employee to the New Cynergy Defendants because of his intimate knowledge of Plaintiffs' customers, methodologies, best practices, pricing, and strategies in the Credit Merchant Services field. Chanin Aff. ¶ 19. Indeed, the New Cynergy Defendants, with whom the Tribul Plaintiffs boarded all of their credit and debit transaction processing business, were or should have been aware that its ISOs maintain contractual relationships with their merchants. Chanin Aff. ¶ 14-15. Third, notwithstanding the Cynergy Defendants' knowledge of the existence of Cypers' valid agreement with Plaintiff, the Cynergy Defendants recruited Cypers and encouraged him to violate his non-compete agreement with Plaintiffs by soliciting Plaintiffs' merchant Insomniac and others away from the Tribul Plaintiffs. Chanin Aff. ¶ 80-88. Ultimately, the New Cynergy Defendants succeeded in inducing Cypers to breach his Agreement with Plaintiffs. Chanin Aff. ¶ 89, 90-93; Exhs. V, W and X. .Fourth, the Tribul Plaintiffs have been damaged by the loss of the business of Insomniac and other merchants that Cypers has moved to other ISOs. *Id.*. Such conduct clearly establishes a likelihood of success on Plaintiffs' claim for tortious interference with a contract.

**D. The Tribul Plaintiffs Will Likely Succeed On Their Claim for Tortious Interference with Business Relations (with Tribul Merchants and Prospective Purchasers)**

The Tribul Plaintiffs will likely succeed on the merits of their tortious interference with business relations claim. To succeed on such a claim, a plaintiff must show: (1) there is a business relationship between it and a third party; (2) the defendant, knowing of that relationship, interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured. *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1990); *Carvel v. Noonan,* 3 N.Y.3d 182, 190, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004). It is well-settled that a claim for tortious interference with prospective business relations claim can succeed upon proof that the defendant tortiously interfered with a continuing business or other customary relationship that does not amount to a formal contract. *Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 205 (2d Cir. 1998). Thus, the claim includes interference with the opportunity of selling services and any other relations that could lead to profitable contracts. *Id.*

As detailed above, the New Cynergy Defendants tortiously interfered with the Tribul Plaintiffs' business relationship with the Tribul Merchants, including without limitation, Insomniac, which has already led to the loss of revenue and monetary damages to the Tribul Plaintiffs. The New Cynergy Defendants have also tortiously interfered with the Tribul Plaintiffs' business relationships with prospective purchasers of the Tribul Merchant portfolio. The Tribul Plaintiffs disclosed to Defendant Cynergy that the Tribul Plaintiffs had decided to sell their merchant portfolio. Chanin Aff. ¶26. Defendant Cynergy knew that the Tribul Plaintiffs had received bona fide offers worth up to $40 million for the Tribul Merchant Portfolio as late as 2011. Chanin Aff. ¶27, 58-60¶. However, Cynergy, with malicious intent, exercised its right of first refusal to interfere with the prospective transaction and to make it clear to the prospective purchaser that Defendant Cynergy would not renegotiate the minimum

21

performance requirements and the right of first refusal for future sales of the portfolio and residuals by the Prospective Purchaser. *Id.*. Cynergy's unfair actions have injured the relationship between Plaintiffs and the Prospective Purchasers. Chanin Aff. ¶28

### E.   The Tribul Plaintiffs Will Likely Succeed On Their Claim for The New Cynergy Defendants' Breach of the June 27 TRO

The New Cynergy Defendants have violated a lawful order of the Court in another case before this Court.  Pursuant to CPLR § 6301, the June 27 TRO "enjoined and restrained the Defendants, their attorneys, agents, employees, representatives and/or servants, and/or any other persons or entities acting by or on their behalf, or under their direction or supervision, from [among other things] (a) contacting, soliciting or contracting with, directly or indirectly, for themselves or for any third party any business, merchant, person or entity that has previously entered into a "Merchant Agreement" and to which Tribul provided or provides services (hereinafter, "Merchant") (as such terms are defined and/or incorporated into the Independent Sales Organization Agreement dated October 1, 2008 between Plaintiff and Defendants); and (b) interfering with Plaintiff Tribul's business, including but not limited to interfering with Plaintiff Tribul's business relations with any of Plaintiff Tribul's Merchants [including without limitation Insomniac, Inc.]. *See* Chanin Aff.; Ex. W

Subsequent to receiving notice of the June 27 TRO, the New Cynergy Defendants have engaged in a series of acts designed to lead Plaintiff Tribul into believing that Cynergy would reasonably negotiate a global resolution of the longstanding conflicts between Cynergy and Plaintiff Tribul that continues to interfere with Plaintiff Tribul's relationships with its ISOs and Merchants.  Chanin Aff. at ¶ 74.  Plaintiff Tribul now understands – based on admissions from Cypers -- that the New Cynergy Defendants have been stalling these long-promised negotiations, while encouraging sales agents, including Cypers, RIO, and their affiliates to move merchants away from Plaintiffs in direct violation of the TRO obtained in the *Cypers* Case. Chanin Aff. ¶¶85-88, 94. .

It is clear that the New Cynergy Defendants have violated the June 27 TRO, and are liable to Plaintiff Tribul for all the damages arising therefrom. *See Id.*; Exs. W, X, Y. "Civil contempt has as its aim the vindication of a private party to litigation and any sanction imposed upon the contemnor is designed to compensate the injured private party for the loss of or interference with the benefits of the mandate." *McCain v. Dinkins*, 84 N.Y.2d 216, 226 (1994).  In *McCormick v. Axelrod*, 59 N.Y.2d 574, 583 (1983), the Court of Appeals has set out the legal standard for finding civil contempt:

> [I]t must be determined that a lawful order of the court, clearly expressing an unequivocal mandate, was in effect. It must appear, with reasonable certainty, that the order has been disobeyed.  Moreover, the party to be held in contempt must have had knowledge of the court's order, although it is not necessary that the order actually have been served upon the party.  Finally, prejudice to the right of a party to the litigation must be demonstrated.

From Cypers' admissions, it is clear that the New Cynergy Defendants were "clearly acting as "servants or agents of the defendants or act[ed] in collusion or combination with" Cypers and RIO (Chanin Aff. ¶¶77. 85-90) – and thus were obligated to observe the mandate of the June 27 TRO, even only upon having received notice of such order. *State Farm Fire & Cas. v Parking Sys. Valet Serv.*, 85 A.D.3d 761, 764-765 (2d Dept. 2011); *People ex rel. Stearns v. Marr*, 181 N.Y. 463, 469-470 (1905); *McCain v. Dinkins*, 84 N.Y.2d 216, 226 (1994). The disobedience need not be deliberate to sustain a finding of civil contempt; rather, the mere act of disobedience, regardless of its motive, is sufficient if such disobedience defeats, impairs, impedes or prejudices the rights of a party. *Incorporated Village of Plandome Manor v. Ioannou*, 54 A.D.3d 365, 862 N.Y.S.2d 592 (2nd Dept. 2008).

**III.**      **ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE HARM**

The Tribul Plaintiffs have already suffered significant monetary damages due to the acts of the New Cynergy Defendants', including without limitation the interference with the Tribul Plaintiffs' Merchants Downlines and the improper withholding of significant portions of the Tribul Plaintiffs' dwindling monthly revenues. Chanin Aff. ¶¶ 3, 98-101.  A preliminary injunction should be granted

where the movant is likely to go out of business or suffer a severe hardship that could possibly render the final judgment ineffectual. *Republic of Lebanon v. Sotheby's*, 167 A.D.2d 142, 145 (1st Dept. 1990); *Mr. Natural, Inc. v. Unadulterated Food Products, Inc.*, 152 A.D.2d 729, 730 (2d Dept. 1989) (defendant's interference with ongoing business with an exclusive licensing agreement deemed to be irreparable harm); *U.S. Ice Cream Corp. v. Carvel Corp.*, 136 A.D.2d 626, 628 (2d Dept. 1988) (same); *see also Frank May Assocs. v. Boughton*, 281 A.D.2d 673, 673-674 (3d Dept. 2001) (preliminary injunction is appropriate to enjoin damage to the good will of a company); *Chrysler Realty Corp. v. Urban Investing Corp.*, 100 A.D.2d 921, 922-923 (2d Dept. 1984) (irreparable harm found where plaintiff would lose tenants, use and occupancy of a building and would be subjected to suit by its tenants for damages).

Simply stated, if the Preliminary Injunction is not granted, the Tribul Plaintiffs will have been effectively put out of business, even before the unconscionable monthly minimum profit clause permits Defendant Cynergy to withhold the Tribul Plaintiffs' entire monthly residuals beginning in December 2012. Chanin Aff. ¶¶ 3, 98-101. The Court should grant the preliminary injunction to protect the Tribul Plaintiffs so that their businesses may still be in existence when an award is ultimately given on the merits of this case. *Lebanon v. Sotheby's*, 167 A.D.2d at 145; *Mr. Natural, Inc.*, 152 A.D.2d at 730.

The actions of the New Cynergy Defendants make it highly likely that the Tribul Plaintiffs will be unable to pay their Downlines. Chanin Aff. ¶ 40. Many of the Tribul Plaintiffs' Downlines will undoubtedly flee from Tribul, causing a run on the merchants, in the next weeks or months, shutting down the Tribul Plaintiffs' business forever if the New Cynergy Defendants are permitted to continue to withhold Residuals, assess fees or interfere with the Tribul Plaintiffs' ability to sell the portfolio or procure financing against the merchant accounts so as to pay the Downlines and their employees.. Chanin Aff. ¶¶ 100.

In light of the foregoing, imminent, continued and irreparable damages will be sustained by the Tribul Plaintiffs in the absence of a preliminary injunction. *Mr. Natural, Inc.*, 152 A.D.2d at 730.Furthermore, if the New Cynergy Defendants are not preliminarily enjoined, the Tribul Plaintiffs will be irreparably injured and have no adequate remedy at law. Although one of the tests for irreparable injury is whether a litigant might obtain adequate compensation in a legal damage award, the legal damages remedy must be as "complete, practicable and efficient as the equitable one." *Poling Transp. Corp. v.A & P Tanker Corp.*, 84 A.D.2d 796, 797 (2d Dept. 1981). In this case, the Tribul Plaintiffs obtain a continuing stream of revenue from the merchant accounts recruited by their Downlines and the future of that revenue depends on the Tribul Plaintiffs' continued goodwill with those Downlines. This is not simply an action to recover damages on a breach of contract, but to preserve years of business development and relationships, the complete calculation of which value does not easily transfer into a dollar amount.

The Tribul Plaintiffs will likely go out of business if the Court does not issue the injunctive reliefsought by the Tribul Plaintiffs. Chanin Aff., ¶ 3, 98-101Where, as here, the plaintiffs are likely to go out of business or suffer a severe hardship that could possibly render the final judgment ineffectual, the harm is irreparable and an injunction should issue. *Republic of Lebanon v. Sotheby's*, 167 A.D.2d 142, 145 (1st Dept. 1990); *Mr. Natural, Inc. v. Unadulterated Food Products, Inc.*, 152 A.D.2d 729, 730 (2d Dept. 1989).

## IV.   THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFFS' FAVOR

The Court should enter the preliminary injunction because the Tribul Plaintiffs have demonstrated that the balance of equities tips heavily in their favor. *S.J.J.K. Tennis, Inc.*, 81 A.D.3d at 630. The preliminary injunction sought by the Tribul Plaintiffs will prevent incalculable harm to the Tribul Plaintiffs – including the likely destruction of the Tribul Plaintiffs' businesses – and will maintain

the status quo (or in the case of stopping certain improperly withholding of Residuals, the status quo ante), pending the outcome of the litigation.  In view of the New Cynergy Defendants' recent actions including, but not limited to, their soliciting and conversion of the Tribul Plaintiffs' merchant Insomniac and their imminent threat of seizing the Tribul Plaintiffs' Merchant Portfolio because of an alleged violation of the Visa/Mastercard bankcard association rules (which the New Cynergy Defendants themselves orchestrated), their ongoing tortious interference with the Tribul Plaintiffs' merchant accounts and their ongoing, repeated defamatory statements concerning the Tribul Plaintiffs, and their lien on the Tribul Plaintiffs portfolio the equities weigh clearly against the New Cynergy Defendants and in favor issuing the preliminary injunction protecting the Tribul Plaintiffs' business. *See Price Paper and Twine Co. v. Miller*, 182 A.D.2d 748, 750, 582 N.Y.S.2d 746 (2nd Dept. 1992) (balancing the injuries in considering a preliminary injunction).

Furthermore, the Court should use its equitable powers to enter a preliminary injunction that returns the parties to the *status quo ante* that preceded the ongoing dispute. *See  XL Specialty Ins. Co.*, 2012 U.S. Dist. LEXIS 82164, at 19-20; *Shah*, 2012 U.S. Dist. LEXIS 62295, at13-14.  The status quo ante refers to the last peaceable moment prior to the commencement of the instant dispute, which is the period prior to the beginning of the New Cynergy's malicious actions, as alleged in the Verified Complaint. *Id.*  Unfortunately, that would presumably require the Court to return the parties to the point in time when the Old CynergyPreB ISO Agreement had just expired, and there was no enforceable loan or personal guaranty.The Tribul Plaintiffs request that this court use it power to grant injunctive relief in this case to restore Plaintiffs to the position before New Cynergy Defendants' malicious actions by preventing New Cynergy Defendants from charging any minimums or taking out debt service or assessing any fees other than the standard schedule A fees during the pendency of this hearing, and not interfering with any Prospective Purchasers or Lenders. Chanin Aff. ¶ 103-105.  The Tribul Plaintiffs'

business will be effectively destroyed if the New Cynergy Defendants are not compelled to remove the liens/UCCs which are currently in place and give back the excess reserves and missing merchant residuals that were unlawfully seized. Id.

The Court should also enter a preliminary injunction compelling the New Cynergy Defendants to return the approximately $800,000 in improperly retained EP reserve and QM funds, which should have been returned to the Tribul Plaintiffs long ago. Furthermore, the Court should require the New Cynergy Defendants to activate a segregated BIN/ICA for the Tribul Plaintiffs' exclusive use, and return the over 1,000 Tribul Plaintiffs' Merchants that are still missing merchants that the New Cynergy Defendants have refused to locate and return to the Tribul Merchant Portfolio and recommence Residual payments on these missing merchants. The provision of a dedicated BIN/ICA was a material term in all of the parties' agreements and LOIs. Prior to the disappearance of these missing merchants when the Tribul Plaintiff's were locked out of Old CynergyPreB's VIMAS data system, the Tribul Plaintiffs received regular and continuous residual payments from these accounts.

In granting this preliminary injunctive relief, the Court is not imposing any excessive burden on the New Cynergy Defendants. The Tribul Defendants are merely asking the Court to require the New Cynergy Defendants to comply with their existing contractual obligations so as not to cause the Tribul Plaintiffs immense loss and destruction of their businesses and to refrain from enforcing any facially unconscionable contract terms or destroying Tribul's business during the pendency of the case.

V.      **Courts Regularly Issue Preliminary Injunctions in Similar Matters**

It is well settled that injunctive relief is available in the context of the actions alleged in Plaintiff's Verified Complaint. *See Gunderman & Gunderman Ins.*, 46 A.D.3d 615, 853 N.Y.S.2d 82 (2nd Dept. 2007) (insurance agency satisfied irreparable injury requirement for preliminary injunction enforcing noncompetition clause in employment agreement by barring former employee from soliciting

its customers for 18 months, through allegations that in addition to losses of commissions that could be compensated through award of damages, agency would lose opportunities to sell further insurance to clients, and would sustain loss of goodwill, that would be difficult to quantity, if injunction were not granted.); *Alside Div. of Assoc. Materials Inc. v. Leclair*, 295 A.D.2d 873, 743 N.Y.S.2d 898 (3rd Dept. 2002) (preliminary injunction proper to enforce covenant not to compete); *Cut Corners Corp. v. Barterama Corp.*, 83 A.D.2d 948, 949 (2d Dept. 1981) (proper to enter a preliminary injunction enjoining racetrack operator from breaching an alleged oral modification extending food vendor's exclusive vending rights to Tuesdays and Thursdays); *Gambar Enterprises, Inc. v. Kelly Services, Inc.*, 69 A.D.2d 297, 306-307 (4th Dept. 1979) (preliminary injunction proper to where plaintiff set forth facts demonstrating a bad faith revocation of consent to an assignment of contractual rights); *American Para Professional Sys. v. Examination Management Servs.*, 214 A.D.2d 413, 414 (1st Dept. 1995) (preliminary injunction granted where plaintiff made prima facie showing of tortious interference).

## VI.  THIS DISPUTE WARRANTS EXPEDITED DISCOVERY AND A FULL EVIDENTIARY HEARING

The Court should order expedited discovery in this action so the Tribul Plaintiff's may obtain necessary material from Defendants for the prosecution of the instant motion.  Upon motions for a preliminary injunction, courts commonly grant accelerated discovery pertinent to a plaintiff's allegations as the information from such discovery aids the court during any evidentiary hearing on the motion and provides the court with more information than contained only in the moving papers. *See Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd.*, 5 Misc. 3d 285, 302, 783 N.Y.S.2d 758, 774 (N.Y. Sup.Ct. 2004) (Cahn, J.).

Here, expedited discovery is warranted in light of defendants' sole possession of the information necessary to determine the extent of their unlawful conduct, and in particular, the New Cynergy Defendants' violation of the June 27 TRO and their tortuous interference with the Tribul Plaintiffs'

28

contractual relations with their ISOs and merchants, and the locations and residuals due from the missing merchants and the improperly withheld residuals. *See Bel Geddes v. Zeiderman*, 228 A.D.2d 393, 644 N.Y.S.2d 729 (1st Dept. 1996) (plaintiff granted discovery priority for breach of fiduciary duty claim, because if true, details would be known only to defendant); *see also DoubleClick, Inc. v. Henderson*, 1997 WL 731413 at *8 (N.Y. Sup. 1997) (court ordered expedited discovery in misappropriation of trade secrets case). Moreover, Defendant Cynergy is the Defendant Cynergysole holder of all documentation relating to the location of the missing 1,000 Merchant Accounts, the millions of dollars of residuals that should have been paid to the Tribul Plaintiffs under those accounts, the true amount of residuals that should be paid to the Tribul Plaintiffs on a monthly basis on those missing accounts.  Therefore, the Tribul Plaintiffs respectfully request that this Court grant the Tribul Plaintiffs' motion for expedited discovery to acquire the full extent of Defendants' unlawful conducts as it pertains to this motion for preliminary injunction.

## CONCLUSION

The Tribul Plaintiffs have established (1) a likelihood of success on the merits, (2) an irreparable injury absent the granting of injunctive relief and (3) a balancing of equities.  As such, Plaintiffs have established an entitlement to a preliminary injunction against the New Cynergy Defendants.

For all of the foregoing reasons and as supported by the accompanying Chanin Affidavit and exhibits thereto, the Tribul Plaintiffs respectfully request that the Court grant Plaintiff's motion for a preliminary injunction granting the relief sought in the accompanying notice of motion, together with such other and further relief as the Court deems just and proper.

29

Dated: New York, New York
       September 28, 2012

                      Respectfully Submitted by,

                      SHAPIRO TAMIR LAW GROUP, PLLC

By:                                
                      Priscilla Cheng
                      Elie B. Gold
                      Jacob H. Nemon
                      Mitchell C. Shapiro
                      Zaki Isaac B. Tamir
                      Dawn L. Yuster
              245 West 17th Street, 5th Floor
              New York, New York 10011
              (T) 212.444.9974
              (F) 212.444.9971
              (E) ComvestCase@ShapiroTamirLaw.com
              (W) www.ShapiroTamirLaw.com
              *Attorneys for Plaintiffs*

Index # 502672/2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

---

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH LLC, SECONDSOURCE FUNDING LLC, DALMAO, INC. and SHMUEL CHANIN,

Plaintiffs,

- against -

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC, COMVESTCYNERGY HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC, CYNERGYEQUITY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE CYNERGY, INC., PIPELINE DATA, INC.,  KIM FITZSIMMONS, SHEILACORVINO,  MARCELO PALADINI, et al.,

Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION SEEKING**                                        A
**PRELIMINARY INJUNCTION AGAINST NEW CYNERGY DEFENDANTS**

---

**SHAPIRO TAMIR LAW GROUP, PLLC**
*Attorneys for Plaintiffs*
245 West 17th Street, 5th Floor
New York, NY 10011
(T) 212.444.9974
(F) 212.444.9971
(E) ComvestCase@ShapiroTamirLaw.com
(W) www.ShapiroTamirLaw.com

**"WE DO NOT ACCEPT SERVICE BY ELECTRONIC TRANSMISSION (FAX)"**

# Exhibit 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

------------------------------------------------------------------ x

TRIBUL MERCHANT SERVICES, LLC, TRIBUL  :
LLC, TRIBUL CASH LLC, SECOND SOURCE     :
FUNDING LLC, DALMAO, INC., and SHMUEL   :
CHANIN,                                                    :
                                                                      :     Index No. 502672/2012
            Plaintiffs,                                     :
                                                                      :
      v.                                                       :
                                                                      :
THE COMVEST GROUP a/k/a COMVEST GROUP  :
HOLDINGS LLC, COMVEST CYNERGY            :
HOLDINGS, INC., PIPELINE CYNERGY         :
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, :
LLC, CYNERGY EQUITY HOLDINGS, INC.,      :     **AMENDED**
CYNERGY DATA, INC., PIPELINE CYNERGY,    :     <u>**NOTICE OF MOTION**</u>
INC., PIPELINE DATA, INC., RANDY MCCOY, KIM :
FITZSIMMONS, SHEILA CORVINO, MARCELO    :
PALADINI, GUSTAVO CEBALLOS, ANDRES       :
ORDONEZ, STEPHEN ASCHETTINO, DEAN M.     :
LEAVITT, JAFFE RAIT HEUR & WEISS P.C.,    :
HOLLI HART TARGAN, NIXON PEABODY LLP,    :
FRANK PENSKI, MARK N. BERMAN, UNICORN    :
PARTNERS LLC, JOHN MARTILLO, 6M          :
INVESTMENT, LP, MERCHANT PROCESSING      :
SYSTEMS CORP., OLEG FIRER, LEON           :
GOLDSTEIN, VLADIMIR SADOVSKY,            :
MERCHANT CAPITAL PRTFOLIO LLC, NEW       :
EDGE PAYMENTS, LLC, PROCESS PINK          :
PAYMENTS LLC, and UNIFIED PAYMENTS, LLC, :
                                                                      :
            Defendants.                                 :

------------------------------------------------------------------ x

     **PLEASE TAKE NOTICE**, that upon the Affirmation of Scott M. Kessler, dated

September 27, 2012, and upon all prior pleadings and proceedings had herein, Defendant

Pipeline Data, Inc. ("Pipeline Data"), will move this Court at "an IAS Part", 360 Adams Street,

Brooklyn, NY 11201, on the 22nd day of October, 2012 at 9:30 in the forenoon of that day or as

soon thereafter as counsel may be heard for an Order extending Pipeline Data's time to answer,

move, or otherwise respond to the Verified Complaint by thirty (30) days, and for such other and

further relief as this Court deems just, proper, and equitable under the circumstances.

      **PLEASE TAKE FURTHER NOTICE**, that answering papers, if any, are required to be

served at least seven days before the return date of this motion pursuant to CPLR 2214(b).

Dated: New York, New York
       October 1, 2012

                                  Respectfully submitted,

                                   /s/ *Scott M. Kessler*
                              Michael C. Marsh, Esq.
                              Scott M. Kessler, Esq.
                              **AKERMAN SENTERFITT LLP**
                              335 Madison Avenue, 26th Floor
                              New York, NY 10017
                              Main: (212) 880-3800

                              *Attorneys for Defendant Pipeline Data, Inc.*

# REQUEST FOR JUDICIAL INTERVENTION
### UCS-840 (7/2012)

| | For Court Clerk Use Only: |
|---|---|
| Supreme        COURT, COUNTY OF_____ Kings | IAS Entry Date |
| Index No: ___ 502672/2012 ___ Date Index Issued: ___ 09/06/2012 | Judge Assigned |
| | RJI Date |

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH LLC, SECOND SOURCE
FUNDING LLC, DALMAO, INC. and SHMUEL CHANIN,

**Plaintiff(s)/Petitioner(s)**

-against-

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC, COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY HOLDINGS, LLC,
CYNERGY EQUITY HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE CYNERGY, INC., PIPELINE DATA, INC.,
RANDY McCOY, KIM FITZSIMMONS, SHEILA CORVINO, MARCELO PALADINI, GUSTAVO CEBALLOS, ANDRES ORDONEZ, STEPHEN ASCHETTINO,
DEAN M. LEAVITT, JAFFE RAIT HEUR & WEISS P.C., HOLLI HART TARGAN, NIXON PEABODY LLP., FRANK PENSKI, MARK N. BERMAN, UNICORN
PARTNERS LLC, JOHN MARTILLO, 6M INVESTMENT, LP, MERCHANT PROCESSING SYSTEMS CORP., OLEG FIRER, LEON GOLDSTEIN, VLADIMIR
SADOVSKY, MERCHANT CAPITAL PORTFOLIO LLC, NEW EDGE PAYMENTS, LLC, PROCESS PINK PAYMENTS LLC, and UNIFIED PAYMENTS, LLC,

**Defendant(s)/Respondent(s)**

**NATURE OF ACTION OR PROCEEDING:** Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested
  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum. For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental:_____
  *(specify)*
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability:_____
  *(specify)*
- ○ Other Negligence:_____
  *(specify)*
- ○ Other Professional Malpractice:_____
  *(specify)*
- ○ Other Tort:_____
  *(specify)*

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see NOTE under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other:_____
  *(specify)*

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ◉ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ○ Other Commercial:_____
  *(specify)*

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the COMMERCIAL DIV RJI Addendum.

**REAL PROPERTY:** How many properties does the application include?___
- ○ Condemnation
- ○ Mortgage Foreclosure (specify):   ○ Residential   ○ Commercial
  Property Address:_____
       Street Address     City     State     Zip
  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the FORECLOSURE RJI Addendum.
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property:_____
  *(specify)*

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)   [see NOTE under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene:_____
  *(specify)*
- ○ Other Special Proceeding:_____
  *(specify)*

**STATUS OF ACTION OR PROCEEDING:** Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: 09/06/2012 |
| Has a summons and complaint or summons w/notice been served? | ◉ | ○ | If yes, date served: 09/07/2012 |
| Is this action/proceeding being filed post-judgment? | ○ | ○ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION: Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice — Date Issue Joined: _____
- ◉ Notice of Motion — Relief Sought: Extend - Time — Return Date: 10/22/12
- ○ Notice of Petition — Relief Sought: _____ — Return Date: _____
- ○ Order to Show Cause — Relief Sought: _____ — Return Date: _____
- ○ Other Ex Parte Application — Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ○ Other (specify): _____

## RELATED CASES: List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

## PARTIES: For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | Tribul Merchant Services, LLC — Plaintiff | Shapiro / Mitchell, C. — Shapiro Tamir Law Group PLLC — 245 West 17th Street, 5th Floor, New York, New York 10011 — +1 (212) 444-9970 / +1 (212) 444-9971 — comvestcase@shapirotamirlaw.com | ◉ YES ○ NO | |
| ☐ | Tribul LLC — Plaintiff | Shapiro / Mitchell, C. — Shapiro Tamir Law Group PLLC — 245 West 17th Street, 5th Floor, New York, New York 10011 — +1 (212) 444-9970 / +1 (212) 444-9971 — comvestcase@shapirotamirlaw.com | ◉ YES ○ NO | |
| ☐ | Tribul Cash LLC — Plaintiff | Shapiro / Mitchell, C. — Shapiro Tamir Law Group PLLC — 245 West 17th Street, 5th Floor, New York, New York 10011 — +1 (212) 444-9970 / +1 (212) 444-9971 — comvestcase@shapirotamirlaw.com | ◉ YES ○ NO | |
| ☐ | Second Source Funding LLC — Plaintiff | Shapiro / Mitchell, C. — Shapiro Tamir Law Group PLLC — 245 West 17th Street, 5th Floor, New York, New York 10011 — +1 (212) 444-9970 / +1 (212) 444-9971 — comvestcase@shapirotamirlaw.com | ◉ YES ○ NO | |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: 09/27/2012

4242905
ATTORNEY REGISTRATION NUMBER

SIGNATURE

Scott M. Kessler
PRINT OR TYPE NAME

Print Form

Print Form

UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

Supreme

COURT, COUNTY OF _____ Kings _____   Index No: ____ 502672/2012 ____

For use when additional space is needed to provide party or related case information.

PARTIES: For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff) | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | Dalmao, Inc.<br>*Last Name*<br>*First Name*<br>*Primary Role*<br>Plaintiff<br>*Secondary Role (if any)* | Shapiro *Last Name*   Mitchell C. *First Name*<br>Shapiro Tamir Law Group PLLC *Firm Name*<br>245 West 17th Street, 5th Floor New York New York 10011<br>*Street Address* *City* *State* *Zip*<br>+1 (212) 444-9970   +1 (212) 444-9971   comvestcase@shapirotamirlaw.com<br>*Phone* *Fax* *e-mail* | ◉YES<br>○NO | |
| ☐ | Chanin *Last Name*<br>Shmeul<br>*First Name*<br>*Primary Role*<br>Plaintiff<br>*Secondary Role (if any)* | Shapiro *Last Name*   Mitchell C. *First Name*<br>Shapiro Tamir Law Group PLLC *Firm Name*<br>245 West 17th Street, 5th Floor New York New York 10011<br>*Street Address* *City* *State* *Zip*<br>+1 (212) 444-9970   +1 (212) 444-9971   comvestcase@shapirotamirlaw.com<br>*Phone* *Fax* *e-mail* | ◉YES<br>○NO | |
| ☒ | The Comvest Group a/k/a *Last Name*   *First Name*<br>Comvest Group Holdings, LLC<br>*First Name*<br>*Primary Role*<br>Defendant<br>*Secondary Role (if any)* | *Last Name*   *First Name*<br>*Firm Name*<br>*Street Address* *City* *State* *Zip*<br>*Phone* *Fax* *e-mail* | ○YES<br>◉NO | |
| ☒ | Comvest Cynergy Holdings, Inc.<br>*Last Name*<br>*First Name*<br>*Primary Role*<br>Defendant<br>*Secondary Role (if any)* | *Last Name*   *First Name*<br>*Firm Name*<br>*Street Address* *City* *State* *Zip*<br>*Phone* *Fax* *e-mail* | ○YES<br>◉NO | |
| ☒ | Pipeline Cynergy Holdings, LLC<br>*Last Name*   Scott M. *First Name*<br>*First Name*<br>*Primary Role*<br>Defendant<br>*Secondary Role (if any)* | *Last Name*   *First Name*<br>*Firm Name*<br>*Street Address* *City* New York *Zip*<br>*State*<br>*Phone* *Fax* *e-mail* | ○YES<br>◉NO | |
| ☒ | Cynergy Equity Holdings, LLC<br>*Last Name*   *First Name*<br>*First Name*<br>*Primary Role*<br>Defendant<br>*Secondary Role (if any)* | *Last Name*   *First Name*<br>*Firm Name*<br>*Street Address* *City* *State* *Zip*<br>*Phone* *Fax* *e-mail* | ○YES<br>◉NO | |

RELATED CASES: List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

Print Form
UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

**Supreme** _____ COURT, COUNTY OF _____ **Kings** _____   Index No: ___ **502672/2012**

**For use when additional space is needed to provide party or related case information.**

**PARTIES:**   For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Cynergy Equity Holdings, Inc<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ◯ YES<br>◉ NO | |
| ☒ | Cynergy Data, Inc.<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ◯ YES<br>◉ NO | |
| ☒ | Pipeline Cynergy, Inc.<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ◯ YES<br>◉ NO | |
| ☐ | Pipeline Data, Inc.<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Kessler          Scott M.<br>Last Name          First Name<br>Akerman Senterfitt LLP<br>Firm Name<br>335 Madison Avenue, 26th Floor   New York   New York   10017<br>Street Address    City    State    Zip<br>+1 (212) 880-3800   +1 (212) 880-8965   scott.kessler@akerman.com<br>Phone    Fax    e-mail | ◉ YES<br>◯ NO | |
| ☒ | McCoy<br>Last Name<br>Randy<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ◯ YES<br>◉ NO | |
| ☒ | Fitzsimmons<br>Last Name<br>Kim<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br>Firm Name<br>Street Address    City    State    Zip<br>Phone    Fax    e-mail | ◯ YES<br>◉ NO | |

**RELATED CASES:**   List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

Print Form

UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

Supreme _____ COURT, COUNTY OF _____ **Kings** _____  Index No: ___ **502672/2012**

For use when additional space is needed to provide party or related case information.

**PARTIES:**   For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Corvino _Last Name_<br>Sheila _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |
| ☒ | Paladini _Last Name_<br>Marcelo _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |
| ☒ | Ceballos _Last Name_<br>Gustavo _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |
| ☒ | Ordonez _Last Name_<br>Andres _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |
| ☒ | Aschettino _Last Name_<br>Stephen _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |
| ☒ | Leavitt _Last Name_<br>Dean M. _First Name_ _Primary Role:_<br>Defendant _Secondary Role (if any):_ | _Last Name_  _First Name_<br>_Firm Name_<br>_Street Address_  _City_  _State_  _Zip_<br>_Phone_  _Fax_  _e-mail_ | ○ YES<br>◉ NO | |

**RELATED CASES:**   List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

Print Form

UCS-840A (7/2012)

# Request for Judicial Intervention Addendum

**Supreme** _____ COURT, COUNTY OF _____ **Kings** _____   Index No: _____ **502672/2012** _____

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N): | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Jaffe Rait Heur & Weiss P.C.<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |
| ☒ | Targan<br>Last Name<br>Holli Hart<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |
| ☒ | Nixon Peabody LLP<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |
| ☒ | Penski<br>Last Name<br>Frank<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |
| ☒ | Berman<br>Last Name<br>Mark N.<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |
| ☒ | Unicorn Partners LLC<br>Last Name<br><br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name          First Name<br><br>Firm Name<br><br>Street Address     City     State     Zip<br><br>Phone     Fax     e-mail | ○ YES<br><br>◉ NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

## Request for Judicial Intervention Addendum

Print Form

UCS-840A (7/2012)

Supreme _____ COURT, COUNTY OF _____ Kings _____ Index No: _____ 502672/2012 _____

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space.

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Martillo Last Name<br>John First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |
| ☒ | 5M Investment, LP Last Name<br>First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |
| ☒ | Merchant Processing Systems Corp. Last Name<br>First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |
| ☒ | Firer Last Name<br>Oleg First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |
| ☒ | Goldstein Last Name<br>Leon First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |
| ☒ | Sadovsky Last Name<br>Vladimir First Name / Primary Role:<br>Defendant Secondary Role (if any): | Last Name   First Name<br>Firm Name<br>Street Address   City   State   Zip<br>Phone   Fax   e-mail | ○YES<br>◉NO | |

**RELATED CASES:** List any related actions. For matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

Print Form

UCS-840A (7/2012)

## Request for Judicial Intervention Addendum

Supreme _____ COURT, COUNTY OF _____ **Kings** _____ Index No: _____ 502672/2012 _____

For use when additional space is needed to provide party or related case information.

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in "Attorneys" space

| Un-Rep | Parties:<br>List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants:<br>Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☒ | Merchant Capital Portfolio LLC<br>Last Name<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>◉NO | |
| ☒ | New Edge Payments, LLC<br>Last Name<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>◉NO | |
| ☒ | Process Pink Payments, LLC<br>Last Name<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>◉NO | |
| ☒ | Unified Payments, LLC<br>Last Name<br>First Name<br>Primary Role:<br>Defendant<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>◉NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>○NO | |
| ☐ | Last Name<br>First Name<br>Primary Role:<br>Secondary Role (if any): | Last Name · First Name<br>Firm Name<br>Street Address · City · State · Zip<br>Phone · Fax · e-mail | ○YES<br>○NO | |

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Tribul Merchant Services v. Rory Cypers, et al. | 13301/2012 | Supreme Court Kings County | Hon. David Schmidt, JSC | Claims for contempt arise from this case. |
| | | | | |
| | | | | |

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

--------------------------------------------------------------- x

TRIBUL MERCHANT SERVICES, LLC, TRIBUL
LLC, TRIBUL CASH LLC, SECOND SOURCE
FUNDING LLC, DALMAO, INC., and SHMUEL
CHANIN,

                Plaintiffs,

      v.

THE COMVEST GROUP a/k/a COMVEST GROUP
HOLDINGS LLC, COMVEST CYNERGY
HOLDINGS, INC., PIPELINE CYNERGY
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS,
LLC, CYNERGY EQUITY HOLDINGS, INC.,
CYNERGY DATA, INC., PIPELINE CYNERGY,
INC., PIPELINE DATA, INC., RANDY MCCOY, KIM
FITZSIMMONS, SHEILA CORVINO, MARCELO
PALADINI, GUSTAVO CEBALLOS, ANDRES
ORDONEZ, STEPHEN ASCHETTINO, DEAN M.
LEAVITT, JAFFE RAIT HEUR & WEISS P.C.,
HOLLI HART TARGAN, NIXON PEABODY LLP,
FRANK PENSKI, MARK N. BERMAN, UNICORN
PARTNERS LLC, JOHN MARTILLO, 6M
INVESTMENT, LP, MERCHANT PROCESSING
SYSTEMS CORP., OLEG FIRER, LEON
GOLDSTEIN, VLADIMIR SADOVSKY,
MERCHANT CAPITAL PRTFOLIO LLC, NEW
EDGE PAYMENTS, LLC, PROCESS PINK
PAYMENTS LLC, and UNIFIED PAYMENTS, LLC,

                Defendants.

--------------------------------------------------------------- x

Index No. 502672/2012

**AFFIRMATION OF
SCOTT M. KESSLER IN
SUPPORT OF MOTION
FOR EXTENSION OF TIME**

    **SCOTT M. KESSLER**, an attorney duly admitted to practice in the Courts of the State

of New York, hereby affirms the following to be true, under penalty of perjury, pursuant to

CPLR § 2106:

{25217443;1}

1.     I am a shareholder with the firm of Akerman Senterfitt LLP, attorneys for Defendant Pipeline Data, Inc. ("Pipeline Data") in the above action, and I am fully familiar with the facts and proceedings herein.

2.     The above-captioned case was commenced on September 6, 2012, by the filing of a Summons and Verified Complaint.  That same day, Plaintiffs' counsel, Mitchell C. Shapiro, purported to serve all of the defendants in this case by delivering a copy of the summons and complaint to my office.  A true and correct copy of Mr. Shapiro's transmittal letter, dated September 6, 2012, is attached hereto as Exhibit "A".

3.     Plaintiffs' counsel attempted service on September 6, 2012 was not proper nor valid because counsel was previously advised, on September 5, 2012, that my law firm was not authorized to accept service on behalf of any of the defendants.  A true and correct copy of the September 5, 2012, email correspondence advising Mr. Shapiro that Akerman Senterfitt would "check with our clients regarding [his] request that [Akerman Senterfitt] accept service of process" is attached hereto as Exhibit "B" (those portions of the email string that contain confidential settlement discussions have not been attached as part of this exhibit).

4.     Without waiting for any further communication that Akerman Senterfitt was authorized to accept service on behalf of any of the defendants, Plaintiffs attempted service of the summons and verified complaint as described in paragraph 2, *supra*.

5.     On September 7, 2012, I advised Mr. Shapiro that my law firm rejected his purported service of the summons and verified complaint on all defendants in this case because we had not received authorization to accept service on behalf of any of the defendants.  *See* Exhibit "B".

{25217443;1}                                              2

6.    Mr. Shapiro responded, on September 9, 2012, that he was serving various of the corporate defendants through the secretary of state and that "there will be NO extensions of time to answer or move." *Id.* (emphasis in original).

7.    Upon information and belief, Pipeline Data was served through the New York Department of State, Division of Corporations, on September 7, 2012, and notice of service through the Department of State, Division of Corporations, was received by Pipeline Data on September 17, 2012.  A true and correct copy of the transmittal notice from the Department of State, Division of Corporations, is attached hereto as Exhibit "C".

8.    As a result of this service, Pipeline Data's time to answer, move or otherwise respond to the verified complaint expires on September 27, 2012.

9.    In order to prepare a response or move with respect to the 82-page, 386-paragraph complaint, containing seventeen (17) causes of action against more than thirty (30) defendants, Pipeline Data will need an extension of time of at least thirty (30) days.  Pipeline Data expects to move to dismiss the verified complaint on the basis that the verified complaint fails to state of action and that certain claims are barred by documentary evidence or are not properly venued before this Court.

10.    Upon information and belief, Pipeline Data would like to file its motion to dismiss jointly with several of the other Pipeline and Cynergy related entities and individuals that were served at a later date or not yet served.  This requested extension of time will streamline the relevant issues to addressed in the motion to dismiss and will save judicial resources because the Court will only need to hear one motion as opposed to a series of motions to be filed as the due date for the response of each defendant passes.

11.     Even though Mr. Shapiro previously advised that he would not agree to any extension of time (although unprovoked and without explanation), we attempted to request an extension on behalf of Pipeline Data.

12.     On September 27, 2012, my colleague, Francisco A. Rodriguez, called Mr. Shapiro, on behalf of Pipeline Data, to request an extension of the time to file a response to the verified complaint.  Mr. Rodriguez was not able to reach Mr. Shapiro and left him a voicemail message explaining the reason for his call.

13.     After not receiving a response from Mr. Shapiro, Mr. Rodriguez called attorney Jacob Nemon, who is listed in the verified complaint as one of Plaintiffs' attorneys.  Mr. Rodriguez was able to reach Mr. Nemon and again requested an extension of time for Pipeline Data to respond to the verified complaint.  Mr. Nemon informed Mr. Rodriguez that he was not authorized to grant the extension, but that he would discuss the matter with his colleagues.

14.     As of the time of the filing of this motion, we have not heard from Mr. Shapiro, Mr. Nemon, or any of Plaintiffs' attorneys with respect to Pipeline Data's requested extension.  Out of an abundance of caution and based on Mr. Shapiro's apparent unwillingness to grant a reasonable extension of time, Pipeline Data is forced to submit this motion.

15.     For all of the foregoing reasons, Pipeline Data respectfully requests that the Court enter an Order extending its time to answer, move, or otherwise respond to the verified complaint by thirty (30) days, and for such other and further relief as this Court deems just, proper, and equitable under the circumstances.

Dated:   New York, New York
         September 27, 2012

                              /s/ Scott M. Kessler
                              SCOTT M. KESSLER



EXHIBIT "A"

# SHAPIRO TAMIR
## LAW GROUP PLLC

September 6, 2012

Akerman Senterfitt LLP
335 Madison Avenue
26th Floor
New York, NY 10017
Att:    Michael Marsh, Esq.
        Scott M. Kessler, Esq.

RE:    *Tribul Merchant Services, LLC, et al.  v. The Comvest Group et al.*
       *Index No. 502672/12; Kings County*

Dear Counsel,

As you are aware, this firm represents Plaintiffs Tribul Merchant Services, LLC, et al. in the above-referenced action.  Both you and Sheila Corvino, Esq., an individual defendant who is also the General Counsel for a number of the corporate entities and was purportedly authorized to negotiate a pre-suit settlement on behalf of all defendants, stated that you were representing <u>all</u> defendants in this case.  You will note that this complaint is identical to the courtesy copy that was provided to you on September 4, 2012 (and identical in all material respects to the original draft complaint that was sent to Ms. Corvino on August 24, 2012).  Accordingly, enclosed and served upon you as the authorized representative of all Defendants, are copies of the Verified Complaint and Summonses for all Parties.

Please note that this case is a related action to the pending matter entitled *Tribul et al v. Cypers et al* (in which you already appeared on behalf of Cynergy Data, and in which Cynergy Data and Pipeline Holdings defaulted on their obligation to comply with a subpoena for documents that was returnable on August 29, 2012).  Please be advised that we will be filing an Order to Show Cause seeking relief against Cynergy Data, Pipeline Holdings, Kim Fitzsimmons and Sheila Corvino in that related case first thing tomorrow morning and will be appearing before Justice Schmidt as soon as he is available.  Please be assured that we will give you ample advanced notice of the Judge's availability so that you may appear on the OTSC.

Sincerely,

Mitchell C. Shapiro

# EXHIBIT "B"

## Kessler, Scott (Sh-NY)

| | |
|---|---|
| **From:** | mcs@shapirotamirlaw.com |
| **Sent:** | Sunday, September 09, 2012 11:00 AM |
| **To:** | Kessler, Scott (Sh-NY) |
| **Cc:** | Marsh, Michael (Sh-Mia) |
| **Subject:** | Re: Tribul et al v. Comvest and Cynergy et al. |

No matter. All the cynergy and pipeline entities were served through the secretary of state on friday. There will be NO extensions of time to answer or move.
Sent from my Verizon Wireless BlackBerry

**From:** <Scott.Kessler@akerman.com>
**Date:** Fri, 7 Sep 2012 22:59:41 +0000
**To:** <mcs@shapirotamirlaw.com>
**Cc:** <michael.marsh@akerman.com>
**Subject:** RE: Tribul et al v. Comvest and Cynergy et al.

Mitchell,

Please be advised that we hereby reject your purported service of the summons and verified complaint on all defendants in the above-referenced case. As per the below, you were previously advised that we would inform you if we were authorized to accept service on behalf of any of our clients. We had not informed you of that authorization by the time you attempted service of the complaint, and your attempted service is therefore a nullity. In any event, we do not expect to be representing all of the 30+ defendants you have named in this action.

**Scott M. Kessler**
Shareholder
Akerman Senterfitt LLP | 335 Madison Avenue | 26th Floor | New York, NY 10017
Dir: 212.880.3874 | Main: 212.880.3800 | Fax: 212.905.6411
Scott.Kessler@akerman.com

**From:** Marsh, Michael (Sh-Mia)
**Sent:** Wednesday, September 05, 2012 6:39 PM
**To:** 'Mitchell C. Shapiro'
**Cc:** Kessler, Scott (Sh-NY)
**Subject:** RE: Tribul et al v. Comvest and Cynergy et al.

Mitchell,

Just to confirm that I will check with our clients regarding your request that our firm accept service of process, to the extent necessary. I will let you know. Of course, our preference remains an amicable resolution. We look forward to hearing from you on my last email.

Thanks,

Michael

**Michael C. Marsh**
Akerman Senterfitt | One Southeast Third Avenue | 25th Floor | Miami, FL 33131
Dir: 305.982.5507 | Main: 305.374.5600 | Fax: 305.374.5095
michael.marsh@akerman.com

1

**From:** Mitchell C. Shapiro [mailto:mcs@shapirotamirlaw.com]
**Sent:** Wednesday, September 05, 2012 12:46 PM
**To:** Marsh, Michael (Sh-Mia); Kessler, Scott (Sh-NY)
**Subject:** RE: Tribul et al v. Comvest and Cynergy et al.

I was at my desk, but apparently am having phone switchboard problems.  2:30 is available. Let's use the following dial in number: 213.493.0800 pw 964959*

**Mitchell C. Shapiro, Esq.**
SHAPIRO TAMIR LAW GROUP PLLC
*Main Office:* 245 West 17th Street, 5th Floor
New York, New York  10011
(tel)  212.444.9974 x 2010 (cell) 917.446.3628 (fax) 212.444.9971
*Billing Address:* 15 Cutter Mill Road, #207
Great Neck, New York  11021
(e-mail) mcs@shapirotamirlaw.com (web) www.shapirotamirlaw.com
(web) www.linkedin.com/in/mitchellcshapiro
*The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521, covers this electronic mail message. The information transmitted by this e-mail is intended only for the addressee and may contain confidential and / or privileged material.  Any interception, review, retransmission, dissemination, or other use of, or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability.  If you received this communication in error, please contact me immediately (by return email, by phone at 212.444.9974 or by fax at 212.444.9971), and delete the communication from any computer or network system.*

**From:** michael.marsh@akerman.com [mailto:michael.marsh@akerman.com]
**Sent:** Wednesday, September 05, 2012 12:14 PM
**To:** mcs@shapirotamirlaw.com; Scott.Kessler@akerman.com
**Subject:** RE: Tribul et al v. Comvest and Cynergy et al.

Just tried you.  Are you available at 2:30?

**Michael C. Marsh**
Akerman Senterfitt | One Southeast Third Avenue | 25th Floor | Miami, FL 33131
Dir: 305.982.5507 | Main: 305.374.5600 | Fax: 305.374.5095
michael.marsh@akerman.com

**From:** mcs@shapirotamirlaw.com [mailto:mcs@shapirotamirlaw.com]
**Sent:** Wednesday, September 05, 2012 11:21 AM
**To:** Kessler, Scott (Sh-NY); Marsh, Michael (Sh-Mia)
**Subject:** Re: Tribul et al v. Comvest and Cynergy et al.

Please call me at 2124449974 ext 2010
Sent from my Verizon Wireless BlackBerry

**From:** <Scott.Kessler@akerman.com>
**Date:** Wed, 5 Sep 2012 15:05:23 +0000
**To:** <mcs@shapirotamirlaw.com>; <michael.marsh@akerman.com>
**Subject:** RE: Tribul et al v. Comvest and Cynergy et al.

Mitchell:

Michael is running late at a prior meeting.  We will call you before lunch time.

**Scott M. Kessler**
Shareholder
Akerman Senterfitt LLP | 335 Madison Avenue | 26th Floor | New York, NY 10017
Dir: 212.880.3874 | Main: 212.880.3800 | Fax: 212.905.6411
Scott.Kessler@akerman.com

# EXHIBIT "C"

```
            State of New York - Department of State
                    Division of Corporations
```

Party Served:                           Plaintiff/Petitioner:
 PIPELINE DATA INC.                        TRIBUL MERCHANT SERVICES, LLC


  PIPELINE DATA INC.
  3 W MAIN ST
  PO BOX 300
  BRASNER FALLS,   NY 13613-0300



Dear Sir/Madam:
Enclosed herewith is a legal document which was served upon the Secretary of
State on 09/07/2012 pursuant to SECTION 306 OF THE BUSINESS CORPORATION LAW.
 This copy is being transmitted pursuant to such statute to the address
provided for such purpose.


                                           Very truly yours,
                                           Division of Corporations



RECEIVED
SEP 1 7 2012

BY:....................

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

-------------------------------------------------------------------x

TRIBUL MERCHANT SERVICES, LLC, TRIBUL LLC, TRIBUL CASH
LLC, SECOND SOURCE FUNDING LLC, DALMAO, INC. and
SHMUEL CHANIN,

Plaintiffs,

- against -

THE COMVEST GROUP aka COMVEST GROUP HOLDINGS, LLC,
COMVEST CYNERGY HOLDINGS, INC., PIPELINE CYNERGY
HOLDINGS, LLC, CYNERGY EQUITY HOLDINGS, LLC, CYNERGY
EQUITY HOLDINGS, INC., CYNERGY DATA, INC., PIPELINE
CYNERGY, INC., PIPELINE DATA, INC., RANDY McCOY,  KIM
FITZSIMMONS, SHEILA CORVINO,  MARCELO PALADINI, GUSTAVO
CEBALLOS, ANDRES ORDONEZ, STEPHEN ASCHETTINO, DEAN M.
LEAVITT, JAFFE RAITT HEUR & WEISS P.C, HOLLI HART TARGAN,
NIXON PEABODY LLP., FRANK PENSKI, MARK N. BERMAN,
UNICORN PARTNERS LLC, JOHN MARTILLO, 6M INVESTMENT, LP,
MERCHANT PROCESSING SYSTEMS CORP., OLEG FIRER, LEON
GOLDSTEIN, VLADIMIR SADOVSKY, MERCHANT CAPITAL
PORTFOLIO LLC, NEW EDGE PAYMENTS, LLC, PROCESS PINK
PAYMENTS LLC, and UNIFIED PAYMENTS, LLC,

Defendants.

-------------------------------------------------------------------x

**Index No: 502672/2012**

**Summons with Verified Complaint**

*Plaintiffs designate Kings County as the place of trial.  The basis of venue is that Plaintiffs and Defendants transact significant business in this County.*

TO:    **TO EACH DEFENDANT
ON ATTACHED LIST AS MARKED**

       **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: August 25, 2012

By: Mitchell C. Shapiro, Esq.

Notice: The object of this action is to
      recover for breach of contract and
      tortious interference with contract and
      business relationships.
The relief sought is Monetary Damages
and Equitable Relief.

SHAPIRO TAMIR LAW GROUP PLLC
Attorneys for Plaintiffs
245 West 17th Street, 5th Floor
New York, NY 10011
(T)  212.444.9970
(F)  212.444.9971
(E)  comvestcase@shapirotamirlaw.com
(W) www.shapirotamirlaw.com

*Upon your failure to appear, judgment will be taken against you by default, with interest and the costs of this action.*

*This SUMMONS AND COMPLAINT and the papers on which it is based, are certified pursuant to Section 130-1.1-a of the rules of the Chief Administrator (22 NYCRR §130-1.1-a)*

1. THE COMVEST GROUP
   aka COMVEST GROUP HOLDINGS, LLC
   CORPORATION SERVICE COMPANY
   80 STATE STREET
   ALBANY, NEW YORK, 12207-2543

2. COMVEST CYNERGY HOLDINGS, INC.
   NATIONAL REGISTERED AGENTS, INC.
   160 GREENTREE DR STE 101
   DOVER, DELAWARE, 19904

3. PIPELINE CYNERGY HOLDINGS, LLC,
   NATIONAL REGISTERED AGENTS, INC.
   160 GREENTREE DR STE 101
   DOVER, DELAWARE, 19904

4. CYNERGY EQUITY HOLDINGS, LLC,
   NATIONAL REGISTERED AGENTS, INC.
   160 GREENTREE DR STE 101
   DOVER, DELAWARE, 19904

5. CYNERGY EQUITY HOLDINGS, INC.,
   NATIONAL REGISTERED AGENTS, INC.
   160 GREENTREE DR STE 101
   DOVER, DELAWARE, 19904

6. CYNERGY DATA, INC.
   NATIONAL REGISTERED AGENTS, INC.
   SUITE 501
   875 AVENUE OF THE AMERICAS
   NEW YORK, NEW YORK, 10001

7. PIPELINE CYNERGY, INC.,
   NATIONAL REGISTERED AGENTS, INC.
   160 GREENTREE DR STE 101
   DOVER, DELAWARE, 19904

8. PIPELINE DATA, INC.
   3 W MAIN ST
   PO BOX 300
   BRASNER FALLS, NEW YORK, 13613-0300

   PIPELINE DATA INC.
   4400 NORTH POINT PARKWAY
   STE 295
   ALPHARETTA, GEORGIA, 30022

9. RANDY McCOY,
   c/o Pipeline Data Inc.
   4400 NORTH POINT PARKWAY
   STE 295
   ALPHARETTA, GEORGIA, 30022

10. KIM FITZSIMMONS
    c/o Pipeline Cynergy Holdings, LLC
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

11. SHEILA CORVINO
    c/o Pipeline Cynergy Holdings, LLC
    160 GREENTREE DR STE 101
    DOVER, DELAWARE, 19904

12. MARCELO PALADINI
    1100 BISCAYNE BLVD UNIT 3905
    MIAMI, FL 33132-1749
    MIAMI-DADE COUNTY

13. GUSTAVO CEBALLOS
    531 N MONROE ST UNIT N
    RIDGEWOOD, NJ 07450-1410
    BERGEN COUNTY

14. ANDRES ORDONEZ
    2132 PLANTATION CT
    LAWRENCEVILLE, GA 30044-3743
    GWINNETT COUNTY

15. STEPHEN ASCHETTINO
    c/o ASCHETTINO STRUHS L.L.P.
    1120 AVENUE OF THE AMERICAS
    FOURTH FLOOR
    NEW YORK, NEW YORK, 10036

16. DEAN M. LEAVITT
    c/o MANDELL MANDELL OKIN &
    EDLEMAN LLP
    ATTN: GLEN S EDELMAN ESQ
    3000 MARCUS AVE
    LAKE SUCCESS, NEW YORK,
    11042

18.  HOLLI HART TARGAN
     c/o JAFFE RAIT HEUR & WEISS P.C
     27777 FRANKLIN ROAD SUITE 2500
     SOUTHFIELD MI 48034-8214

19.  NIXON PEABODY LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

20.  FRANK PENSKI
     c/o NIXON PEABODY LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

21.  MARK N. BERMAN
     c/o Nixon Peabody LLP
     1300 CLINTON SQUARE
     ROCHESTER, NEW YORK, 14604

22.  UNICORN PARTNERS LLC
     c/o MANDELL MANDELL OKIN & EDLEMAN LLP
     ATTN: GLEN S EDELMAN ESQ
     3000 MARCUS AVE
     LAKE SUCCESS, NEW YORK, 11042

23   JOHN MARTILLO
     c/o 6M INVESTMENT, LP
     5500 Preston Rd. Ste 250
     Dallas, TX 75205-2699

24.  6M INVESTMENT, LP
     5500 Preston Rd. Ste 250
     Dallas, TX 75205-2699

25.  MERCHANT PROCESSING SYSTEMS CORP.
     d/b/a MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

26.  OLEG FIRER
     c/o Unified Payment, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

27.  LEON GOLDSTEIN
     c/o MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

28.  VLADIMIR SADOVSKY
     c/o MERCHANT PROCESSING
     SYSTEMS OF NY, LLC
     555 8TH AVE
     NEW YORK, NEW YORK, 10018

29.  MERCHANT CAPITAL
     PORTFOLIO LLC,
     Att: Star Capital Management LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

30.  NEW EDGE PAYMENTS, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

31.  PROCESS PINK PAYMENTS LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

32.  UNIFIED PAYMENTS, LLC
     3363 NE 163rd Street
     Suite 705
     North Miami Beach, FL 33160

33.  JAFFE RAIT HEUR &
     WEISS P.C
     27777 FRANKLIN ROAD
     SUITE 2500
     SOUTHFIELD MI 48034-
     8214