UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
------------------------------------X

Tribul Merchant Services, LLC;          REPORT AND RECOMMENDATION
Tribul LLC; Tribul Cash LLC; Second
Source Funding LLC; Dalmao, Inc. and
Shmuel Chanin,

        Plaintiffs,                     12-cv-5063(FB)(VMS)

        v.

Comvest Group; Comvest Cynergy
Holdings, Inc.; Pipeline Cynergy
Holdings, LLC; Cynergy Equity
Holdings, LLC; Cynergy Equity
Holdings, Inc.; Cynergy Data, Inc.;
Pipeline Cynergy, Inc.; Pipeline
Data, Inc.; Randy McCoy; Kim
Fitzsimmons; Sheila Corvino; Marcelo
Paladini; Gustavo Ceballos; Andres
Ordonez; Stephen Aschettino; Dean
Leavitt; Jaffe Raitt Heuer & Weiss
P.C.; Holli Hart Targan; Nixon
Peabody, LLP; Frank Penski; Mark N.
Berman; Unicorn Partners LLC; John
Martillo; 6M Investment, LP;
Merchant Processing Systems Corp.;
Oleg Firer; Leon Goldstein; Vladimir
Sadovsky; Merchant Capital Portfolio,
LLC; New Edge Payments, LLC; Process
Pink Payments LLC; and Unified
Payments, LLC,

Defendants.

------------------------------------X

**Scanlon, Vera M., United States Magistrate Judge:**

    Plaintiffs Tribul Merchant Services, LLC; Tribul LLC;

Tribul Cash LLC; Second Source Funding LLC; Dalmao, Inc.; and

Shmuel Chanin (collectively the "Tribul Plaintiffs") initially

filed the instant complaint in New York State Supreme Court,
Kings County in August 2012. The complaint, which alleges
seventeen causes of action against thirty-two Defendants, echoes
many of the same allegations that the Tribul Plaintiffs brought
before the United States Bankruptcy Court for the District of
Delaware in the context of a Title 11 proceeding filed in 2009.
Some of the new complaint's allegations, notably those that
correspond to Plaintiff Dalmao, Inc. ("Dalmao"), which is a
corporation formed in Delaware and doing business in New York
under the direction of Plaintiff CEO Shmuel Chanin, do not have
a relationship to the 2009 Bankruptcy. Another set of original
allegations bearing little connection to the 2009 Bankruptcy is
that which arises out of the Cynergy EP Agreement.

    Defendants removed the action to this Court under 28 U.S.C.
§ 1452(a), asking the Court to assume jurisdiction. Defendants
also ask this Court, if it assumes jurisdiction, to transfer the
case to the United States District Court for the District of
Delaware for assignment to the Bankruptcy Court for the District
of Delaware (hereinafter the "Bankruptcy Court") under 28 U.S.C.
§ 1412. The Tribul Plaintiffs oppose, and request that the
entire litigation be remanded to State court pursuant to 28
U.S.C. § 1452(b). Importantly, the language of 28 U.S.C. §
1452(a) expressly allows for a claim-specific jurisdictional
analysis, as it discusses the removal of a "claim or cause of

action." The statute does not require that the case be treated as a unified whole. The statute's contemplation of claim severance makes sense, as there is no supplemental jurisdiction in bankruptcy court. Each individual cause of action must go where there is jurisdiction to hear it.

Should this Court find that it has jurisdiction, the Tribul Plaintiffs request a grant of the emergency petition for the relief sought in their complaint.

The Honorable Judge Frederic Block referred the above described motions to me for a report and recommendation on where these claims should be heard and whether injunctive relief should be awarded. See Oct. 25, 2012 Order.

This Court respectfully recommends finding federal jurisdiction over the causes of action that are founded on factual allegations already litigated before the Bankruptcy Court. These particular causes of action, which are described below, in Sections (I)(1) and (II)(1)(a), (b), and (c), infra, are core proceedings over which this Court has jurisdiction. This Court further recommends transferring these claims to the District of Delaware for assignment to the Bankruptcy Court in the interest of justice. The Court also recommends finding that there is no federal jurisdiction over the causes of action that are founded on factual allegations that are distinct from the bankruptcy proceedings temporally, substantively, and in terms

3

of the parties involved. This Court recommends that these select causes of action, which are identified in Sections (I)(2), (II)(2)(c), and (d), _infra_, be remanded to State court.

This Court recommends that the District Court deny the TRO without prejudice. This Court also recommends that the District Court not rule on the request for preliminary injunctive relief, leaving those applications to be made to either the State court or the Bankruptcy Court where jurisdiction will rest, as the harm the Tribul Plaintiffs allege is not so imminent that those courts would not have time to rule. In the alternative, this Court recommends that the District Court deny the request for a preliminary injunction.

I.   **FACTUAL SUMMARY**

1. **Background And The 2009 Old Cynergy Bankruptcy, Including Claims Raised By The Tribul Plaintiffs**

The facts as cited herein are drawn from the Tribul Plaintiffs' complaint unless otherwise indicated. Docket No. 1-3. This Report and Recommendation also draws from documents previously submitted to the Bankruptcy Court in the District of Delaware in the related bankruptcy and to the New York Supreme Court, Kings County, which was the forum for this action before removal.

The Tribul Plaintiffs are independent sales organizations ("ISO") which market credit card processing services to merchants. The Tribul Plaintiffs recruit agents, also known as "down lines," for help.  The down lines refer subscribing merchants to the Tribul Plaintiffs, and the Tribul Plaintiffs in turn refer their merchant portfolios to a "Super ISO" that processes these transactions through the credit card companies and sponsoring banks.  Once a merchant's infrastructure for accepting credit cards is up and running, the Tribul Plaintiffs receive a commission (known as a "residual") from each credit card transaction.

Since 2006, the Tribul Plaintiffs have worked with a Super ISO that goes by some variation of the name Cynergy. There was an Old Cynergy, which filed for bankruptcy in 2009, and now

there are New Cynergy Defendants (eight entities in all, which the Tribul Plaintiffs allege are alter egos of one another, and which will be referred to collectively in this opinion). Old Cynergy is now defunct. The New Cynergy Defendants are still a going business concern.

From 2006 to 2008, Tribul Plaintiffs entered into various agreements with Cynergy Data, LLC; Cynergy Data Holdings, Inc.; and Cynergy Prosperity Plus, LLC (collectively "Old Cynergy").

In 2006, Tribul Plaintiffs agreed to refer merchants to Old Cynergy's bank and credit card processing network in exchange for residuals (the "October 16, 2006 ISO Agreement"). Tribul Plaintiffs were required to pay a portion of these residuals to their down lines for recruiting merchants on their behalf.

In 2008, Cynergy Prosperity Plus, LLC ("CPP") granted Second Source Funding LLC ("SSF") an $8,000,000 revolving line of credit ($8MM Loan Agreement). SSF was the principal signatory to the $8MM Loan Agreement, but the Tribul Plaintiffs guaranteed it.

In 2008, the Tribul Plaintiffs and Old Cynergy entered into a contract whereby the Tribul Plaintiffs assumed liability for losses relating to the Classics Closeouts merchant account (the "Classic Closeouts Liability Assumption Agreement").

On June 3, 2009, the Tribul Plaintiffs filed a lawsuit against Old Cynergy in New York State Supreme Court, Kings

County, alleging breach of contract, unjust enrichment, breach of fiduciary duty, breach of implied covenant of good faith and fair dealing, and other causes of action (hereinafter the "2009 New York State court litigation"). Tribul Merchant Services, LLC et al. v. Cynergy Data, LLC et al., Index No. 5026721/2012 (N.Y. Sup.Ct. 2012). Many of the 2009 New York State complaint's allegations dealt with disputes growing out of the aforementioned agreements.

On September 1, 2009, Old Cynergy and CPP commenced a bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware. In re CD Liquidation Co. Plus, LLC f/k/a Cynergy Data, LLC, et al., Case No. 09-13038 (Bankr.D.Del.)(Gross, J.) at Bankruptcy Docket No. 1.[1]

In September 2009, Old Cynergy and CPP began to take steps to sell their assets. This sale, summarized in a proposed Asset Purchase Agreement ("APA"), would, inter alia, assign Old Cynergy's rights and responsibilities under Executory Contracts, including the October 16, 2006 ISO Agreement, to the New Cynergy Defendants. Bankruptcy Docket No. 13 (the Debtor's motion to approve asset sale and the APA itself).

On October 6, 2009, the Tribul Plaintiffs filed an objection to the APA with the Bankruptcy Court. Docket No. 32-2/Bankruptcy Docket No. 215. The Tribul Plaintiffs' primary

---

[1] Hereinafter citations to the 2009 Bankruptcy case will simply read Bankruptcy Docket No. [X].

objection was that they were entitled to greater "cure costs" than the APA provided to them. The cure costs were meant to settle any claims that the Tribul Plaintiffs allegedly had stemming from the soon-to-be-sold contract, and the Tribul Plaintiffs argued that the Debtors' proposed cure amounts for the Tribul Parties were substantially less than the outstanding defaults under the Tribul Parties' agreements with the Debtors. Once the Bankruptcy Court determined the cure costs and New Cynergy Defendants paid them, the New Cynergy Defendants would have a fresh start with the contracts, going forward unencumbered by inherited liabilities.

On October 9, 2009, the Bankruptcy Court approved the APA. Docket No. 32-3/Bankruptcy Docket No. 258 (the Bankruptcy Court's Order Authorizing and Approving (A) the Sale of Transferred Assets Free and Clear of Liens and Encumbrances and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases). In that approval Order, the Bankruptcy Court stated that "the Assumed Contracts, whether entered into before or after the Petition Date, shall be transferred to the Purchaser, free and clear of all Interests of any kind or nature whatsoever, and shall remain in full force and effect for the benefit of Purchaser in accordance with their respective terms." Id. The approval Order preserved objections to cure amounts and stated that they would be addressed pursuant to a subsequent

8

ruling. Id.  Among the agreements the Cynergy Defendants assumed pursuant to that Order was the October 16, 2006 ISO Agreement. The Tribul Plaintiffs continued to litigate the related cure amounts.

In January 2010, the Tribul Plaintiffs filed Proofs of Claim against Old Cynergy's estate in the Bankruptcy Court. Docket Nos. 17-4 and 17-5. First, the Tribul Plaintiffs stated that they were asserting "all claims" arising under the October 11, 2006 ISO Agreement, and listed those claims as (1) the fraudulent withholding of residuals because of false claims that full repayment on the $8 MM Loan Agreement was immediately due because SSF defaulted; false claims that the Tribul Plaintiffs breached terms in the October 11, 2006 ISO Agreement and were consequently obligated to pay fees and penalties; and general subterfuge; (2) the unauthorized depletion of a residual fund where the withheld money should have been kept in escrow pending dispute resolution; (3) fraudulent inducement that the Tribul Plaintiffs enter the Classic Closeouts Liability Agreement without paying any due consideration, and then charging Tribul Plaintiffs for the account's massive losses; and (4) locking the Tribul Plaintiffs out of the Virtual Merchant Application System ("VIMAS"), an electronic database where the Tribul Plaintiffs could track the merchant relationships and residual entitlements they had built up through their relationship with Old Cynergy.

Docket No. 17-4. Second, the Tribul Plaintiffs stated that it
was asserting "all claims" alleged in the 2009 New York State
court litigation, including: (1) Old Cynergy's fraudulent
attempt to accelerate repayment on the $8MM Loan Agreement; (2)
Old Cynergy's fraudulent enforcement of the Classic Closeouts
Liability Assumption Agreement; (3) Old Cynergy's defamation of
the Tribul Plaintiffs to their merchants and down lines; and (4)
Old Cynergy's tortious interference with the Tribul Plaintiffs'
business relationships. Docket No. 17-5. In substance, many of
these Proofs of Claims were duplicative because of the overlap
of the 2009 New York State court litigation claims and the
October 16, 2006 ISO Agreement.

On December 21, 2010, the Bankruptcy Court confirmed a
Liquidation Plan in the Old Cynergy bankruptcy. Docket No. 17-
6/Bankruptcy Docket No. 1190 (the proposed Joint Liquidation
Plan); Docket No. 17-7/Bankruptcy Docket No. 1202 (the
Bankruptcy Court's Order confirming the Plan). The Tribul
Plaintiffs were classed as General Unsecured Creditors and were
to receive in full satisfaction of their claims a pro rata share
of the New Liquidation Trust Proceeds after payment in full of
all Secured Claims. Docket No. 17-2/Bankruptcy Docket No. 85
(the Notice of Appointment of the Creditors' Committee); Docket
No. 17-7/Bankruptcy Docket No. 1190 (the proposed Joint Plan of
Liquidation). The Liquidation Plan included a mechanism by which

the Liquidation Trustee, Charles M. Moore, could object to and litigate claims against the estate after confirmation. In addition to the Bankruptcy Court's confirmation, the Plan was duly accepted by each class of creditors, including the Tribul Plaintiffs' class. Docket No. 17-7/Bankruptcy Docket No. 1202 (the Court's Order confirming the Joint Plan of Liquidation). On confirming the Liquidation Plan, the Bankruptcy Court retained jurisdiction of the case "pursuant to, and for the purposes of, the [Liquidation] Plan and such other purposes as may be necessary and useful to aid the confirmation, consummation and implementation of the Plan, to the extent that the Bankruptcy Court may legally retain jurisdiction of such matters." Docket No. 17-7/Bankruptcy Docket No. 1202 (the Court's Order confirming the Joint Plan of Liquidation).

Liquidation Trustee Moore objected to some of the Tribul Plaintiffs' claims against the estate, which then became a subject of litigation in the Bankruptcy Court. Docket No. 17-9/Bankruptcy Docket No. 1461 (the Tribul Plaintiffs' summary judgment opposition in the context of that litigation). Shortly before trial in the Tribul Plaintiffs' contested claims in the bankruptcy, the Tribul Plaintiffs settled all of their remaining claims with Old Cynergy's Litigation Trustee in February 2012 ("Tribul Settlement"). Bankruptcy Docket No. 1513 (the Court Order approving filing the Tribul Settlement under seal);

Bankruptcy Docket No. 1514 (the Tribul Settlement itself). The Tribul Settlement is sealed and has not been provided to this Court.

**2. The Instant Action**

On August 25, 2012, the Tribul Plaintiffs filed this action in New York Supreme Court, Kings County, alleging seventeen causes of action against thirty-two Defendants. Old Cynergy is not among the Defendants in the action, but most of the Defendants were players in the story of Old Cynergy's 2009 Bankruptcy. Docket No. 1-3; Tribul Merchant Services, LLC et al. v. Cynergy Data, LLC et al., Index No. 502672/2012 (N.Y. Sup. Ct. 2012).

Eight of the Defendants in the instant action purchased Old Cynergy's assets in the APA (collectively the "New Cynergy Defendants"). They are Comvest Group; Comvest Cynergy Holdings, Inc.; Pipeline Cynergy Holdings, LLC; Cynergy Equity Holdings, LLC; Cynergy Equity Holdings, Inc.; Cynergy Data, Inc.; Pipeline Cynergy, Inc. and Pipeline Data, Inc. Id.

Eight other Defendants formerly served as Old Cynergy officers, currently serve as New Cynergy officers, or served in both capacities (collectively the "Officer Defendants"). They are Randy McCoy, Kim Fitzsimmons, Sheila Corvino, Marcelo Paladini, Gustavo Ceballos, Andres Ordonez, Stephen Aschettino and Dean M. Leavitt. Id.

Eight other Defendants served as attorneys or advisors to Old Cynergy during the 2009 Bankruptcy (collectively the "Attorney-Advisor Defendants"). They are Jaffe Raitt Heuer & Weiss, PC; Holli Hart Tagan; Nixon Peabody, LLP; Frank Penski; Mark N. Berman; Unicorn Partners, LLC; John Martillo and 6M Investment, LP. Id.

The remaining eight Defendants were involved in a failed transaction with Dalmao, Inc., one of the Tribul Plaintiffs (collectively referred to as the "Unified Defendants"). They are Merchant Processing Systems Corp; Oleg Firer; Leon Goldstein; Vladimir Sadovsky; Merchant Capital Portfolio, LLC; New Edge Payments, LLC; Process Pink Payments, LLC and Unified Payments, LLC. Id.

The Tribul Plaintiffs' 2012 State court complaint is eighty-nine pages and makes voluminous factual allegations beginning from 2006 to the present day. Not all of them are necessary to list here, but the bulk of them are the exact same factual allegations made in the Proofs of Claim the Tribul Plaintiffs filed before the Bankruptcy Court in Delaware in January 2010 during Old Cynergy's 2009 Bankruptcy. Compare Tribul Merchant Services, LLC et al. v. Cynergy Data, LLC et al., Index No. 502672/2012 (N.Y. Sup. Ct. 2012)[2] with In re CD Liquidation Co., LLC, f/k/a Cynergy Data, LLC et al., 09-13038

_____

[2] Docketed in the instant case at Docket Nos. 17-4 and 17-5.

(Bankr. D.Del.)(Gross, J.). As to these near-identical allegations, the only possibly meaningful difference is that whereas they were leveled against Old Cynergy in the 2009 Bankruptcy, they are leveled in the instant complaint against the New Cynergy Defendants, the Officer Defendants and the Attorney-Advisor Defendants. <u>Id.</u>

The only substantive allegations in the Tribul Plaintiffs' 2012 State court complaint which were not made before the Bankruptcy Court during the 2009 Bankruptcy relate to (a) the New Cynergy Defendants' rights and obligations with respect to assets sold in the APA which was approved by the Bankruptcy Court in 2009 and subject to a Settlement Agreement signed by Tribul Plaintiffs in 2012; (b) Nixon Peabody's allegedly fraudulent conduct during the 2009 Bankruptcy; (c) the New Cynergy Defendants' and the Officer Defendants' alleged breach of the Cynergy Executive Partner Agreement ("the Cynergy EP Agreement"), which the Tribul Plaintiffs also allege contains unconscionable terms; and (d) the validity of the Dalmao, Inc. Settlement. We now describe the facts relevant to these four types of claims. As before, they come from the Tribul Plaintiffs' complaint in the removed action.

> **a. Alleged Uncertainty Regarding The New Cynergy Defendants' Rights And Obligations Relating To Assets Sold In The APA**

The Tribul Plaintiffs allege that the New Cynergy Defendants misunderstand two aspects of the APA. First, the Tribul Plaintiffs allege that the New Cynergy Defendants believe that the Tribul Plaintiffs' obligations under the $8MM Loan Agreement survived the APA such that they are still bound by them. Second, the Tribul Plaintiffs alleged that the New Cynergy Defendants bought merchant agreements and reserves in the APA that contained residuals destined for the Tribul Plaintiffs that the New Cynergy Defendants must disburse but have not paid.

### b. Alleged Fraudulent Acts Committed By The Attorney-Advisor Defendants During The 2009 Bankruptcy

The Tribul Plaintiffs allege that the Attorney-Advisor Defendants advised Old Cynergy to improperly and fraudulently foreclose on the Tribul Plaintiffs' merchant accounts; to improperly and fraudulently withhold Tribul Plaintiffs' residuals to cover operating losses in preparation for bankruptcy; and to improperly delay the 2009 New York State Court litigation. The Tribul Plaintiffs allege that the Attorney-Advisor Defendants' motivation was to fraudulently inflate the value of Old Cynergy prior to bankruptcy and to ensure that more cash was on hand to pay the Attorney-Advisor Defendants' professional fees. Id. According to Tribul Plaintiffs, Old Cynergy paid the Attorney-Advisor Defendants on

time and more completely than Old Cynergy paid the Tribul
Plaintiffs.

### c. The New Cynergy Defendants' And The Officer Defendants' Alleged Breach Of The Allegedly Unconscionable Cynergy EP Agreement

After Old Cynergy began to unwind in bankruptcy (although
not before the bankruptcy was over, as the Tribul Settlement was
not reached until February 2012), the Tribul Plaintiffs
continued to do significant business with the New Cynergy
Defendants under the October 11, 2006 ISO Agreement and then, in
late 2010/early 2011, the Tribul Plainitffs negotiated and
signed another ISO Agreement with the New Cynergy Defendants
("the Cynergy EP Agreement").

The Tribul Plaintiffs now allege that they signed the
Cynergy EP Agreement under economic duress created by the New
Cynergy Defendants, the Officer Defendants and the Attorney-
Advisor Defendants. The Tribul Plaintiffs claim that the Cynergy
EP Agreement contains unconscionable terms that cripple the
Tribul Plaintiffs' economic potential (e.g., right of first
refusal and steep penalties for failing to meet minimum
performance requirements). According to the Tribul Plaintiffs,
the minimum performance requirements are so onerous that the
Tribul Plaintiffs cannot sell their business (which they say is
worth approximately $40,000,000) or obtain a line of credit from
any bank using their business as collateral, because potential

purchasers and banks believe that with the minimum performance requirements imposed by the Cynergy EP Agreement, the Tribul Plaintiffs are no longer a robust concern.

Furthermore, the Tribul Plaintiffs allege that the New Cynergy Defendants and the Officer Defendants have breached and continue to breach the Cynergy EP Agreement because they are interfering with the Tribul Plaintiffs' relationship with the Tribul Plaintiffs' merchants and sales agents, also known as down lines.

The centerpiece example offered by the Tribul Plaintiffs of this interference revolves around a down line named Rory Cypers. Rory Cypers is a down line with a relationship to the Tribul Plaintiffs' largest merchant account, Insomniac, Inc. ("Insomniac"). The Tribul Plaintiffs allege a conspiracy between the New Cynergy Defendants and the Officer Defendants to recruit Rory Cypers to poach the Insomniac merchant portfolio, along with its lucrative residuals, for themselves. In fact, the Tribul Plaintiffs were so troubled by the Rory Cypers activity that they filed a separate action against him in New York Supreme Court in 2012 and obtained a TRO barring further attempts to poach the Insomniac account ("the 2012 Cypers TRO"). Tribul Merchant Services, LLC v. Rory ("Reuven") Cypers and Residual Income Opportunities, Inc., Index No. 13301/2 (N.Y. Sup., Kings County)(Schmidt, J.). The Tribul Plaintiffs allege

that the New Cynergy Defendants and the Officer Defendants nevertheless have continued their poaching program unabated, and are in contempt of the 2012 Cypers TRO. For reasons that are unclear to this Court, the Tribul Plaintiffs raise claims related to the 2012 Cypers TRO in this new action, rather than in the Cypers action.

### d. Post-Bankruptcy Allegations Of A Failed Business Combination, Defamation, Tortious Interference With Business Relationships, And Fraudulent Inducement Of A Settlement

The Tribul Plaintiffs allege that on January 25, 2010, Co-plaintiff Dalmao, Inc. ("Dalmao") entered into an agreement with the Unified Defendants whereby Dalmao agreed to aid the Unified Defendants in operating a new ISO called MCP. In exchange, Dalmao allegedly acquired a 50% membership interest in MCP.  The other 50% ownership belonged to Star Capital JV, LLC ("SCJV"), a company related to the Unified Defendants.

On February 24, 2010, and perhaps spurred by the goodwill generated by Dalmao and the Unified Defendants' new agreement, the Tribul Plaintiffs, the New Cynergy Defendants and some of the Unified Defendants all contemplated an even broader joint venture. These parties signed a Letter of Intent ("LOI") whereby they agreed to openly and in good faith share confidential business information with the goal of consummating an agreement by April 1, 2010. The deal never came to fruition, and the

Tribul Plaintiffs allege that the LOI was a ruse by the New Cynergy Defendants and the Unified Defendants to collect and exploit the Tribul Plaintiffs' proprietary information, such as merchant accounts and down line contacts.  The Tribul Plaintiffs also allege that the New Cynergy Defendants and SCJV defamed them with a press release announcing that they provided some services for Tribul Plaintiff accounts.

As a result of the aborted LOI plan, Dalmao told the Unified Defendants that it wished to come to a professional separation, but that it wished to preserve Dalmao's share of MCP. The Tribul Plaintiffs now allege that the Unified Defendants then began an intentional and malicious campaign to lock Dalmao out of MCP; to taint the New Cynergy Defendants against the Tribul Plaintiffs generally; and to defame the Tribul Plaintiffs even more. In 2010, the Tribul Plaintiffs sued the Unified Defendants in New York State Supreme Court to stop the alleged conduct. Dalmao Ventures LLC et. al. v. Oleg Firer, Leon Goldstein, et. al., Index. No. 651510/2010 (N.Y. Sup.Ct. 2010).

The Tribul Plaintiffs allege that the Unified Defendants then began a different campaign, in which the Unified Defendants tried to persuade the New Cynergy Defendants to force the Tribul Plaintiffs to enter into a settlement in the Dalmao litigation by subjecting them to economic duress through their New Cynergy

business dealings. According to the Tribul Plaintiffs, the New Cynergy Defendants basically refused to enter into the Cynergy EP Agreement with them unless the Tribul Plaintinffs entered into settlement in the Dalmao litigation with the Unified Defendants.

The Tribul Plaintiffs wanted to enter the Cynergy EP Agreement so much, despite the fact that it allegedly has the unconscionable terms that they now complain of, that they agreed to settle the Dalmao lawsuit, and gave up claims worth approximately $6,000,000 in the process ("the Dalmao Settlement"). The Tribul Plaintiffs now wish to be released from the Dalmao Settlement.

## II.  DISCUSSION

28 U.S.C. § 1334(b) grants the District Courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." Thus, a district court's bankruptcy jurisdiction is limited to cases "arising under," "arising in," or "related to" a case filed under the Bankruptcy Code.

An "arising in" or an "arising under" proceeding is what is known as a "core proceeding," an action which, "by its nature, could arise only in the context of a bankruptcy case." In re 610 W.142 Owners Corp., 219 B.R. 363, 367 (Bankr. S.D.N.Y. 1998). 28 U.S.C. § 157(b)(2) lists some core proceedings, but it is a non-

exclusive list and consequently the determination of whether a particular proceeding is core or non-core cannot always be made by simply consulting that list. See In re Best Products Co, Inc., 68 F.3d 26, 31 (2d Cir. 1995). A court must conduct a case-by-case analysis and ask whether a matter implicates the core of bankruptcy administration. See In re S.G. Phillips Constructors, Inc., 45 F.3d 702, 707 (2d Cir. 1995).

If a proceeding is not core, then a District Court proceeds to consider whether it has "related to" jurisdiction by asking whether the civil proceeding "might have any 'conceivable effect' on the bankruptcy estate." Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2011).

**1. Federal Jurisdiction Exists Over Causes of Action Recycling Allegations From 2009 Bankruptcy Proofs Of Claim, Asking For Interpretation Of The APA, And Alleging Fraudulent Conduct By The Attorney-Advisor Defendants**

**a. There Is Core Federal Jurisdiction Over Claims Presented To The Bankruptcy Court As Proofs Of Claim In The 2009 Bankruptcy**

The Defendants argue that this Court has core jurisdiction over the Tribul Plaintiffs' claims that were before the Bankruptcy Court during the 2009 Bankruptcy. Docket No. 17. The Defendants further argue that the instant causes of action constitute core proceedings to the extent that they allege the same facts as in the Tribul Plaintiffs' Proofs of Claim in the 2009 Bankruptcy. Id. We agree.

21

Case law holds that a "determinative factor" in finding
core federal jurisdiction over a civil proceeding can be that
the party challenging jurisdiction filed a Proof of Claim on the
same facts in bankruptcy that resulted in "allowance or
disallowance of claims against the estate." See In re S.G.
Phillips Constructors, Inc., 45 F.3d 702, 705 (2d Cir. 1995);
see also In re CBI Holding Co., Inc. v. Ernst & Young, 529 F.3d
432, 466 (2d Cir. 2008), cert. denied, 556 U.S. 1183 (2009); 28
U.S.C. § 157(b)(2)(B). "[N]othing is more directly at the core
of bankruptcy administration. . . than the quantification of all
liabilities of the debtor." In re S.G. Phillips Constructors,
Inc., 45 F.3d at 705. Therefore, "the bankruptcy court's
determination whether to allow or disallow a claim is a core
function." Id.; see Pan Am. World Airways, Inc. v. Evergreen
Int'l Airlines, Inc., 132 B.R. 4, 7 (S.D.N.Y. 1991)("When a
creditor files a proof of claim it submits itself to the
bankruptcy court's equitable power, and the claims, even though
arising under state law, become core proceedings within the
jurisdiction of the bankruptcy court.").

The Tribul Plaintiffs filed Proofs of Claim in the 2009
Bankruptcy as to broad swaths of the factual allegations in this
litigation. Docket Nos. 17-4 and 17-5. Federal jurisdiction
therefore vests over all the causes of action in the instant
complaint to the extent that they rely on the same facts. This

means that this Court has jurisdiction over all causes of action arising under the October 11, 2006 ISO Agreement, including but not limited to the particular claims articulated in the Tribul Plaintiffs' Proofs of Claim in the 2009 Bankruptcy. Docket No. 17-4. This also means that this Court has jurisdiction over all causes of action that were previously pleaded in the 2009 New York State court litigation, the complaint that the Tribul Plaintiffs incorporated wholesale into their Proofs of Claim in the 2009 Bankruptcy. Docket No. 17-5; Bankruptcy Docket No. 1461.[3] If there is any doubt that the Tribul Plaintiffs meant to bring the same causes of action now as were before the Bankruptcy Court in 2009, one need only compare the 2009 state court litigation complaint and the instant complaint; the 2012 document is in many sections a word-for-word copy of the 2009 state court litigation complaint.

The Tribul Plaintiffs argue that this is not a core proceeding because they are suing non-debtor parties, not the Debtor against whom they filed Proofs of Claim. Docket No. 27. We disagree with the Tribul Plaintiffs' theory because the instant allegations are that the new Defendants acted to pad their own wallets first so as to lessen other creditors'

---

[3] On page 17 of the bankruptcy court hearing transcript, the Tribul Plaintiffs' counsel reminds presiding Judge Gross that he had twice ruled that the 2009 New York State court litigation complaint was part of the Tribul Plaintiffs' Proofs of Claim and relevant to the resolution of those Proofs of Claim.

recovery. These allegations go to the integrity of the
bankruptcy plan and belong before the Bankruptcy Court. See In
re Best Products Co., Inc., 68 F.3d 26, 32 (2d Cir.
1995)(rejecting argument that a controversy involving non-
debtors did not concern the debtor in any way when the
controversy implicated the relative priority of the debtor's
obligations, and reminding that determination of priority rights
was necessary to administer a bankruptcy estate and was not
simply a dispute between two creditors).

A case illustrative of this point is Donaldson v.
Bernstein, in which the Third Circuit affirmed federal
jurisidiction over a litigation trustee's post-confirmation plan
lawsuit against non-debtors for fraudulently diverting business
away from the debtor during bankruptcy proceedings. 104 F.3d 547
(3d Cir. 1997). The Donaldson Court held that such post-
confirmation litigation "is not collateral to the bankruptcy
case. Rather, this action implicates" its integrity. Id. at 553;
see In re Portrait Corp. of Am., Inc., 406 B.R. 637, 641 (Bankr.
S.D.N.Y. 2009)(holding that a third-party's trademark
infringement lawsuit against the purchaser of a debtor's assets
was a core proceeding because it implicated the sale order: "It
does not matter that the dispute is now between two
nondebtors."). Similarly, here, the Tribul Plaintiffs' approach
implicates the integrity of the bankruptcy process because by

24

recycling already-adjudicated questions relating to the
bankruptcy estate in a differently styled State proceeding, the
Tribul Plaintiffs hope to game the ranking of bankruptcy claims.
However, ranking claims is at the core of the bankruptcy process
and cannot be circumvented by the Tribul Plaintiffs filing suit
in a State court. See Beebe Int'l Inc. v. French Am. Banking
Corp. (In re Wedtech Corp.), 72 B.R. 313, 316 (Bankr. S.D.N.Y.
1987); 28 U.S.C. § 157(b)(2)(A)(matters concerning the
administration of the estate are core); 28 U.S.C. §
157(b)(2)(F)(proceedings to determine, avoid, or recover
preferences are core). We thus recommend that these claims be
heard by the Bankruptcy Court, which has jurisdiction over them.

> **b. There Is Core Federal Jurisdiction Over Claims That
> Require The Bankruptcy Court To Interpret The Sale
> Order That It Confirmed**

The Defendants argue that the Tribul Plaintiffs' claims
alleging that their obligations under the $ 8MM Loan Agreement
did not survive the APA require an interpretation of the sale
order entered by the Bankruptcy Court. Docket No. 17. Similarly,
Defendants argue that the Tribul Plaintiffs' claims that the New
Cynergy Defendants owe them residuals from merchant reserves
purchased through the APA requires an interpretation of the sale
Order. Id. The Defendants argue that when claims such as these
require the interpretation of a bankruptcy court's asset sale
Order, the claims are core and must be heard by the Bankruptcy

Court. Id. We also agree and recommend that the District Court find that the Bankruptcy Court has jurisdiction over these core proceedings.

In In re Petrie Retail, Inc., the Second Circuit considered an analogous dispute. 304 F.3d 223 (2d Cir. 2002). There, the debtor had leased retail space in a mall, and assigned its rights under that lease in a bankruptcy sale order. Id. at 225-26. The Bankruptcy Court entering the sale order later presided over a post-sale contract dispute between two non-debtors, i.e., the original lessor and the lease assignee. Id. at 227. The dispute dealt with whether a rent-escalation provision that was part of the original contract survived the sale order. Id. The lessor objected to the Bankruptcy Court's exercise of jurisdiction. Id. at 227-28.

The Second Circuit found the claim to be core and affirmed federal jurisdiction. Despite the fact that "the dispute between [the two non-debtors arose] outside of bankruptcy proceedings," the Court held it was a core proceeding because the parties' rights depended on an interpretation of the bankruptcy court-approved sale order. Id. at 229. In addition, the Court observed that the lease in dispute had been part of the lessors' claim against the estate. Id. at 230. "As such, the dispute uniquely affected and was uniquely affected by the core bankruptcy

26

functions as to matters concerning the administration of the estate." Id. (quoting 28 U.S.C. § 157(b)(2)(A)).

Similarly, in Back v. LTV Corp. (In re Chateaugay Corp.), the Southern District of New York considered whether a bankruptcy court properly exercised jurisdiction over state personal injury lawsuits between non-debtor parties involving vehicles sold in a bankruptcy asset sale. 213 B.R. 633, 635 (S.D.N.Y. 1997). The SDNY held that a bankruptcy court had core jurisdiction to interpret and enforce its own sale order, which arguably intended to absolve the purchaser from bearing certain liabilities relating to the vehicles going forward.  Id. at 637.

The same considerations that made the contract disputes core in In re Petrie Retail, Inc. and In re Chateaugay Corp. make the APA claims alleged by the Tribul Plaintiffs core here. The question about the Tribul Plaintiffs' post-sale obligations under the $8MM Loan Agreement would require, just as in In re Petrie Retail, Inc. and In re Chateaugay, interpretation of the APA and confirming Court Order, and enforcement of that interpretation. "A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders." In re Petrie Retail, Inc., 304 F.3d 223, 230 (2d Cir. 2002). The Tribul Plaintiffs' claim that the New Cynergy Defendants owe them residuals out of the purchased merchant accounts and

reserves similarly fall under the Bankruptcy Court's jurisdiction.

Ironically, the Tribul Plaintiffs' argument that the sale Order insulates them from liability under the $8MM Loan Agreement undermines their insistence that the dispute should be heard in State court. By their own admission, interpretation of the sales Order is required. The Tribul Plaintiffs' argument that they are still entitled to cure costs on the October 16, 2006 ISO Agreement works this same effect – it highlights that the dispute can only be resolved by an interpretation of the sales Order and the Tribul Settlement, where the Tribul Plaintiffs' objections to the cure costs were ultimately resolved.

In sum, the Tribul Plaintiffs' invocation of the bankruptcy proceedings to justify their position only confirms the Bankruptcy Court's centrality in resolving this claim. This Court recommends that the District Court hold that the Tribul Plaintiffs' claims about their rights and obligations under contracts sold in the Bankruptcy Court-approved APA be heard by the Bankruptcy Court.

### c. There Is Core Federal Jurisdiction Over Claims Relating To The Attorney-Advisor Defendants' Allegedly Fraudulent Acts During The 2009 Bankruptcy

The Defendants argue that the allegedly fraudulent acts committed by the Attorney-Advisor Defendants "arose in" the 2009

bankruptcy. Docket No. 17. They reason that they are therefore core proceedings and that there is federal jurisdiction to hear them. Id.  We agree and recommend the District Court hold that the Bankruptcy Court has jurisdiction over them.

The Tribul Plaintiffs' relationship with the Attorney-Advisor Defendants arose in the Title 11 proceeding in which the Tribul Plaintiffs were creditors. The "bankruptcy court must be able to assure itself and. . . [those] who rely on the process that court-approved [professionals]. . . are performing their work[] conscientiously and cost-effectively." Baker v. Simpson, 613 F.3d 346, 351 (2d Cir. 2010)(citing In re Southmark Corp., 163 F.3d 925 (5th Cir. 1999)). The claims here "inevitably involve[] the nature of the services performed for" the bankruptcy estate and "cannot stand alone." Id.; see Sanders Confectionary Products, Inc. v. Heller Financial, Inc., 973 F.2d 474 (6th Cir. 1992)(holding claims against a bankruptcy trustee to be "core proceedings" because they could not exist independently of the bankruptcy). Therefore, the fraud allegations leveled against the Attorney-Advisor Defendants are core proceedings that must be determined by the Bankruptcy Court. Id.

The fact that the Attorney-Advisor Defendants did not represent the Tribul Plaintiffs in the 2009 Bankruptcy has no bearing on the core designation. The conclusion that the fraud

allegations are core turns on the federal system's interest in the integrity of the administration of the case, which is implicated regardless of the complaint's author. See Donaldson, 104 F.3d at 553.

### d. Mandatory Abstention Does Not Apply To Core Proceedings, And This Court Recommends That The District Court Decline To Grant Permissive Abstention As To Any Of The Core Proceedings

The Tribul Plaintiffs ask this Court to consider abstaining from exercising its jurisdiction, Docket No. 9, but the legal significance of the core designation is that the doctrine of mandatory abstention, detailed in 28 U.S.C. § 1334(c)(2), does not apply to core proceedings. Mandatory abstention can only apply when a proceeding based upon a State law cause of action is "related to" a case under Title 11, but does not arise under or arise in a case under Title 11. Baker v. Simpson, 613 F.3d 346 (2d Cir. 2010).

The Tribul Plaintiffs suggest that this Court should abstain from exercising jurisdiction under the "permissive abstention" statute, found at 28 U.S.C. § 1334(c)(1), which states that nothing prevents a district court "in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." Docket No. 9.

"[F]ederal courts should be sparing in the exercise of discretionary abstention." Metromedia Fiber Network, Inc. v. Various State & Local Taxing Auths. (In re Metromedia Fiber Network, Inc.), 299 B.R. 251, 280 (Bankr. S.D.N.Y. 2003). A court should take the following twelve factors into consideration in its permissive abstention analysis: (1) the effect or lack thereof on the efficient administration of the estate if a court recommends abstention, (2) the extent to which [non-bankruptcy] law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable [non-bankruptcy] law, (4) the presence of a related proceeding commenced in State court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing [non-bankruptcy] law claims from core bankruptcy matters to allow judgments to be entered in a [non-bankruptcy] court with enforcement left to the bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties. See In re Marguiles, 476 B.R. 393, 402 (Bankr. S.D.N.Y. 2012).

31

Factors one, two, three, four, six, seven, ten and twelve weigh so strongly in favor of exercising jurisdiction, this Court recommends that the District Court decline to abstain. The first factor argues that these factual allegations should once again be decided in the federal system where they were first considered. The substantive allegations have already been in a federal forum, and in the interest of judicial economy, it does not make sense to have a State forum now learn the lengthy allegations.[4] The second factor favors the Bankruptcy Court because issues relating to the bankruptcy are at the heart of these claims. The third factor also does as the Bankruptcy Court in Delaware is well able to address straightforward New York State law claims.

Factor four's application to this case reminds that there is no presence of a related proceeding in New York State court, but rather these issues were determined by the Bankruptcy Court in Delaware. Factor six, which gauges the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, reinforces this point. The factual allegations in the instant complaint that were the subject of Proofs of Claim in the main

---

[4] In addition, the Court notes the Jaffe Defendants' objection to personal jurisdiction in New York. Docket No. 6. If this Court were to abstain and send the causes of action over the Attorney-Advisor Defendants back to New York Supreme Court, Kings County, this objection would persist. Exercising jurisdiction, and transferring the case to Delaware Bankruptcy Court where personal jurisdiction over the Jaffe Defendants likely exists, contributes to the efficient administration of the bankruptcy estate. As noted, the claims against the Jaffe Defendants as the Attorney-Advisor Defendants are core proceedings.

bankruptcy action are not just related, they are frequently identical.  A side-by-side comparison of the 2009 New York State court litigation incorporated by reference into the Tribul Plaintiffs' Proofs of Claim with the present complaint shows that a large part of the text was copied and pasted. Furthermore, the relatedness of this proceeding to the Bankruptcy Court litigation becomes important when considering that the Tribul Plaintiffs' sealed settlement agreement with the debtor is in the Clerk's Office for the Bankruptcy Court, such that that forum is all the more well positioned to understand the prior release or lack thereof of these claims.

The seventh factor argues in favor of federal jurisdictional exercise over abstention. It is not simply that the causes of action growing out of these repeated factual allegations are technically a core proceeding, their consistent resolution goes directly to the goal of the uniform administration of the bankruptcy system. The tenth factor is implicated in that Plaintiffs are seeking a second bite at the apple after the Bankruptcy Court resolved many of these issues. Rather than having appealed the Bankruptcy Court decisions, the Tribul Plaintiffs now seek State court relief. This forum shopping must be discouraged. As to the twelfth factor, on these claims, all of the Parties participated in the bankruptcy process in some way – as debtors, claimants, attorney-advisors,

or purchasers. They should be familiar with the Delaware

Bankruptcy Court.

Because the overwhelming number of factors, combined with

their logical heft, do not favor abstention, we do not recommend

permissive abstention. Stated simply, to disallow a federal

forum from hearing these recycled claims would undermine the

proceedings that have already taken place before the Bankruptcy

Court by promoting creditor gamesmanship, allowing forum

selection, and opening the door to the non-uniform disposition

of bankruptcy claims.

### e. This Court Recommends That These Causes Of Action Be Transferred To The District of Delaware

Now that we have determined to recommend that the causes of

action growing from the aforementioned allegation categories are

core, we must consider the Defendants' motion to transfer venue

to the United States District Court for the District of

Delaware, for assignment to the United States Bankruptcy Court

there. Docket Nos. 32, 33, 34, 35 and 38. Our analysis of this

question is guided by 28 U.S.C. § 1412, which states that "[a]

district court may transfer a case or proceeding under title 11

to a district court for another district, in the interest of

justice or for the convenience of the parties," and 28 U.S.C. §

157(b)(1), which states that "[b]ankruptcy judges may hear and

determine all cases under title 11 and all core proceedings,

arising under title 11, or arising in or related to a case under title 11. . .").

     "Interest of justice," as a basis for transferring venue of a bankruptcy proceeding, is a broad and flexible standard, which must be applied upon case-by-case basis after considering whether transfer would promote efficient administration of bankruptcy estate, judicial economy, timeliness and fairness. See In re Iridium Operating LLC, 285 B.R. 822, 836 (S.D.N.Y. 2002). The Defendants, because they are the parties moving for transfer of venue, must make a clear-and-convincing showing that transfer is warranted. See Lothian Cassidy LLC v. Ransom, 428 B.R. 555, 561 (E.D.N.Y. 2010).

     A clear-and-convincing showing has been made here for many of the same reasons that we have found that federal jurisdiction exists over these causes of action.  Namely, transfer promotes efficient administration of the bankruptcy by allowing the Bankruptcy Court to rule on issues that it has in many ways previously considered and that potentially affect the integrity of its process. See, e.g., CCM Pathfinder Pompano Bay, LLC v. Compass Financial Partners, LLC, 396 B.R. 602, 608 (S.D.N.Y. 2008)("[T]he existence of a related action pending in the transferee court weights heavily towards transfer."). Transfer furthers judicial economy and a timely adjudication of these proceedings because the Bankruptcy Court in Delaware is already

familiar with the causes of action and has ready access to the sealed settlement agreement which will allow it to determine quickly whether the Tribul Plaintiffs are enjoined from pursuing the claims in their latest incarnation by that agreement. See, e.g., Bankruptcy Court Docket Nos. 1461, 1513-14 (a 114-page Bankruptcy Court hearing transcript dedicated to the Tribul Plaintiffs' Proofs of Claims, and then the sealed Tribul Settlement and related Order). Finally, transfer is fair to the Tribul Plaintiffs because although they filed in New York State court, they have previously been in the Bankruptcy Court in Delaware for years on these disputes; they will not be strangers in a unknown forum.

Clear and convincing facts exist that these proceedings ought to be resolved in Bankruptcy Court in Delaware, which will surely afford the Parties efficient and fair treatment.

**2. There Is No Federal Jurisdiction Over Causes Of Action Related To The Alleged Breach Of The Cynergy EP Agreement And The Dalmao Settlement, And We Recommend Remanding These Causes Of Action To The New York State Supreme Court, Kings County**

**a. There Is No Federal Jurisdiction Over Causes of Action Relating To The Alleged Breach Of The Cynergy EP Agreement And The Dalmao Settlement**

The balance of the Tribul Plaintiffs' action arises out of facts relating to the Dalmao Settlement and the Cynergy EP Agreement. More detailed descriptions of these transactions are

found in Sections I.2.c and I.2.d, supra, but what follows is a
brief recap drawn from the complaint. We then transition into
the applicable legal analysis.

    The Dalmao Settlement dispute began in January 2010 with a
deal between Plaintiff Dalmao, Inc. and SCJV whereby those two
parties enjoyed a 50-50 membership interest in an ISO called
MCP.  In March 2010, the Tribul Plaintiffs, the New Cynergy
Defendants and the Unified Defendants entered into an
information-sharing agreement in furtherance of a possible joint
venture of their own. That joint venture never came to pass, and
the Tribul Plaintiffs sued the New Cynergy Defendants and the
Unified Defendants in New York Supreme Court for Kings County,
alleging that they exploited information they gathered during
the negotiation process to boost their own businesses at the
Tribul Plaintiffs' expense. Dalmao Ventures LLC et al. v. Oleg
Firer, Leon Goldstein, et al., Index No. 651501/2010. The Tribul
Plaintiffs settled that case, but they now complain that they
entered the settlement under duress and wish to have the
settlement revoked because, inter alia, the New Cynergy
Defendants had a superior bargaining position and offered a
contract that enabled the Tribul Plaintiffs to remain a viable
business.

    The Cynergy EP Agreement is that contract that allegedly
convinced the Tribul Plaintiffs to enter the Dalmao Settlement

against their will. The Tribul Plaintiffs and the New Cynergy
Defendants signed the Cynergy EP Agrement in late 2010/early
2011. Like the October 16, 2006 ISO Agreement, the Cynergy EP
Agreement sets out terms governing the Tribul Plaintiffs and the
New Cynergy Defendants' business relationship as ISO and Super
ISO, respectively. The Tribul Plaintiffs now allege that the New
Cynergy Defendants have breached the Cynergy EP Agreement with
persistent attempts to poach the Tribul Plaintiffs' merchants
and down lines. The Tribul Plaintiffs also allege that the
Cynergy EP Agreement bears terms so unconscionable it should be
reformed.

Whereas the causes of action analyzed in Section II.1,
supra, are core claims, the causes of action arising from the
Dalmao Settlement and the Cynergy EP Agreement are not. The
Tribul Plaintiffs never filed Proofs of Claim relative to the
Dalmao Settlement or the Cynergy EP Agreement dispute, nor would
judicial review of the factual allegations growing out of these
two sets of facts require the interpretation of an order
previously entered by the Bankruptcy Court.  A review of 28
U.S.C. § 157(b)(2)'s nonexhaustive list of core proceedings[5]

---

[5] 28 U.S.C. § 157(b)(2) states that "[c]ore proceedings include, but are not
limited to- -
   (A)     Matters concerning the administration of the estate;
   (B)     Allowance or disallowance of claims against the estate or
     exemptions from property of the estate, and estimation of claims or
     interests for the purposes of confirming a plan under chapter 11, 12,
     or 13 of title 11 but not the liquidation or estimation of contingent

reveals no qualifying category for the Dalmao Settlement or the Cynergy EP Agreement facts, and the Defendants present no other persuasive arguments for the Court to weigh in favor of determining these claims as core.  Centrally, the Dalmao Settlement and the Cynergy EP Agreement disputes do not implicate the same agreements as did the pre-confirmation claims and therefore have never even been tangentially reviewed by the Bankruptcy Court.

The Dalmao Settlement and Cynergy EP Agreement claims do not "arise under" Title 11 or "arise in" a case under Title 11, and are therefore not core proceedings. Thus, the remaining inquiry is whether the causes of action relating to the Dalmao Settlement and the Cynergy EP Agreement are "related to" the 2009 Bankruptcy. If the Dalmao and Cynergy EP Agreement causes

---

or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;
(C)     Counterclaims by the estate against persons filing claims against the estate;
(D)     Orders in respect to obtaining credit;
(E)     Orders to turn over property of the estate;
(F)     Proceedings to determine, avoid or recover preferences;
(G)     Motions to terminate, annul or modify the automatic stay;
(H)     Proceedings to determine, avoid or recover fraudulent conveyances;
(I)     Determinations of the validity, extent or priority of liens;
(J)     Confirmations of plans;
(K)     Orders approving the use or lease of property, including the use of cash collateral;
(L)     Orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;
(M)     Other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-credit or the equity security holder relationship, except personal injury tort or wrongful death claims; and
(N)     Recognition of foreign proceedings and other matters under chapter 15 of title 11.

of action are "related to" the 2009 Bankruptcy, federal jurisdiction exists pursuant to 28 U.S.C. § 1334(b). If they are not, then there is no basis upon which to exercise federal jurisdiction.

"Related to" jurisdiction is broad prior to confirmation of a liquidation plan, Celotex Corp. v. Edwards, 514 U.S. 300, 308 (1995), and includes any proceedings that "might have any 'conceivable effect' on the bankruptcy estate." In re Parmalat Capital Finance, Limited, 639 F.3d 572, 579 (2d Cir. 2011); In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992)(discussing the seminal case of Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)). After a liquidation plan is confirmed, the breadth of "related to" jurisdiction narrows. In re General Growth Properties, Inc., 460 B.R. 592, 600 (Bankr. S.D.N.Y. 2011).

"Related to" jurisdiction is unlikely when any recovery would inure exclusively to the plaintiffs and not alter other creditors' positions. See In re General Media, Inc., 335 B.R. 66, 75 (Bankr. S.D.N.Y. 2005). Additionally, "related to" jurisdiction is unlikely when a hypothetical payout would not likely affect the coffers of the bankrupt estate. See Allstate Ins. Co. v. CitiMortgage, 2012 WL 967582, at *5 (S.D.N.Y. Mar. 13, 2012)(refusing "related to" jurisdiction over a litigation between non-debtors when the removing defendants could not

articulate on what theory they could conceivably be reimbursed
by, and therefore effect, a debtor's bankruptcy estate). Here,
the Dalmao causes of action center around facts that allegedly
occurred in 2010, which is to say before the Liquidation Plan
for the 2009 Bankruptcy was confirmed. Even still, the
Defendants have failed to explain how any monetary award from
the litigation underlying the Dalmao Settlement could
conceivably accrue to the benefit of Old Cynergy's bankruptcy
estate.  If the Tribal Plaintiffs were successful in recovering
damages from the Dalmao Settlement dispute, the facts are such
that it seems "any recovery would inure to the benefit of" the
Tribul Plaintiffs.[6]

When a dispute arises in a post-confirmation context, the
"essential inquiry" to determine "related-to" bankruptcy
jurisdiction is stricter than that for pre-confirmation
assessment. It asks "whether there is a close nexus to the
bankruptcy plan or proceeding sufficient to uphold bankruptcy
court jurisdiction over the matter." In re Resorts Intern.,
Inc., 372 F.3d 154, 166-67 (3d Cir. 2004); see In re Kirkland,
600 F.3d 310, 317 (4th Cir. 2010); In re Pegasus Gold Corp., 394
F.3d 1189, 194 (9th Cir. 2005). "The 'close nexus' inquiry
insures that at the post-confirmation stage, the matter before

---

[6] Finally, and only as anecdotal evidence that the Defendants themselves do not
believe they have much argument for removal on the Dalmao causes of action,
the Court notes that the Defendants did not remove them when they were filed
in isolation in 2010.

the court 'affects an integral aspect of the bankruptcy process.'" In re Metro-Goldwyn-Mayer Studios, Inc., 459 B.R. 550, 556 (Bankr. S.D.N.Y. 2011)(quoting Resorts Intern., 372 F.3d at 167)). As the dispute involving the Cynergy EP Agreement allegedly did not even come into existence until late 2010/early 2011, it is subject to the "close nexus" test.

"Courts have found the requisite nexus where adjudication of the post-confirmation dispute will affect the interests of creditors or requires interpretation of the reorganization plan. However, where the case has been fully administered and the interests of the creditors will be unaffected by the resolution of the dispute, bankruptcy courts have declined to exercise post-confirmation subject matter jurisdiction." In re Kassover, 448 B.R. 625, 632-33 (Bankr. S.D.N.Y. 2011)(collecting cases). Here, the dispute involving the Cynergy EP Agreement falls squarely within the latter category, which is to say, it has no nexus with the 2009 Bankruptcy.

In Matter of Pan Am. School of Travel, Inc, a bankruptcy court found that it did not have "related to" jurisdiction over a federal trademark infringement suit brought against the post-confirmation debtor that had "rejoined the real world of post-reorganization life." 47 B.R. 242, 244 (Bankr. S.D.N.Y. 1985). The bankruptcy court observed that "what is at issue in [the trademark] lawsuit is not an attempt to collect a pre-petition

42

debt… A debtor is not to be insulated from its post-confirmation liabilities merely because it was successful in reorganizing its affairs and composing its debts." Id. (citations omitted).

We encounter a similar situation here. The New Cynergy Defendants are like the post-confirmation debtor in Matter of Pan Am. School of Travel. Post-confirmation, and with Old Cynergy's assets, the New Cynergy Defendants are trying to make a successful go of it in the credit card processing service industry. Post-confirmation, they entered the Cynergy EP Agreement with the Tribul Plaintiffs. As the New Cynergy Defendants strike out on their own, with the passage of time and circumstance, they have become more and more removed from the transitional moment when they purchased Old Cynergy's assets. Accordingly, the New Cynergy Defendants' new endeavors do not have a nexus to the 2009 Bankruptcy proceeding. See, e.g., In re Kassover, 448 B.R. 625, 633-34 (Bankr. S.D.N.Y. 2011)(holding when the liquidating trustee was moonlighting as a disbursing agent that had little to do with the bankruptcy, disputes relating to that other work were not "related to" the bankruptcy proceeding). There being no nexus between the Cynergy EP Agreement and the 2009 Bankruptcy, the Court has no "related to" jurisdiction over the Cynergy EP Agreement causes of action under 28 U.S.C. § 1334(b).

### b. This Court Recommends That These Causes Of Action Be Remanded To New York State Supreme Court, Kings County

In accordance with the above analysis, this Court respectfully recommends that the District Court find that it has no subject matter jurisdiction over the Tribul Plaintiffs' causes of action relating to the Dalmao Settlement and the Cynergy EP Agreement. This Court further recommends that the District Court grant the Tribul Plaintiffs' motion to remand to the Supreme Court of the State of New York, Kings County, as it applies to Dalmao Settlement and the Cynergy EP Agreement causes of action only.

### 3. This Court Recommends The District Court Hold That It Cannot Grant Any Injunctive Relief For The Remanded Claims Over Which Federal Jurisdiction Does Not Exist, Deny TRO Relief For The Transferred Claims Over Which Federal Jurisdiction Exists, And Allow The Bankruptcy Court To Rule On The Preliminary Injunction Petitions On The Transferred Claims

The Tribul Plaintiffs also seek a temporary restraining order ("TRO") and a preliminary injunction against a subset of the Defendants in this action. Docket No. 9. The members of this subset are the New Cynergy Defendants and two of the Officer Defendants (Kim Fitzsimmons, New Cynergy Chief Executive Officer, and Sheila Corvino, New Cynergy Chief Legal Officer) (hereinafter collectively referred to as the "Injunction Defendants"). Id.

The Tribul Plaintiffs claim that they seek this injunctive relief in order to preserve the status quo during the pendency of this litigation. Id. In other words, the Tribul Plaintiffs argue that if the Court does not preserve the status quo, the Injunction Defendants' actions will irreparably harm them such that even if the Tribul Plaintiffs were to prevail in this lawsuit, no amount of money could remedy their injury.

As to the TRO request, we recommend that the District Court address the request for the TRO as that is Plaintiffs' time-sensitive request for immediate relief. The principal difference between a TRO and a preliminary injunction is that the former may be issued "before the adverse party can be heard in opposition." Fed.R.Civ.P. 65(b)(1)(A). A TRO expires by its terms, which must conform to limits set forth in the Federal Rules of Civil Procedure, and is meant to be a stop-gap measure before the parties have an opportunity to make their respective presentations at a preliminary injunction proceeding.

As to the preliminary injunction request, this Court recommends that the District Court defer a ruling on that request until the claims are transferred to the District of Delaware and the New York State Supreme Court, Kings County. Before an injunction may be issued, a preliminary injunction hearing must be held should the Injunction Defendants request one.  The Injunction Defendants have, in fact, requested an

evidentiary hearing as to the preliminary injunction, as is their right. 11/2/2012 Letter from New Cynergy Defendants to this Court (not yet filed on ECF due to inclement weather, but copies of the letter have been served upon the Tribul Plaintiffs). Given the jurisdictional decisions recommended above, any preliminary injunction hearing would occur after this action is transferred to the transferee courts. It is thus appropriate for the preliminary injunction petition to remain pending so that it can be considered by the transferee/remand courts.

Were the District Court to consider issuing the preliminary injunction, this Court recommends that the preliminary injunction request based on the present record be denied for the same reasons explained below as to why the TRO should not issue. It is not necessary to hold a hearing before denying the preliminary injunction, as Plaintiffs have claimed that the record is sufficient to support the issuance of a preliminary injunction. 11/5/2012 Letter from the Tribul Plaintiffs to this Court (not yet filed on ECF due to inclement weather, but copies of the letter have been served on all Defense counsel of record). Thus, the Tribul Plaintiffs' due process rights are not adversely affected by the denial of preliminary injunction without a hearing.

### a. Summation Of The Tribul Plaintiffs' Request For Preliminary Injunctive Relief

Turning to the TRO, the Tribul Plaintiffs seek both mandatory and negative TROs against the Injunction Defendants. A mandatory injunction is "[a]n injunction that orders an affirmative act or mandates a specific course of conduct." Black's Law Dictionary, 7349 (2d Pocket Ed. 2001). A negative injunction, by contrast, works to restrain the performance of an act.

The Tribul Plaintiffs offer a verbose request for negative injunctive relief. Yet, at its heart, the Tribul Plaintiffs' point is simple: They want the Injunction Defendants to refrain from speaking to various categories of persons affiliated with Tribul Plaintiffs' business interests for fear that the Injunction Defendants will defame the Tribul Plaintiffs and hurt their business; attempt to poach the Tribul Plaintiffs' business; or sabotage any sale or loan negotiations involving the Tribul Plaintiffs.  Docket No. 9.  The Tribul Plaintiffs thus seek a negative injunction barring the Injunction Defendants from contacting (1) any of the Tribul Plaintiffs' merchants or down lines; (2) any prospective purchasers of the Tribul Plaintiffs or their assets; or (3) any prospective lenders of money to the Tribul Plaintiffs. Id.

47

The Tribul Plaintiffs also seek mandatory injunctive relief to compel the Injunction Defendants to:  (1) retract prior defamatory statements they have made against the Tribul Plaintiffs, including some statements made several years ago; (2) return approximately $800,000 in improperly retained residuals; (3) rehabilitate the Tribul Plaintiffs' VIMAS account so it reflects every last one of their "missing merchants"; (4) recommence residual payments to the Tribul Plaintiffs for the aforementioned "missing merchants" and establish a repayment schedule for related back residuals; (5) establish segregated bank reserves where the Tribul Plaintiffs' residuals will be kept pending setoff determinations and final distribution to the Tribul Plaintiffs; and (6) waive enforcement of any unconscionable terms in the Cynergy EP Agreement so that the Tribul Plaintiffs can have an easier time attempting to sell their merchant portfolio/obtain financing using their merchant portfolio as a security interest. Id.

As explained above, the Court lacks jurisdiction over some of the Tribul Plaintiffs' claims, while it has bankruptcy jurisdiction over others.  We address the injunctive relief request in light of these two categories of claims.

### b. This Court Lacks Jurisdiction Over The Remanded Claims And Cannot Grant Related Injunctive Relief

The Tribul Plaintiffs argue that the Court should issue interim relief even if subject matter jurisdiction is lacking. They reason that the Second Circuit has held that "a United States District Court has the authority to determine its own jurisdiction in a matter before it, and to maintain the status quo, as by issuance of a temporary restraining order, pending the determination of that issue." Docket No. 37 (citing United States v. Thompson, 319 F.2d 665, 667 (2d Cir. 1963). Assuming, arguendo, that that is true, the jurisdictional ruling is no longer pending. It is made. This Court has recommended that the District Court hold that this federal court has no jurisdiction over the causes of action growing out of the Cynergy EP Agreement (including the Cypers TRO) and the Dalmao Settlement. To the extent the Court lacks jurisdiction over the claims, it lacks jurisdiction to issue an injunction based on the claims. Thus, applying that determination to the injunctive relief request, there is no federal jurisdiction over all of the claims seeking negative injunctive relief, and the sixth claim seeking mandatory injunctive relief, which is the waiver of certain unspecified terms of the Cynergy EP Agreement. These claims should be remanded to State court because there is no basis for federal jurisdiction over them, even under the Bankruptcy Code. All requested injunctive relief pertaining to these factual allegations should be brought before the New York State court.

As to these remanded causes of action, the Court observes that the Tribul Plaintiffs have repeatedly commented that the New York Supreme Court, Kings County, was on the brink of deciding the Tribul Plaintiffs' requests for injunctive relief when this action was removed. Based on the Tribul Plaintiffs' representations about the State court's readiness to address its claims, an expeditious remand to the State court will enable it to handle these requests for injunctive relief in a timely way.

Moreover, although there is some time sensitivity to the Tribul Plaintiffs' claims, the harm that the Tribul Plaintiffs' allege will occur and destroy their business if they do not obtain injunctive relief is not so imminent that there is insufficient time for the State court to address their claims, at least according to the Tribul Plaintiffs' papers.  In the Affidavit of Shmuel Chanin, the primary sworn statement in support of the Tribul Plaintiffs' request for injunctive relief, he stated that the New Cynergy Defendants have promised to forbear from assessing a minimums shortfall reduction against the Tribul Plaintiffs' residuals until January 2013.  Docket 1-3 at p. 114. In their State court memorandum of law in support of a preliminary injunction, the Tribul Plaintiffs argued that the relief was needed during the pendency of the action because otherwise, they might face the loss of their business "within a matter of months, if not weeks." Id. at p. 133.  Thus, the

approximately one-month detour for these claims in federal district court in New York will not result in the destruction of the Tribul Plaintiffs' business.

In sum, we recommend denying the TRO as to the entire request for negative injunctive relief and the sixth request for mandatory injunctive relief.

> c. **This Court Recommends That TRO Relief Be Denied For The Transferred Claims, And The District Court Allow The Bankruptcy Court To Weigh The Preliminary Injunction Application**

Moving on to those causes of action where federal jurisdiction does exist, as a preliminary matter, the Parties dispute whether the Tribul Plaintifs' application for a TRO is properly analyzed under federal or state law. Docket Nos. 9, 19. The Tribul Plaintiffs urge this Court to apply New York State law. Docket No. 9. This argument is rejected. It is well established that "once a case has been removed to federal court . . . federal rather than state law governs the future course of proceedings." Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 437 (1974). Accordingly, the question of whether a preliminary injunction should issue is guided by a federal framework. See Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 15 (2d Cir. 1987).

Under the federal framework, a TRO is "an extraordinary remedy never awarded as of right." Weinberger v. Romero-Barcelo,

456 U.S. 305, 312 (1982). In the Second Circuit, a movant for a
TRO must show "(a) irreparable harm and (b) either (1)
likelihood of success on the merits or (2) sufficiently serious
questions going to the merits to make them a fair ground for
litigation and a balance of hardships tipping decidedly toward
the party requesting the preliminary relief." Blum v. Schlegel,
18 F.3d 1005, 1010 (2d Cir. 1994) (citing Jackson Dairy, Inc. v.
H.P.Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1970)). On the
question of irreparable harm, "it has always been true that
irreparable injury means injury for which a monetary aware
cannot be adequate compensation and that where money damages is
adequate compensation a preliminary injunction will not issue."
Jackson Dairy, Inc., 596 F.2d at 72 (citing Studebaker Corp. v.
Gittlin, 360 F.2d 692, 698 (2d Cir. 1966)). Nonetheless, federal
case law does recognize that in certain circumstances "[a]
threat to trade or business may constitute irreparable harm."
United Retail Inc. v. Main Street Mall Corp., 903 F. Supp. 12,
14 (S.D.N.Y. 1995) (citing a string of Second Circuit cases in
support of this proposition).

The Defendants argue that the Tribul Plaintiffs' TRO
petition improperly seeks the ultimate relief demanded in their
complaint. Docket No. 19. While there is no categorical bar to a
plaintiff seeking a mandatory TRO, the Tribul Plaintiffs
certainly do face a higher burden before they can obtain such

relief because a mandatory TRO "alters the status quo by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo." Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010)). The Tribul Plaintiffs therefore must show a more compelling justification for mandatory TRO relief than for the negative injunctive relief they also seek. (As noted above, we recommend that all of the requests for negative injunctive relief be remanded to State court for lack of subject matter jurisdiction.)

As to the first element of the TRO test, the Tribul Plaintiffs state that they are in danger of suffering irreparable harm because denial of the contested dollar amounts in their federal claims, if withheld for much longer, will put them out of business. Docket No. 9. The Defendants counter that even if there are some circumstances where going out of business could constitute irreparable harm, such circumstances do not exist here. Docket No. 19.  The Defendants argue that the Tribul Plaintiffs cannot just make a conclusory statement that they will go out of business, without proper factual support, even in the context of a TRO petition, to convert a run-of-the-mill damages action into an emergency. Id. (citing cases). The Defendants argue that the Tribul Plaintiffs are merely

manipulating emergency relief mechanisms to received expedited review of their complaint. Id.

This Court cannot say with any certainty that the Tribul Plaintiffs are manipulating the emergency relief mechanism to expedite ordinary proceeding. We do observe that the recycled allegations providing the foundation for the claims to be transferred to Bankruptcy Court largely occurred in 2008 and 2009. It cannot be that a request for their resolution, three or four years after they accrued, can be a true emergency. See Fox v. Anthony, 2010 WL 3338549, at *2 (N.D.N.Y. July 15, 2010)(observing that the plaintiff waited several months to file her action in ruling that there was no justification for a TRO or preliminary injunction); Simon v. Foley, 2007 WL 4191836, at *6 (W.D.N.Y. Nov. 21, 2007)(holding that the plaintiffs had not made adequate showing of threat of irreparable harm, particularly where plaintiffs waited 17 months to file the lawsuit). Even in the State court action, the Tribul Plaintiffs waited a month after filing the action to request a TRO. Docket No. 1-3, at pp. 93-97.

Based on the record presented by the Tribul Plaintiffs, which they have stated does not need to be supplemented with a hearing, Docket No. 38, this Court recommends that the District Court find that the Tribul Plaintiffs have not adequately shown that they will suffer irreparable harm based on the claims that

will be transferred to Bankruptcy Court. Resolution of the
alleged defamation by a retraction of such statements would not
resolve the Tribul Plaintiffs' claimed cash flow problems or
inability to sell their business. The return of $800,000 or the
payment of the alleged "missing merchant" residuals would
probably help their alleged immediate cash flow problem, but it
would not solve the alleged underlying problems that the New
Cynergy Defendants are interfering with their business
operations such that it will no longer be a viable business, and
that the terms of their agreement are too onerous to permit the
sale of the business.  The relief requested relating to the
VIMAS account or the creation of segregated accounting reserves
is simply a form of administrative relief that might make the
Tribul Plaintiffs' life easier but the failure to obtain this
relief would have no immediate effect on the successful
operation of their business or its sale.  The injunctive relief
that goes to the heart of the Tribul Plaintiffs' irreparable
harm allegations are those that relate to the State court-
directed claims, not these claims.

We also recommend that the District Court hold that the
record as it stands on the claims for the Bankruptcy Court does
not demonstrate a likelihood of success on the merits or
sufficiently serious questions going to the merits and a balance

of hardships tipping decidedly toward the Tribul Plaintiffs to merit the issuance of a TRO.

Cases have held that the preclusive effect of a prior court ruling on a current cause of action undermines a finding of substantial likelihood/sufficiently serious questions in an injunctive relief petition. See, e.g., Van Pier v. Long Island Sav. Bank, FSB, 159 F.3d 1349 (2d Cir. 1998)(holding that the district court had properly denied a motion for an injunction because the res judicata effect of an earlier state court ruling undermined a showing of a likelihood of success on the merits, or the existence of sufficiently serious questions on the merits); Hickerson v. City of New York, 146 F.3d 99, 113 (2d Cir. 1998)(holding that the plaintiffs, who had already litigated their claims in an earlier action, "can show neither 'a likelihood of success on the merits' nor 'sufficiently serious questions' . . . and the district court's denial of plaintiffs' motion for a preliminary injunction was entirely proper").

Here, as described in detail above, the procedural history of the Tribul Plaintiffs' causes of action comes to center stage. We have noted earlier that the causes of action we recommend be transferred to the Bankruptcy Court seem to have been "copied and pasted" from the 2009 State court action pleading that was incorporated by reference into the 2009

56

Bankruptcy as a Proof of Claim.  This is why there is federal
jurisdiction over these causes of action: they have already been
presented to, and have been resolved in various ways by, the
Bankruptcy Court in the District of Delaware. <u>See</u> <u>State of N.Y.</u>
<u>v. Mayer</u>, 1990 WL 164686, at *1 (N.D.N.Y. Oct. 19, 1990)
(stating that another district court's and appellate court's
refusals to stay the execution of a Bankruptcy Court settlement
agreement was a ground to deny a preliminary injunction
petition).

Given the significant questions of preclusion that have
been raised by the Defendants' presentation on the motion to
transfer venue, we recommend that the District Court hold that
the record does not demonstrate a likelihood of success on the
merits or sufficiently serious questions going to the merits and
a balance of hardships tipping in Plaintiffs' favor sufficient
to justify a TRO. We further recommend that the District Court
refrain from ruling on the preliminary injunction application at
this time.

**III. CONCLUSION**

In conclusion, for the foregoing reasons, this Court
recommends to the District Court that the Tribul Plaintiffs'
motion to remand this case be granted in part, and denied in
part. This Court further recommends that the Defendants' motion
to transfer the case to the United States District Court be

granted in part, and denied in part. The effect of the partial grant and partial denial of each Parties' respective motions is (1) that the Tribul Plaintiffs' causes of actions founded on allegations relating to the 2009 Bankruptcy would be transferred to the District of Delaware for assignment to the Bankruptcy Court there, see Section (II)(2), supra, and (2) that the Tribul Plaintiffs' causes of action relating to the Cynergy EP Agreement (including the Cypers TRO) and the Dalmao Settlement would be remanded to New York Supreme Court, for Kings County. See Section (II)(1), supra.

This Court further recommends that the District Court deny the Tribul Plaintiffs' TRO request in toto for lack of subject matter jurisdiction as to some claims and as to others for failure to establish both irreparable harm and likelihood of success on the merits/sufficiently serious questions on the merits and a balance of hardships tipping in the Tribul Plaintiffs' favor. See Section (II)(3), supra. This Court recommends that the District Court defer ruling on the Tribul Plaintiffs' preliminary injunction so that the Bankruptcy Court and the New York Supreme Court, Kings County, can convene the necessary hearings on those motions.

A copy of this report and recommendation will be filed electronically and notice sent electronically to the parties on this date. Objections to the report and recommendation must be

filed with the Clerk of Court, with a courtesy copy to the Honorable Judge Frederic Block.

As a general matter, the Parties have fourteen days to file objections to this report and recommendation. 28 U.S.C. § 636 (b)(1). However, in view of the fact that the Tribul Plaintiffs claim that if they do not obtain relief by the end of the month, they will suffer some irreparable harm, there is some time sensitivity to review of this report and recommendation. Accordingly, any objections to this report and recommendation must be electronically filed with the Clerk of the Court by **November 16, 2012** with a courtesy copy to the Honorable Frederic Block. See Hispanic Counseling Ctr., Inc. v. Incorporated Village of Hempstead, 237 F. Supp. 2d 284, 289-90 (E.D.N.Y. 2002) (time period for filing objections to report and recommendation "may be shortened where exigencies exist"); Hidalgo v. New York, 2011 U.S. Dist. LEXIS 134014, at *12 (E.D.N.Y. Nov. 17, 2011); Grayson v. Cathcart, No. 08-MC-33 (RRM)(JO), 2009 U.S. Dist. LEXIS 112457, 2009 WL 4723271, at *4 (E.D.N.Y. Dec. 3, 2009) (same).

Failure to file objections within this period waives the right to appeal the District Court's Order. See 28 U.S.C. § 636 (b) (1); Fed.R.Civ.P. 72; Beverly v. Walker, 118 F.3d 900, 902

(2d Cir. 1997); <u>Savoie v. Merchants Bank</u>, 84 F.3d 52, 60 (2d

Cir. 1996).[7]


Dated: November 9, 2012
  Brooklyn, New York


         _____/s/_____
         VERA M. SCANLON, U.S.M.J.

---

[7] This report and recommendation was prepared with the assistance of law clerk Ryan Lozar during the aftermath of Hurricane Sandy in New York.